No. 08-99001

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

DAVID SCOTT DETRICH,
Petitioner-Appellant

v.

RYAN THORNELL, et al.,
Respondents-Appellees.

---

On Appeal from the United States District Court
District of Arizona, No. CV-03-00229-TUC-DCB

**PETITIONER/APPELLANT'S
REPLACEMENT OPENING BRIEF**

---

Amy Armstrong, AZ Bar No. 022795
Emily Skinner, AZ Bar No. 025761
Sam Kooistra, AZ Bar No. 032776
Arizona Capital Representation Project
amy@azcapitalproject.org
emily@azcapitalproject.org
sam@azcapitalproject.org
1201 E. Jefferson St., Suite 5
Phoenix, AZ 85034
(602) 388-4023

HABEAS COUNSEL FOR PETITIONER/APPELLANT
DAVID SCOTT DETRICH

# TABLE OF CONTENTS

I.     STATEMENT OF JURISDICTION.................................................1

II.    BAIL/DETENTION STATUS..................................................1

III.   STATEMENT OF ISSUES....................................................2

IV.   STATEMENT OF THE CASE.................................................2

V.    STATEMENT OF FACTS......................................................3

    A. Dave Detrich's Background ...........................................3

       1.  Dave's Childhood ...............................................3

       2.  Dave's Young Adulthood........................................9

       3.  Dave's Mental Health..........................................10

       4.  Dave's Move to Arizona .......................................12

    B. The Crime ..........................................................13

    C. Initial Trial and Sentencing ........................................14

    D. The First Appeal....................................................16

    E. The Retrial .........................................................17

    F. The Resentencing ..................................................17

    G. The Appeal .........................................................19

    H. Initial State Post-Conviction........................................19

    I.  Federal Habeas & Successive Post-Conviction Proceedings..............20

    J.  Martinez Remand ...................................................21

VI.   SUMMARY OF ARGUMENT................................................22

VII.  ARGUMENT.............................................................24

    CERTIFIED ISSUES.......................................................24

    A. Counsel's Failure to Investigate & Cross-Examine Critical Lay &
       Expert Witnesses Violated Dave's Right to Effective Assistance of
       Trial Counsel.......................................................24

       1.  Standard of Review............................................24

       2.  Circumstances Requiring Relief.................................24

          i.   Failure to Present a Coherent Defense (Amended Petition
             Claim A(1))..............................................26

ii.  Failure to Call Shell (Amended Petition Claim A(3)) ..........................31

iii.  Failure to Investigate Other Witnesses (Amended Petition Claim A(4))................................................................................34

iv.  Failure to Obtain Necessary Expert Assistance (Amended Petition Claim A(5))................................................................43

3.  District Court Analysis..................................................................48

4.  AEDPA Does Not Bar Relief ........................................................57

i.  The State Court Decision Was Based on an Unreasonable Application of *Strickland*..............................................................59

ii.  The State Court Decision was Based on an Unreasonable Determination of the Facts ........................................................63

5.  Evidentiary Development................................................................64

6.  Conclusion ....................................................................................67

**B. Counsel's Failures to Investigate & Challenge the State's Aggravating Evidence & Investigate & Present Mitigating Evidence Violated Dave's Right to Effective Assistance of Sentencing Counsel**...............68

1.  Standard of Review.......................................................................68

2.  Circumstances Requiring Relief....................................................68

i.  Counsel Failed to Develop & Present Mitigating Evidence...............68

ii.  Counsel Failed to Investigate or Challenge the State's Aggravation ................................................................................81

3.  District Court Analysis..................................................................91

4.  AEDPA Does Not Bar Relief ......................................................101

i.  The Deficiency Prong Should be Reviewed *de Novo* ........................101

ii.  The State Court Decision was an Unreasonable Application of *Strickland* ..............................................................................101

iii.  The State Court Decision was Based on an Unreasonable Determination of the Facts ......................................................104

5.  Evidentiary Development..............................................................108

6.  Conclusion ..................................................................................109

**UNCERTIFIED ISSUES** ................................................................... 109

**C. The State Court's Causal Connection Limitation on Mitigation Violated Dave's Rights to Due Process & to be Free From Cruel & Unusual Punishment** ..................................................... 109

    1. Standard of Review ........................................................... 109

    2. Circumstances Requiring Relief ..................................... 110

    3. District Court Analysis .................................................... 115

    4. AEDPA Does Not Bar Relief ............................................ 115

    5. Conclusion ........................................................................ 116

**VII. CONCLUSION** ........................................................................ 116

# TABLE OF AUTHORITIES

## Cases

*Andrews v. Davis,*
 944 F.3d 1092 (9th Cir. 2019) ......................................................................102

*Avena v. Chappell,*
 932 F.3d 1237 (9th Cir. 2019) ...........................................................25, 30, 71

*Bean v. Calderon,*
 163 F.3d 1073 (9th Cir. 1998) ............................................................. 96, 100

*Bemore v. Chappell,*
 788 F.3d 1151 (9th Cir. 2015) ................................................................ 27, 31

*Brecht v. Abrahamson,*
 507 U.S. 619 (1993) .............................................................................110, 114

*Caliendo v. Warden,*
 365 F.3d 691 (9th Cir. 2004) ......................................................................107

*Campell v. Reardon,*
 780 F.3d 752 (7th Cir. 2015) .........................................................................51

*Correll v. Ryan,*
 539 F.3d 938 (9th Cir. 2008) ................................................... 30, 81, 90, 100

*Creech v. Richardson,*
 59 F.4th 372 (9th Cir. 2023) .........................................................................58

*Cullen v. Pinholster,*
 563 U.S. 170 (2011) ................................................................... 21, 107, 108

*Daniels v. Woodford,*
 428 F.3d 1181 (9th Cir. 2005) ................................................................ 31, 62

*Detrich v. Ryan,*
 619 F.3d 1038 (9th Cir. 2010) .......................................................................21

*Detrich v. Ryan,*
 677 F.3d 958 (9th Cir. 2012) .........................................................................21

*Detrich v. Ryan,*
 740 F.3d 1237 (9th Cir. 2013) ................................................................*passim*

*Dickens v. Ryan,*
  740 F.3d 1302 (9th Cir. 2014) .......................................................49, 50, 66

*Doe v. Ayers,*
  782 F.3d 425 (9th Cir. 2015) .......................................................25

*Eberle v. Wilkinson,*
  2010WL4068511 (S.D.Ohio Oct. 14, 2010) ...........................................36

*Eddings v. Oklahoma,*
  455 U.S. 104 (1982) ...............................................99, 110, 115, 116

*Elmore v. Ozmit,*
  661 F.3d 783 (4th Cir. 2011) .......................................................47

*Grant v. Lockett,*
  709 F.3d 224 (3rd Cir. 2013) .......................................40, 110, 113, 115

*Harrell v. Israel,*
  672 F.2d 632 (7th Cir. 1982) .......................................................61

*Harris v. Wood,*
  64 F.3d 1432 (9th Cir. 1995) ...........................................24, 43, 45, 47

*Hart v. Gomez,*
  174 F.3d 1067 (9th Cir. 1999) .......................................................33

*Hinton v. Alabama,*
  571 U.S. 263 (2014) .............................................................*passim*

*Hurles v. Ryan,*
  706 F.3d 1021 (9th Cir. 2013) .......................................................24

*Hurles v. Ryan,*
  752 F.3d 768 (9th Cir. 2014) ...........................................64, 67, 104, 108

*James v. Ryan,*
  733 F.3d 911 (9th Cir. 2013) .......................................................57

*Jennings v. Woodford,*
  290 F.3d 1006 (9th Cir. 2002) .......................................................31, 32

*Johnson v. Williams,*
  568 U.S. 289 (2013) .......................................................57

*Jones v. Chappell,*
  31 F.Supp.3d 1050 (C.D.Cal. 2014) .......................................................66, 108

*Kelsey v. Garrett,*
   68 F.4th 1177 (9th Cir. 2023) ................................................................. 62

*Lambert v. Blodgett,*
   393 F.3d 943 (9th Cir. 2004) .................................................................. 24

*Lambright v. Schriro,*
   490 F.3d 1103 (9th Cir. 2007) ................................................. 71, 95, 100

*Leeds v. Russell,*
   75 F.4th 1009 (9th Cir. 2023) ............................................................ 58, 66

*Liao v. Junious,*
   817 F.3d 678 (9th Cir. 2016) ................................................................. 60

*Libberton v. Ryan,*
   583 F.3d 1147 (9th Cir. 2009) ................................................................ 71

*Lockett v. Ohio,*
   438 U.S. 586 (1978) ............................................................................... 99

*Lopez v. Schriro,*
   491 F.3d 1029 (9th Cir. 2007) ............................................................... 99

*Lord v. Wood,*
   184 F.3d 1083 (9th Cir. 1999) .......................................................... 32, 60

*Mahoney v. Diaz,*
   2014 WL 2985720 (C.D.Cal. July 1, 2014) ........................................... 36

*Maples v. Thomas,*
   565 U.S. 266 (2012) ............................................................................... 25

*Martinez v. Ryan,*
   566 U.S. 1 (2012) ............................................................................ *passim*

*McKinney v. Ryan,*
   813 F.3d 798 (9th Cir. 2015) ............................................................ *passim*

*McKoy v. North Carolina,*
   494 U.S. 433 (1990) .................................................................... 113, 114

*Miller v. Dretke,*
   420 F.3d 356 (5th Cir. 2005) ................................................................. 36

*Miller-El v. Cockrell,*
   537 U.S. 322 (2003) ................................................. 64, 104, 106, 109

*Miller-El v. Dretke,*
545 U.S. 231 (2005) ..................................................................105

*Newton v. City of New York,*
566 F.Supp.2d 256 (S.D.N.Y. 2008) ..........................................82

*Panetti v. Quarterman,*
551 U.S. 930 (2007) ..................................................................108

*In re Peasley,*
90 P.3d 764 (Ariz. 2004) ............................................................40

*Penry v. Johnson,*
532 U.S. 782 (2001) ..............................................95, 110, 111, 112

*Phillips v. Woodford,*
267 F.3d 966 (9th Cir. 2001) ......................................................30

*Porter v. McCollum,*
558 U.S. 30 (2009).............................................................. 72, 102

*Ramonez v. Berghuis,*
490 F.3d 482 (6th Cir. 2007) ..........................................33, 59, 60

*Reynoso v. Giurbino,*
462 F.3d 1099 (9th Cir. 2006) ......................... 34, 35, 40, 51

*Rios v. Rocha,*
299 F.3d 796 (9th Cir. 2002) ................................................ 24, 62

*Rodney v. Filson,*
916 F.3d 1254 (9th Cir. 2019) ....................................................58

*Rompilla v. Beard,*
545 U.S. 374 (2005) ...........................................................*passim*

*Rose v. Lundy,*
455 U.S. 509 (1982) ....................................................................20

*Ryan v. Detrich,*
563 U.S. 984 (2011) ....................................................................21

*Sanders v. Ratelle,*
21 F.3d 1446 (9th Cir. 1994) ......................................................33

*Scott v. Schriro,*
567 F.3d 573 (9th Cir. 2009) ............................... 49, 50, 56, 97

*Seidel v. Merkle,*
    146 F.3d 750 (9th Cir. 1998) ..................................................................31

*Shinn v. Ramirez,*
    142 S. Ct. 1718 (2022) ......................................................65, 66, 67

*Silva v. Woodford,*
    279 F.3d 825 (9th Cir. 2002) ........................................................ 67, 109

*Skipper v. South Carolina,*
    476 U.S. 1 (1986) ............................................................... 80, 115

*Smith v. Texas,*
    543 U.S. 37 (2004) ..................................................................110

*Spreitz v. Ryan,*
    916 F.3d 1262 (9th Cir. 2019) ...........................................................114

*State v. Amaral,*
    368 P.3d 925 (Ariz. 2016) ........................................................ 77, 96

*State v. Bilke,*
    781 P.2d 28 (Ariz. 1989) ......................................................... 77, 96

*State v. Bocharski,*
    189 P.3d 403 (Ariz. 2008) ........................................................ 52, 89

*State v. Carlson,*
    48 P.3d 1180 (Ariz. 2002) ......................................................86, 89, 98

*State v. Christensen,*
    628 P.2d 580 (Ariz. 1981) .........................................................*passim*

*State v. Detrich,*
    873 P.2d 1302 (Ariz. 1994) .............................................................17

*State v. Detrich,*
    932 P.2d 1328 (Ariz. 1997) ................................................. 19, 113, 115

*State v. Doerr,*
    969 P.2d 1168 (Ariz. 1998) .............................................................88

*State v. Gretzler,*
    659 P.2d 1 (Ariz. 1983) ......................................................... 87, 88

*State v. Gulbrandson,*
    906 P.2d 579 (Ariz. 1995) .............................................................89

*State v. Hyde,*
    921 P.2d 655 (Ariz. 1996) ................................................................87

*State v. Jeffers,*
    661 P.2d 1105 (Ariz. 1983) ..............................................................89

*State v. Jimenez,*
    799 P.2d 785 (Ariz. 1990) ................................................................86

*State v. Lujan,*
    604 P.2d 629 (Ariz. 1979) ................................................................99

*State v. Malone,*
    444 P.3d 733 (Ariz. 2019) ..........................................................28, 29

*State v. Miles,*
    414 P.3d 680 (Ariz. 2018) ................................................................91

*State v. Montaño,*
    77 P.3d 1246 (Ariz. 2003) ....................................................81, 83, 89

*State v. Moody,*
    94 P.3d 1119 (Ariz. 2004) ..........................................87, 90, 98, 99

*State v. Roscoe,*
    910 P.2d 635 (Ariz. 1996) ................................................................88

*State v. Smith,*
    673 P.2d 17 (Ariz. 1983) ..................................................................88

*State v. Soto-Fong,*
    928 P.2d 610 (Ariz. 1996) ....................................................84, 85, 86

*State v. Talmadge,*
    999 P.2d 192 (Ariz. 2000) ................................................................60

*State v. Trostle,*
    951 P.2d 869 (Ariz. 1997) ................................................................81

*State v. Villafuerte,*
    690 P.2d. 42 (Ariz. 1984) ................................................................83

*State v. Wallace,*
    728 P.2d 232 (Ariz. 1986) ................................................................83

*State v. Wallace,*
    191 P.3d 164 (Ariz. 2008) ................................................................52

*State v. Wallace,*
    272 P.3d 1046 (Ariz. 2012) ........................................................................89

*State v. Woods,*
    687 P.2d 1201 (Ariz. 1984) ........................................................................55

*Steinkuehler v. Meschner,*
    176 F.3d 441 (8th Cir. 1999) ................................................................38, 39

*Summerlin v. Schiro,*
    427 F.3d 623 (9th Cir. 2005) ...............................................................24, 99

*Taylor v. Maddox,*
    366 F.3d 992 (9th Cir. 2004) .............................................................63, 105

*Trevino v. Thaler,*
    569 U.S. 413 (2013) ...................................................................................57

*United States v. Cronic,*
    466 U.S. 648 (1984) ............................................................................*passim*

*United States v. Tucker,*
    716 F.2d 576 (9th Cir. 1983) ....................................................................41

*Waidla v. Davis,*
    68 F.4th 575 (9th Cir. 2023) ...................................................................103

*Wallace v. Stewart,*
    184 F.3d 112 (9th Cir. 1999) ....................................................................91

*Walton v. Arizona,*
    497 U.S. 639 (1990) ...................................................................................87

*Washington v. Smith,*
    219 F.3d 620 (7th Cir. 2000) ........................................................53, 54, 61

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ............................................................................*passim*

*Williams v. Alabama,*
    73 F.4th 900 (11th Cir. 2023) .............................................................96, 102

*Williams v. Taylor,*
    529 U.S. 362 (2000) ...........................................................................65, 103

*Zant v. Stephens,*
    462 U.S. 862 (1983) ...........................................................................87, 107

**Constituional Provisions, Statutes, & Rules**

Sixth Amendment ................................................................................*passim*

Eighth Amendment .............................................................................*passim*

Fourteenth Amendment .......................................................................*passim*

A.R.S. §13-703(F)(6) (now A.R.S. §13-751(F)(4)).................................. 3, 18, 81, 86

A.R.S. §13-1105 ......................................................................................14

A.R.S. §13-1304 ......................................................................................14

A.R.S. §13-1406 ................................................................................ 14, 16

28 U.S.C. §§1291, 1651, 2241....................................................................1

28 U.S.C. §2253 ..................................................................................*passim*

28 U.S.C. §2254 ..................................................................................*passim*

AEDPA ..............................................................................................*passim*

Ariz.R.Crim.P.32.8(a).........................................................................63, 104

Ariz.R.Evid.608(b)(1) ...............................................................................55

**Other Authorities**

*Shinn v. Ramirez,* 142 S.Ct. 1718 (2022), Transcript of Oral argument at
    26-27, (No.20-1009) (available at https://www.supremecourt.gov/
    oral_arguments/argument_transcripts/2021/20-1009_5j31.pdf).......................67

Boyle, G.J. *What does the neuropsychological Category Test measure? Arch. Clin.
    Neuropsych,* 1988, *3,* 69–76 ...............................................................74, 77

Gregg W. Etter, *Totemism and Symbolism in the White Supremacist Movements:
    Images of an urban tribal warfare culture,* 8:2 J. Gang Res. 49, 54 (2001)...........36

Police Dep't, *Gang Training Manual,* available at
    https://www.ojp.gov/pdffiles1/Digitization/148396NCJRS.pdf.......................36

# I. <u>STATEMENT OF JURISDICTION</u>

This appeal is from final judgment and orders disposing of all claims raised in Petitioner David Detrich's habeas petition in U.S. District Court. The district court's jurisdiction was based on 28 U.S.C. §2241. Judgment was entered November 15, 2007. 1-ER-181.[1] The Motion to Alter or Amend the Judgment was denied December 5, 2007. 1-ER-122. The Notice of Appeal was filed December 13, 2007. 8-ER-1868. This Court's jurisdiction is based on 28 U.S.C. §§1291, 1651, and 2253.

While pending on appeal before this Court, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012). This Court issued an *en banc* decision remanding to the district court to consider or reconsider dozens of allegations under *Martinez*. *Detrich v. Ryan (Detrich V)*, 740 F.3d 1237 (2013)(*en banc*). The district court denied the remanded claims August 16, 2022. 1-ER-46; 1-ER-121. This Replacement Opening Brief follows.

# II. <u>BAIL/DETENTION STATUS</u>

David ("Dave") Detrich is currently serving a death sentence at Arizona State Prison Complex. 1-ER-267.

---

[1] Appellant's Excerpts of Record are "ER"; the state Record on Appeal, "ROA"; the postconviction Record on Appeal, "PCR ROA"; and transcripts, "RT." The district court docket is "DCT.Dkt." This Court's docket is "Dkt."

## III. STATEMENT OF ISSUES

**CERTIFIED ISSUES:**

**A. DID COUNSEL'S FAILURES TO INVESTIGATE & CROSS-EXAMINE CRITICAL LAY & EXPERT WITNESSES VIOLATE DAVE DETRICH'S RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL?**

**B. DID COUNSEL'S FAILURES TO INVESTIGATE & CHALLENGE THE STATE'S AGGRAVATING EVIDENCE & INVESTIGATE & PRESENT MITIGATING EVIDENCE VIOLATE DAVE DETRICH'S RIGHT TO EFFECTIVE ASSISTANCE OF SENTENCING COUNSEL?**

**UNCERTIFIED ISSUES:**

**C. DID THE STATE COURT'S CAUSAL CONNECTION LIMITATION ON MITIGATION VIOLATE DAVE DETRICH'S RIGHTS TO DUE PROCESS & TO BE FREE FROM CRUEL & UNUSUAL PUNISHMENT?**

## IV. STATEMENT OF THE CASE

Witnesses last saw Elizabeth Souter accompanied by two individuals, Dave Detrich and his onetime co-defendant, Alan Charlton. After Ms. Souter was found dead, authorities arrested Charlton. Charlton testified against Dave in exchange for a deal that spared his life and released him from prison in less than 10 years. Charlton's testimony blamed Dave for Ms. Souter's death provided the basis for the sole aggravator.

Dave's court appointed counsel failed him repeatedly at trial and sentencing. Counsel proceeded on an internally inconsistent defense by presenting both mistaken identity (a defense defied by Dave's visible facial dysmorphia) and that Dave was present but not the actual killer. Counsel failed to develop a viable impulsivity defense

to premeditated murder, call a critical witness to whom co-defendant Charlton confessed, or retain an independent pathologist to understand and develop potential challenges to the forensic evidence.

Counsel spent only 10.5 hours preparing for and attending the sentencing trial. Counsel failed to investigate or challenge the aggravation, although an independent pathologist would have severely undercut both Charlton's version of the crime and the sole aggravator.[2] 2-ER-402,¶15. Counsel filed a three-page sentencing memorandum that did not address aggravation and devoted less than a third of a page to mitigation. 6-ER-1273. The only mitigation introduced at the 11th hour was three brief letters written by one of Dave's sisters. 5-ER-1105; 6-ER-1262, 1273. The Arizona Supreme Court applied a causal nexus test, discounting the mitigation that was presented. Despite these Sixth and Eighth Amendment violations, Dave stands sentenced to die while his co-defendant has been free for 26 years.

## V. <u>STATEMENT OF FACTS</u>

### A. DAVE DETRICH'S BACKGROUND

#### 1. Dave's Childhood

Dave faced enormous hurdles since before birth. Dave's parents, who married as teenagers, did not have the skills necessary to provide a stable and caring home for Dave and his siblings. Dave's mother, Pat Koch, regularly drank alcohol throughout

---

[2] Now codified at A.R.S. §13-751(F)(4).

her pregnancies and had a long-standing addiction to Percodan and Valium. 2-ER-534; 3-ER-627,¶75. Because Dave was the youngest of four, he was exposed to the highest level of alcohol consumption in utero as, by the time she was pregnant with him, she had built up an alcohol tolerance. 2-ER-495–96. This prenatal alcohol exposure was detrimental to Dave's development and likely caused his cleft lip and palate—a congenital defect associated with prenatal alcohol use. 2-ER-497.

Dave's disabilities had powerful and long-term psychological and physical effects. His cleft lip and palate were so severe that his nostrils were completely separated, and he had a "gaping hole in the roof of his mouth." 2-ER-506. To repair his palate, Dave had to undergo repeated surgeries as an infant and toddler, including one botched surgery during which he nearly bled to death. 3-ER-614,¶7, 656,¶4. The surgeries resulted in baby Dave's separation from his mother for extended periods of time, including the weeks immediately after his birth. 3-ER-656,¶5. This interrupted Dave's attachment to his caregiver, traumatized him, and impaired his brain development. 2-ER-440–42.

Dave was malnourished throughout infancy, as his cleft palate made it difficult for him to eat. 3-ER-614,¶7. He was so small that his sisters dressed him in their doll's clothes. 3-ER-614,¶9; 2-ER-506. He was also slow to learn to speak—hardly speaking until age three or four and still difficult to understand throughout most of his childhood. 2-ER-512–13. Dave's cleft lip and palate rendered him socially isolated, rejected, and ridiculed by his peers. 2-ER-513–14; 3-ER-593,¶2, 650,¶47. His parents

4

were ashamed and embarrassed of him. 3-ER-593,¶2. Dave was "teased mercilessly" about his cleft lip at school. *Id.* Children born with a cleft lip and palate "are known to be frequent victims of psychosocial stress and rejection as a result of their malformations." 3-ER-582.

Dave's childhood home was filthy, with green slime on the baby bottles and cockroaches around the doors. 3-ER-593,¶3. The house smelled like urine. 3-ER-602,¶38, 648,¶33. Their father, Norm, would often leave the family for hunting or fishing trips when he and Pat were fighting. 2-ER-510–11; 3-ER-646,¶23, 648,¶37.

Norm struggled to earn enough to keep the family out of poverty. 3-ER-646,¶24. They did not have money for regular doctor visits for the kids. 3-ER-647,¶30. Norm was rarely at home—he worked nearly every day and spent his free time at bars. 3-ER-658,¶11. After discovering Norm cheated on her, Pat moved out with the children and filed for divorce. 3-ER-659,¶16. Pat and the four children lived in Kansas, while Norm lived in Ohio, taking the kids for the summer and holidays. 3-ER-615,¶14. Pat's financial situation became even more dire as a single mother; she would mix powdered milk with regular milk to try and stretch it. *Id.* Norm's child support checks would bounce, and Pat relied on her mother and sister to help keep the children clothed. 3-ER-659,¶18.

Pat and Norm's divorce was very difficult on Dave, who blamed himself and his cleft palate. 3-ER-659,¶17. Around the time of the divorce, Dave was six years old and started wetting the bed. 3-ER-615,¶15.

Although Norm shared custody, he rarely saw the children after the divorce. 3-ER-615,¶17. Even during visits, they spent most of their time with his new wife, Jean. 3-ER-659,¶19. A few years after the divorce, Norm and Jean kidnapped the children after a visit. 3-ER-659,¶20. When Dave's sister Darci started to cry upon learning she would not be going home, Norm "slapped her so hard he knocked her over." 3-ER-615–16,¶18. Pat traveled to Ohio from Kansas to get the children, but the Ohio court awarded custody to Norm. 3-ER-616,¶19. After the kidnapping, Jean became incredibly cruel to the children, especially Dave.

Jean beat the Detrich children daily—"with belts, fly swatters, chairs, tools, wires, wooden spoons or anything she could grab when she was mad." 3-ER-616,¶21,. She hid the evidence of the beatings by making the children wear long sleeves and pants to hide bruises. *Id.* Norm was rarely home to protect the children. *Id.*

Dave "was the littlest, and could not stand up for himself." 3-ER-616,¶22. He also lacked the coping skills of the other children. *Id.* Danny and Diana Jo ("Jo") "were older, and Darci could read Jean better to avoid the abuse." *Id.* Dave was also singled out for wetting the bed. Jean humiliated Dave by telling people about his bed-wetting and hanging his sheets out the window so neighbor kids would see. 3-ER-616–17,¶23. Jean also routinely humiliated Dave by calling him "hare lip," "retarded," "pissy baby," and by dressing him as a girl. 2-ER-515, 518–519, 521–22.

When Dave was around nine years old, Jo came home "on an extremely hot summer day to find [Dave] chained by his neck to the clothesline pole, out in the back

yard, in the sun and without water." 3-ER-617,¶24. Jo could not unchain her baby

brother, because she knew that would result in her "get[ting] the beating of [her] life"

and Dave would be punished even more. *Id.* Jo sought help from the neighbors, who

refused to intervene. *Id.* On another occasion, Jean tied Dave up in the garage, telling

him "If you are going to act like an animal then I will treat you like an animal." 3-ER-

617,¶25.

 When the family moved to Michigan, Jean became even more controlling. She

told others that the children were hers and dyed her blonde hair brown to match their

hair. 3-ER-617,¶26; 2-ER-516–17. Jean would tell the children "she wished…[they]

were dead or she could kill…[them] at any time." 2-ER-520. The abuse Dave suffered

impeded his brain development, resulting in PTSD. 3-ER-576–78, 583; 2-ER-466,

469–471, 472–473, 479–484, 489. The prolonged stress of living with Jean's cruelty

caused Dave to withdraw emotionally and physically cower from others' touch. 3-ER-

621,¶¶44-45; 3-ER-660,¶¶23-24. He re-experienced the trauma for years, having

nightmares about Jean coming to kill him, and suffered paralyzing fear and anxiety,

including intrusive thoughts about the abuse, sleeping with his eyes opening, and

living in a state of hypervigilance where he would constantly "scan[ ]…the

environment for clues that something bad was about to happen." 2-ER-459, 474–78,

482–83, 485–87, 490; 2-ER-541, 542–43; 2-ER-443. Dave coped by self-medicating

with alcohol, which helped his anxiety but worsened his existing disabilities. 2-ER-

461, 467–71, 472–73.

Dave first started drinking alcohol at age 10. Dave's brother Danny would sneak shots of whiskey from Norm's bar and give them to him. 3-ER-624–25,¶62. Eventually, when Dave was around 12, Pat was able to regain custody. 3-ER-660,¶22; 2-ER-504. By that time, Pat had married Kenneth "Skip" Murdie and the Detrich children lived with them in Kansas. 2-ER-505. In Skip's house, Dave's alcohol dependence developed rapidly. By age 13, Dave "could easily drink of a fifth of…bourbon" or an entire case of beer in one night. 3-ER-625,¶63. Dave idolized Skip, who was "the father none of…[the Detrich kids]…ever had." 2-ER-528. Skip operated a farm, which he expected to own someday, and Dave worked with him. 2-ER-527. Skip, however, was an alcoholic who encouraged Dave to drink. 2-ER-526, 528–29, 530. Skip and Dave also smoked marijuana together. 2-ER-531. By age 14, Dave was not only drinking heavily, but was also regularly using speed and hallucinogenic drugs. *Id.* Dave's alcoholism continued throughout his adulthood. "He did stop drinking for a while when he started a new job or school, but would start again when things did not work out for him." *Id.*

Skip sexually abused Dave. Once, Skip picked up a 14 or 15-year-old girl that Dave liked, and both Skip and Dave had sex with her in a van together. 2-ER-533. When Dave was in eighth grade, Skip and Dave had sex with a friend of Skip's, a woman who was 19 or 20. *Id.*

Skip's drinking and infidelities caused Pat and Skip to fight and led to the disintegration of their marriage. 2-ER-533–34. When Pat and Skip fought, they were

extraordinarily violent. On one occasion Skip broke Pat's nose and, in another, Pat fired a gun at Skip. 2-ER-532; 3-ER-626–27,¶¶72-74. On three occasions, Jo had to drive Pat to the hospital because Skip had beaten her so badly, he broke bones. 3-ER-627,¶74. Dave regularly witnessed this abuse; the violence wore on him. 3-ER-627,¶73; 2-ER-500.

Dave's only escape was the joy and success he experienced working on the farm with Skip. 3-ER-623,¶57. When Skip was too drunk to work, Dave would cover for him. *Id.* Dave told Jo that "he wanted to be a farmer when he grew up…." *Id.* Skip anticipated being able to own the farm eventually and, later, pass it on to Dave. 3-ER-623,¶57. Skip's drinking, however, literally cost him the farm. When Skip took 15-year-old Dave on a six-day bender in Kansas City, the farm owner fired him. 3-ER-635,¶4. After, Skip and Pat split up and Dave "lost not only Skip but…what he was going to do for the rest of his life. It…devastat[ed]…him." 2-ER-535.

## 2. Dave's Young Adulthood

In 1979, Dave enlisted in the Army. 2-ER-446. For a while, Dave succeeded in military life and was promoted three times. *Id.* His substance abuse, however, eventually re-escalated. *Id.*; 3-ER-653–54,¶64. Dave received an other-than-honorable discharge because of his alcoholism and use of alcohol in a "restricted place." 2-ER-446.

In 1982, Dave's older brother Danny was killed in a car accident, for which Dave inexplicably blamed himself. 2-ER-537. Dave flew in for the funeral but was in a

car accident and missed the funeral. *Id.* According to Jo, Dave "never had the chance to say goodbye [to Danny]…That was pretty traumatic for him." *Id.* Because of Dave's grief, he moved in with Danny's widow, Joyce, and took care of her and Danny's daughter. *Id.*; 2-ER-454. Joyce and Dave eventually had a son, Timothy. 2-ER-455. Dave and Joyce separated when Timothy was around a year old. 3-ER-631,¶94.

Dave continued to struggle with substance addiction and had difficulties holding down a job, even when his work performance was good. 3-ER-630,¶¶89-90. For a while, Dave worked for his Aunt Betty at a nursing home. *Id.* Betty planned to retire and turn the business over to Dave, but that plan ended when Dave got drunk with a patient. 3-ER-654,¶67.

Throughout his life, Dave continued to struggle with drug and alcohol dependency, depression, and made several suicide attempts. 3-ER-608–09,¶64, 631,¶95.

### 3. Dave's Mental Health

Dave's prenatal exposure to alcohol, his childhood abuse and neglect, and lifelong self-medication with drugs and alcohol had a substantial effect on his mental health. Friends and family realized that Dave's behaviors were not normal. His oldest sister, Jo, describes:

> …David could not see the natural sequence of events that would occur from taking a particular course of action; he had no appreciation of cause and effect despite being told previously what would happen in

10

certain circumstances….David is…unable to plan, and acts on the spur of the moment….When he has money he will eat like a king until it is all gone, without rationing or thinking of the future. Then he is broke and can barely eat. Next time around, he will handle his money the same way.

3-ER-631–32,¶¶97-98.

Psychiatric and neuropsychological evaluations, corroborated by witness observations, demonstrate that Dave suffers from brain damage and is impulsive. 3-ER–637,¶14; 5-ER-1174–75; 3-ER-576, 582-83; 3-ER-697–98; 3-ER-588–89. As a result of his brain damage, caused in part by congenital birth defects, Dave also suffers from Cognitive Disorder, a mental disorder characterized by impulsivity and poor problem-solving ability. 2-ER-555–57; 3-ER-702, 591–92, 576, 582–83. Dave's childhood trauma contributed to his adult impairments. 3-ER-582; 3-ER-591; 2-ER-444–45. His disabilities are reflected in poor impulse control, behavioral disorders, attention deficits, difficulty with problem solving, misinterpretation of social cues, perseveration (an inability to abandon ineffective strategies), and poor executive functioning. 3-ER-582; 3-ER-571; 3-ER-693, 696; 2-ER-447–49; 2-ER-429–31.

Dave's symptoms are also consistent with Alcohol Related Neurodevelopmental Disorder (ARND), a condition caused by prenatal alcohol exposure. 2-ER-491–92, 497, 498; 2-ER-556–57. ARND causes impulsivity, poor planning, poor executive functioning, poor goal setting, and creates obstacles in relationship development, bonding, and social competence. 2-ER-493, 494, 498. The years of childhood abuse worsened Dave's congenital cognitive issues.

11

"[C]hildren…exposed to severe and chronic abuse and neglect during…development manifest cognitive brain dysfunction at significantly higher rates than children without abuse." 3-ER-582. "…[T]here is significant overlapping evidence of severe abuse and neglect…and this abuse is highly likely to have contributed to…[Dave's]…further neurocognitive worsening." *Id.* "These cognitive deficits" affected Dave's "ability to problem solve and control his impulses." *Id.*

These organic impairments resulted in Dave's lifelong struggle to steer the course. Jo explained:

> David does not seem to have any insight into his life or why things never work out for him. He does not understand why things that work for other people do not work for him. When things did not work out he repeated the same pattern of getting frustrated, doing something stupid, turning to alcohol and then running away. If he handled a situation badly one time, he would not learn to handle it differently the next time. Eventually his life became a frustration cycle of what felt like failures to him and he did not understand why.

3-ER-631.

### 4. Dave's Move to Arizona

In the mid-1980s, Dave attended an in-patient alcohol treatment program in Kansas and, upon completion, moved in with Jo in Michigan. 6-ER-1278. He traveled the country for a while and eventually made his way to southern Arizona, where his sister Darci was living. *Id.*; 4-ER-885. He abstained from alcohol for about a year-and-a-half, until the night of the crime. 6-ER-1278; 6-ER-1345.

## B.   THE CRIME

On November 4, 1989, Dave and his co-worker Alan Charlton were drinking excessively (approximately two cases of beer each). 7-ER-1405, 1408. While driving around Tucson, they saw Elizabeth Souter walking along the road and picked her up, believing she could get drugs. 6-ER-1341, 1345–46. Dave and Ms. Souter went inside a bar and returned soon after with some unknown drug. 7-ER-1408–09, 1413–1416. Dave remembers nothing more of the evening. 6-ER-1341, 1346. Dave, Charlton, and Souter went to Ms. Souter's house, where Tammy Winsett and Ms. Souter's daughters, Gwendolyn and Caprice, were present. 7-ER-1507–09, 1515–16; 7-ER-1402, 1411–12. Ms. Souter and Dave cooked and attempted injecting the drugs. 7-ER-1413–16. Either the needle was damaged or the drugs were bad because Ms. Souter and Dave were "screaming and hollering" that the "needle wouldn't pick [the cocaine] up." 7-ER-1416. At some point, Ms. Souter and Dave were lying on a mattress on the living room floor, and Caprice saw Dave with a "little" knife near Ms. Souter's throat.[3] Ms. Souter asked to be left alone so she could go to sleep, but Dave continued to talk to her. 7-ER-1522–23. Upon seeing the knife, Tammy, Gwendolyn, and Caprice left the house to get help. As Tammy was returning to the apartment, she saw Charlton,

---

[3] The knife in Dave's possession could not have been the murder weapon. 7-ER-1522; 7-ER-1417, 1437–38 (Charlton testifying that Exhibit 1 was the little knife that Dave had); 7-ER-1560–61 (medical examiner testifying that Exhibit 1 is inconsistent with victim's injuries).

Dave, and Souter getting into Charlton's car, although there were no streetlights, and it was difficult to see. 7-ER-1512. By that time, Ms. Souter had consumed excessive amounts of alcohol, resulting in a blood alcohol content between .32 and .39. 7-ER-1513–14, 1519, 1544–48, 1568–69.

Charlton drove away with Dave and Ms. Souter in his car. 7-ER-1419. Ms. Souter's body was found the following morning in the desert outside of Tucson with multiple stab wounds. 7-ER-1486–87; 7-ER-1530.

## C. INITIAL TRIAL AND SENTENCING

Tucson Police received a 911 call, leading to Charlton's arrest. 7-ER-1676–77. Charlton's left arm had what appeared to be cuts or scratches, 7-ER-1488–89, and he was found in possession of a knife in a sheath, later identified as the knife most consistent with Ms. Souter's wounds. 7-ER-1560–61. Dave was arrested shortly after Charlton. A grand jury indicted both men for first-degree murder (A.R.S. §13-1105), kidnapping (A.R.S. §13-1304), and sexual assault (A.R.S. §13-1406). 8-ER-1800.

While in the Pima County Jail, Charlton confessed to another inmate, Phil Shell. Charlton told Shell that he committed the murder with his own knife and that he was pinning the crime on Dave to avoid the death penalty. 7-ER-1645–47. Charlton told Shell that he, Dave, and Ms. Souter parked behind a bar somewhere in Tucson, and Dave and Ms. Souter were kissing. 7-ER-1646–48. Charlton was furious about having been "ripped off" by Ms. Souter with the bad drugs and about Ms. Souter, who was African American, kissing Dave, who was white. *Id.* Charlton

14

despised African American people and used racial slurs to refer to Ms. Souter. 7-ER-1648. In a rage, Charlton pulled out a knife and began stabbing Ms. Souter. 7-ER-1647–48.

Consistent with his statements to Shell, Charlton quickly entered into a plea under which he pled guilty to kidnapping and agreed to testify against Dave in exchange for the State dropping the capital murder charge against him. 7-ER-1433–34; 8-ER-1791–95. In addition to this remarkable benefit, Charlton received an additional benefit of being released from jail for 60 days after he testified but before he began serving his 10.5-year prison term. 8-ER-1792.

The prosecution's case against Dave was based squarely on Charlton's testimony. Charlton admitted that he was driving that night, but he was "extremely" drunk and does not remember portions of the evening. 7-ER-1437–50. In each of his lucid moments, Charlton supposedly witnessed events essential to the prosecution's case against Dave. For example, Charlton asserted during one of his lucid moments he observed Dave "humping" Ms. Souter. 7-ER-1420–21. Charlton also claimed that later, he looked over and saw Ms. Souter's throat had been cut. 7-ER-1421. Charlton never testified that he saw Dave inflict any wounds, but supposedly he felt the knife "poke [him] in the arm about three or four times." 7-ER-1424. Charlton further claimed that once the car came to a stop, Dave asked him to help move Ms. Souter's body, but he refused. 7-ER-1423.

Only after he had completed his plea negotiation—almost a year after his original statement to police—that Charlton first made his most egregious accusation. Charlton initially told police that after Dave allegedly "raped" Ms. Souter, he asked Charlton "if [he] wanted a shot at it." 8-ER-1818–19. Almost a year later—*after* finalizing his plea agreement with the prosecution—Charlton accused Dave of saying: "it's dead but it's warm. Do you want a shot of it?" 8-ER-1762; 8-ER-1795.

Dave was convicted of first-degree murder and kidnapping, but was acquitted of sexual assault but convicted of the lesser-included offense of sexual abuse. 1991 ROA71.

Counsel conducted no mitigation investigation, requested no expert assistance beyond a cursory evaluation by the court's psychologist, and presented no evidence in support of a life sentence. RT02/04/1991. The combination aggravation/mitigation hearing lasted less than 15 minutes. *Id.* The sentencing judge determined the crime was "especially cruel, heinous or depraved" and that no mitigation was sufficiently substantial to call for leniency and sentenced Dave to death. 1991 ROA71 at 5-8. Charlton ultimately served only 8 years and 10 months of his 10.5-year sentence. 2-ER-414.

## D.   THE FIRST APPEAL

On appeal, the Arizona Supreme Court reversed the murder and kidnapping convictions based on the trial court's improper refusal to instruct on unlawful

imprisonment, the lesser-included offense of kidnapping. *State v. Detrich (Detrich I)*, 873 P.2d 1302, 1305-06 (Ariz.1994).

## E.   THE RETRIAL

Retrial counsel, Harold Higgins, worked a total of 132.5 hours in the six months from appointment until the end of the guilt-innocence trial. 6-ER-1348–49. Excluding requests for payment, he filed three motions throughout the entire trial. 7-ER-1583–97. The entire guilt-innocence trial lasted fewer than four days. 6-ER-1360–64; 7-ER-1394–97, 1496–99, 1570–76. Counsel did not contact Shell in time to secure his presence at trial, so Shell's 1991 testimony was read into the record. 7-ER-1493; 4-ER-890.

The jury convicted Dave of kidnapping and first-degree murder but did not unanimously agree on a theory of murder. Nine jurors found premeditation, 11 found felony murder, and only eight found both. 6-ER-1354–59, 1394.

## F.   THE RESENTENCING

A few days before the aggravation-mitigation hearing, counsel filed a three-page sentencing memorandum. He did not challenge aggravation. He alleged five mitigators with no caselaw or argument: 1) intoxication at the time of the crime; 2) abusive childhood, 3) lack of prior serious convictions, 4) remorse and 5) co-defendant's minimal sentence. 6-ER-1275.

At the aggravation-mitigation hearing, the prosecution argued that the (F)(6) "especially cruel, heinous or depraved" aggravator was supported by Dave's alleged

17

commission of sexual assault, despite his 1990 acquittal on those charges. 6-ER-1292. Like original counsel, resentencing counsel failed to investigate or develop evidence in support of a life sentence, interview and present witnesses, or collect or offer life history records. Counsel's argument for Dave's life spans less than seven transcript pages. 6-ER-1312–18. Counsel argued primarily about doubt over Dave's level of participation in the crime, despite having failed to secure Shell's presence to testify in person. 6-ER-1249–54, 1303–12; 7-ER-1493. At the 11th hour, counsel submitted three letters from Dave's sister, Diana Jo Stevens. 6-ER-1263–68, 1269–72, 1276–78.

The court conducted an *Enmund/Tison* inquiry, concluding Dave alone actually killed and intended to kill the victim. 6-ER-1242–43. The court also found the crime was committed in an "especially cruel, heinous or depraved manner." A.R.S. §13-703(F)(6).

The court found five mitigating circumstances proven. First, that Dave's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired. 6-ER-1247. However, the court discounted this because Dave was "cognizant of his surroundings" and "able to carry on conversations." *Id.* The court also found Dave came "from an abusive background," felt "some remorse for the killing," had no prior convictions involving violence, and had a "long history of alcohol and substance abuse." 6-ER-1248–49, 1254. The court refused to consider in mitigation Charlton's 10.5-year sentence or that Dave had a 10-year-old son. 6-ER-1249. The court concluded the mitigation was

not sufficiently substantial to outweigh the aggravator and sentenced Dave to death.

6-ER-1258

## G.   THE APPEAL

On direct appeal the Arizona Supreme Court applied a causal nexus test and

upheld Dave's convictions and sentences. *State v. Detrich* (*Detrich II*), 932 P.2d 1328

(Ariz.1997).

## H.   INITIAL STATE POST-CONVICTION

Initial Postconviction ("PCR") counsel requested investigative funding to

develop Dave's conviction and sentencing claims. 6-ER-1236. In the alternative,

counsel requested an evidentiary hearing on his funding request. 6-ER-1237. The

court—the same judge who sentenced Dave to death—denied both requests. 1-ER-

266. Counsel renewed the request and appealed the denial of resources through a

Special Action to the Arizona Supreme Court. That court denied jurisdiction, leaving

PCR counsel to prepare a petition with no investigative funding. 5-ER-1160–63, 1145.

The PCR court eventually granted funding for a neuropsychological expert—

Dr. Briggs. 5-ER-1181–83. Dr. Briggs examined Dave but had no collateral records or

information regarding his background, beyond that presented at sentencing. Defense

counsel offered Dr. Briggs' report, which identified issues with executive

functioning/impulsivity, in support of the petition. 5-ER-1167–79. The court

summarily denied relief without evidentiary development. 1-ER-262–65. The Arizona

Supreme Court denied review. 1-ER-261.

## I.  FEDERAL HABEAS & SUCCESSIVE POST-CONVICTION PROCEEDINGS

In 2003, federal habeas proceedings were initiated. Because of the total exhaustion rule, *Rose v. Lundy*, 455 U.S. 509 (1982), habeas counsel did not file a mixed petition but alerted the district court and Respondents to the unexhausted claims. 4-ER-891–901. Counsel presented the unexhausted claims in successive PCR proceedings in 2005. The state court permitted no investigation or evidentiary development and dismissed the petition. 1-ER-257–60. The Arizona Supreme Court denied review. 1-ER-182.

The district court granted an evidentiary hearing on ineffective assistance of counsel ("IAC") at sentencing for failure to investigate and present mitigating evidence. 1-ER-255–56. The court held a four-day evidentiary hearing at which counsel presented lay and expert witnesses and voluminous records, detailing Dave's traumatic childhood and resulting PTSD, developmental disabilities, and organic brain damage. The district court concluded Dave satisfied *Strickland v. Washington*'s performance prong, but not the prejudice prong. 466 U.S. 668 (1984); 1-ER-139, 163.

The district court certified only the IAC for failure to develop and present mitigation claim. 1-ER-179. This Court granted certificates of appealability (COA) on two additional issues—IAC for failure to investigate and challenge aggravation and the dismissal of prospective jurors based on death penalty views and the refusal to permit voir dire on racial bias. A three-judge panel of this Court determined that Dave had been deprived of his Sixth Amendment rights by sentencing counsel's failure to

develop and present mitigation, and that the state court decision denying relief was based on an unreasonable determination of the facts. *Detrich v. Ryan*, 619 F.3d 1038 (9thCir.2010). This Court denied relief on Dave's jury selection claim, DCT.Dkt.85, and, because it granted relief on the mitigation claim, did not reach the aggravation claim. 619 F.3d at 1052, n.3.

The Supreme Court reversed and remanded the case to this Court for further consideration after *Cullen v. Pinholster*, 563 U.S. 170 (2011). *Ryan v. Detrich*, 563 U.S. 984 (2011)(mem.). This Court affirmed its ruling. *Detrich v. Ryan*, 677 F.3d 958 (9thCir.2012). The State moved to rehear the case *en banc*, Dkt. 120, and the defense moved to remand the case pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Dkt. 128. The Court granted rehearing *en banc* and the *en banc* panel granted the motion to remand. 740 F.3d 1237.

Upon discovering new evidence and claims for relief in his *Martinez* remand proceedings, Dave filed a third PCR petition in 2016. The petition was summarily denied on September 6, 2022. The Petition for Review to the Arizona Supreme Court remains pending.

## J.    MARTINEZ REMAND

On remand, the district court denied evidentiary development and relief. 1-ER-46–120. The court granted a COA on Dave's IAC at trial claim. 1-ER-119.

During the pendency of the remand proceedings, this Court issued its opinion in *McKinney v. Ryan*, 813 F.3d 798 (9thCir.2015)(*en banc*). This Court granted Dave's

Unopposed Motion to Expand the Remand to "address the impact of *McKinney*…."
Dkt. 177. The district court denied relief and denied a COA on the *McKinney* remand.
1-ER-112–19.

## VI. <u>SUMMARY OF ARGUMENT</u>

### A. Counsel's Failure to Investigate & Cross-Examine Critical Lay & Expert Witnesses Violated Dave's Right to Effective Assistance of Counsel

Inexperienced, overworked, and under resourced, counsel spent barely three working weeks preparing for and conducting Dave's capital trial. He failed to investigate key prosecution witnesses, including the co-defendant. He did not engage an expert or otherwise challenge the State's forensic evidence. He failed to call the most critical defense witness to testify live, allowing compromised and ineffective past testimony to be read into the record. Because of these many failures, counsel was unable to challenge the State's evidence and presented a defense that was incoherent and contradictory. He did so despite the availability of effective challenges to the State's evidence and a more compelling defense theory. Counsel's conduct fell below the standard of care and prejudiced Dave. *Strickland, supra*; *Wiggins v. Smith*, 539 U.S. 510 (2003).

**B. COUNSEL'S FAILURES TO INVESTIGATE & CHALLENGE THE STATE'S AGGRAVATING EVIDENCE & INVESTIGATE & PRESENT MITIGATING EVIDENCE VIOLATED DAVE'S RIGHT TO EFFECTIVE ASSISTANCE OF SENTENCING COUNSEL**

Counsel spent little more than 10 hours preparing for Dave's capital sentencing hearing. He did no meaningful investigation into Dave's background, the circumstances of the crime, or the noticed aggravation, called no expert or lay witnesses to testify, and collected no records outside those in the court record. In mitigation, counsel offered three letters written by Dave's sister which offered glimmers of the mitigation available. Counsel's conduct fell below the standard of care and prejudiced Dave. *Strickland, supra*; *Wiggins*, *supra*; *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

**C. ARIZONA'S CAUSAL CONNECTION LIMITATION ON MITIGATION VIOLATED DAVE'S RIGHT TO DUE PROCESS & TO BE FREE FROM CRUEL & UNUSUAL PUNISHMENT**

The Arizona Supreme Court ignored most of the mitigation offered in support of life, instead applying state law that required mitigation be causally connected to the crime. The court's refusal to consider the mitigation central to Dave's plea for life violated the Eighth Amendment. *McKinney, supra*.

## VII. <u>ARGUMENT</u>

**CERTIFIED ISSUES**

**A.    COUNSEL'S FAILURE TO INVESTIGATE & CROSS-EXAMINE CRITICAL LAY & EXPERT WITNESSES VIOLATED DAVE'S RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL**

### 1.    Standard of Review

This Court reviews *de novo* the district court's denial of the writ and its factual findings for clear error. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9thCir.2004). This Court reviews *de novo* district court decisions under §2254(d). *Hurles v. Ryan*, 706 F.3d 1021, 1030 (9thCir.2013). Denial of evidentiary development is reviewed for abuse of discretion. *Id.*

### 2.    Circumstances Requiring Relief

The duty to investigate a capital crime is "critically important." *See Summerlin v. Schiro*, 427 F.3d 623, 630 (9thCir.2005). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690). When assessing an attorney's decision not to investigate, a court "must consider…whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 537. Counsel who fails to conduct such investigation is ineffective. *See e.g. Harris v. Wood*, 64 F.3d 1432, 1435-36 (9thCir.1995); *Rios v. Rocha*, 299 F.3d 796 (9thCir.2002).

Counsel must begin investigating the responsibility phase of a capital trial "immediately upon…entry into the case" and investigation "should be pursued

expeditiously." ABA Guidelines for the Appointment and Performance of Counsel in a Death Penalty Case (1989)("1989 ABA Guidelines") 11.4.1(A). "Prevailing professional norms, as outlined by the [1989] ABA standards, required that a lawyer 'conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case….'" *Doe v. Ayers,* 782 F.3d 425, 434 (9thCir.2015)(quoting *Bobby v. Van Hook,* 588 U.S. 4, 7, 11 (2009))(cleaned up). "Defense counsel should not carry a workload that, by reason of its excessive size, interferes with the rendering of quality representation…." *ABA Standards for Criminal Justice: Prosecution and Defense Function*, 3d ed., Standard 4-1.3(e) (adopted 1991, published 1993).

Trial counsel here was inexperienced, overworked, and under resourced. He had only tried one other capital case, which also resulted in a death sentence, had no specialized capital litigation training, and had a "very heavy caseload." 2-ER-552,¶¶3, 9. Occupied with numerous other cases, counsel worked only 132.5 hours—a little over three weeks—throughout the course of Dave's trial. 6-ER-1349. These figures reflect the deficiency of counsel's performance. Proper representation and investigation of a capital trial require an investment of thousands of hours. *See e.g. Maples v. Thomas*, 565 U.S. 266, 272 (2012)("death penalty litigation is plainly time intensive"); *id.* at 272 n.1 ("One study of federal capital trials from 1990 to 1997 found that defense attorneys spent an average of 1,480 out-of-court hours preparing a defendant's case"); *Avena v. Chappell*, 932 F.3d 1237, 1248 (9thCir.2019)(fact that

attorney billed only 94 hours representing capital trial defendant "is a striking initial indication of his deficient investigation").

### i. Failure to Present a Coherent Defense (Amended Petition Claim A(1))

"Formulation of and adherence to a defense theory are vital in any criminal case. In the bifurcated…capital trial, the defense theory is especially important." 1989 ABA Guidelines, Commentary to 11.7.1. Counsel here failed in this vital task. Because counsel failed to conduct an adequate investigation, Dave was stuck with a defense that was nonsensical and doomed to fail. Counsel adopted this irrational approach despite the availability of a far more coherent and compelling theory.

At trial, counsel presented two mutually exclusive theories—that Dave had been misidentified and was not present at all, or that he was present but not responsible for the killing. 7-ER-1492 (counsel arguing "[T]here is a lot of things that raise serious questions about whether…it was this man. And if it was this man, what it was he did."); 6-ER-1377–78 (counsel arguing witnesses' initial description of the man at the house as Hispanic "raise[s] a real question about who the guy was with Alan Charlton…"); 7-ER-1490–91 (counsel arguing the evidence "raises great questions about whether or not the second guy there, the Hispanic looking guy, had a knife, took it with him…"); 6-ER-1379 (counsel arguing "Charlton's story is not corroborated by the evidence…the story he told to Phillip Shell is what is corroborated by the evidence."). Shell's testimony regarding Charlton's confession

was credible and corroborated by the evidence. *See* subsection (2)(ii), *infra*. However, it was in direct tension with a misidentification defense. The prosecution seized upon this glaring inconsistency. 6-ER-1380, 1382–83 (characterizing the defense's argument as "nothing more than a grab bag. He is throwing out there any kind of possible reason he can get you to seize upon.").

The misidentification defense was implausible. Several eyewitnesses testified to seeing Dave in Ms. Souter's house prior to her disappearance. 7-ER-1511, 1521, 1411. Although witnesses were confused as to whether Dave was a dark-skinned Caucasian or Hispanic, 6-ER-1377–78, Dave nonetheless has a "memorable face." 6-ER-1370. Dave is almost six feet tall and has a pronounced cleft lip. 6-ER-1238–39; 5-ER-1121.

Trial counsel's presentation of an implausible misidentification defense was substandard. *Bemore v. Chappell*, 788 F.3d 1151, 1163-64 (9thCir.2015)(IAC for "not tak[ing] steps to investigate the plausibility of the alibi" where "there was not a single witness testifying live before the jury" who placed petitioner at the alibi location). The Supreme Court has acknowledged that "[p]resenting a weak…defense at the guilt phase, and thereby risking losing credibility in advocating for a client's life at the penalty phase, is often a questionable strategy[.]" *Id.* at 1168 (citing *Florida v. Nixon*, 543 U.S. 175, 192 (2004); *United States v. Cronic,* 466 U.S. 648, 656 n.19 (1984)).

Counsel's incoherent, contradictory defense is particularly inexplicable because an alternate, compelling theory was available. Shell's testimony regarding Charlton's confession was credible, and Dave's involvement in the crime was explained by his

27

impulsivity. Arizona law recognizes that a defendant's characteristic impulsivity may serve as a defense to premeditation. *State v. Christensen*, 628 P.2d 580 (Ariz.1981); *State v. Malone*, 444 P.3d 733, 735 (Ariz.2019). Counsel could have convincingly marshaled such a defense had he only investigated Dave's life.

Counsel knew that Dave suffered childhood physical and emotional abuse. *See* Claim B(2)(i)(a), *infra*. As the district court found, counsel was deficient at sentencing for failing to investigate Dave's background and history, including his precarious mental health. 1-ER-139. Had counsel investigated, he would have discovered Dave's character trait of impulsivity.

At least three lay witnesses were available to testify to Dave's longstanding trait of impulsivity. His oldest sister, Jo explained:

> …David could not see the natural sequence of events that would occur from taking a particular course of action; he had no appreciation of cause and effect despite being told previously what would happen in certain circumstances.[He is]…unable to plan, and acts on the spur of the moment….

3-ER-631–32,¶¶97-98; *id.* at 621,¶47, ("David would do anything on a dare if it would win someone's approval."); *id.* at 622,¶48 (describing Dave's impulsive risk taking on snowmobiles and motorcycles); *id.* at 629,¶88 ("David's behavior sometimes did not make sense. If his car or motorcycle broke down somewhere he would just abandon it and walk rather than bring the bike with him, or try to get it fixed or towed.").

Dave's brother-in-law, Garry Stevens, describes:

> …Dave and I were out riding dirt bikes together. We were ten miles outside of town and my bike broke down. We decided to have Dave tow my bike. We hooked up a tow line and I told Dave to give me time to get on the bike. Dave took off and went a whole block before he even realized I was not there.

3-ER-636,¶7; *id.* ("Dave would drink and do drugs with anyone even if he just met them. He did not think through situations…."). Dave's father, Norm, observed:

> [Dave] crashed his motorcycle countless times trying to get over obstacles.…I often saw him trying to get the motorcycle over something, and he would keep trying to go over it by trying to ramp up the performance of the vehicle until he could do it. It was like David could not learn from his mistakes.

3-ER-653,¶62.

In addition, expert witnesses could have testified to Dave's "impulse-ridden" behavior. 3-ER-702,¶45. Neuropsychologist Dr. Briggs observed Dave's impulsivity on several neuropsychological tests. 5-ER-1174–75. According to neuropsychologist Dr. Froming, Dave's "haphazard pattern of responses and impulsive productions are what characterize…[his] functioning." 3-ER-694–95,¶27; *id.* at 695–96,¶29. Dave's "impulsive and haphazard" responding makes it difficult for him "to perform a systematic, careful analysis." *Id.* Dr. Froming found Dave's impulsivity "so extraordinary that I have not witnessed it in any of my previous evaluations since 1979." 3-ER-701,¶42.

This impulsivity evidence was relevant to the question of premeditation. *Christensen*, *Malone*, *supra*. There was no strategic reason for failing to investigate and

present this evidence, nor could there be. Counsel admitted that his failure to investigate Dave's "background and life history" or to obtain "services of any mental health professional" was not strategic. 2-ER-553,¶10. Counsel's failure to pursue a reasonable defense is not strategic where it stems from a failure to conduct necessary investigation. *Phillips v. Woodford*, 267 F.3d 966, 976-80 (9thCir.2001)(IAC where counsel pursued a "patently meritless alibi defense" without investigating other valid defenses); *Avena*, 932 F.3d at 1250 (IAC for failing to investigate self-defense claim which would have rebutted prosecution's theory of aggravation). "An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy." *Correll v. Ryan,* 539 F.3d 938, 949 (9thCir.2008).

Counsel's presentation of an inconsistent and incoherent defense was prejudicial because a lesser-degree of participation or impulsivity defense would have rebutted premeditation. Available lay and expert testimony would have provided critical context and support for the lack of premeditation, creating "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting [premeditation]." *Strickland*, 466 U.S. at 695. "The establishment of the character trait of acting without reflection tends to establish that [a defendant] acted impulsively. From such a fact, the jury could have concluded that he did not premeditate the homicide." *Christensen*, 628 P.2d at 583. Critically, the jurors were not unanimous on premeditation or felony murder. 6-ER-1392. Had the jurors not been confused by conflicting defenses and known of Dave's impulsivity, they might have

30

acquitted him of premeditated murder and found him guilty of the lesser-included offense of second-degree murder.[4]

Additionally, the same evidence supporting the lesser-degree of participation and *Christensen* defense would have been powerful mitigating evidence for sentencing. "Given the hazards of a weak innocence defense, counsel's failure even to investigate [Petitioner's] potential mental health issues is a strong indication of deficient performance." *Bemore,* 788 F.3d at 1169; *Seidel v. Merkle*, 146 F.3d 750, 755-56 (9thCir.1998)(IAC for failing to investigate and present potentially fruitful mental health defense despite actual and constructive notice of client's mental impairments); *Daniels v. Woodford,* 428 F.3d 1181, 1207-08 (9thCir.2005)(IAC for failing to investigate and present evidence showing client unable to premeditate killing due to mental illness); *Jennings v. Woodford*, 290 F.3d 1006, 1017-19 (9thCir.2002)(same).

### ii. Failure to Call Shell (Amended Petition Claim A(3))

Phil Shell's actual presence at Dave's 1994 trial was essential, as his testimony undercuts Charlton's version of events, casting doubt on both Dave's responsibility for the crime and the sole aggravating factor. At the 1990 trial, Shell testified that while both pretrial inmates in jail, Charlton confessed to him that he stabbed Ms. Souter. Although Shell had been acquitted by the time of the 1990 trial, the jury likely

---

[4] Indeed, the first jury acquitted Dave of the more serious offense of sexual assault and the Arizona Supreme Court reversed for the court's failure to provide the lesser-included instruction of kidnapping, false imprisonment.

discounted his testimony because he was being detained as a material witness and testified wearing handcuffs and jail clothes. 7-ER-1640; 4-ER-889.

In 1994, Shell was a free man living in Missouri and willing to testify for the defense again. Counsel, however, waited until less than two weeks prior to trial to contact Shell. 4-ER-890. Shell was scared to fly but offered to make the journey from Missouri to Tucson via Amtrak or rental car. *Id.* Ultimately, Shell was unable to rent a car because he lacked a credit card required for the rental. *Id.* Investigator James Williams was willing to fly to Missouri and drive Shell back to Tucson to testify, but instead, trial counsel decided to read Shell's prior testimony into the record, implying to the court that Shell was unavailable. 5-ER-1116–17; 7-ER-1580–81, 1493.

Counsel's failure to secure Shell's presence at Dave's 1994 trial was not strategic. Had Shell testified in person, the jury could have looked him in the eye—without cuffs and prison garb—and judged his credibility. Reading Shell's prior testimony into the record denied the jury and sentencing judge this possibility. *Lord v. Wood*, 184 F.3d 1083, 1095 (9thCir.1999)(counsel cannot make judgments about the credibility and appearance of a witness without "looking him in the eye and hearing him tell his story"). Juror Lonnie Ripplinger remembers testimony being read into the record and "thinking that the witness should have been there to testify in person." 2-ER-416,¶7.

Because trial counsel did not call Shell to testify, counsel could not explore areas outside the 1990 transcript. Shell's initial statement to predecessor counsel

contained highly probative evidence not elicited in 1990, such as: 1) Charlton was sitting in a pool of Ms. Souter's blood, 2) Charlton called Ms. Souter "the black whore," 3) Charlton described to others in prison that "cutting somebody's throat is the most horrible thing," and 4) Charlton was going to "lay it on as thick and heavy as he could" to get Dave the death penalty. 8-ER-1703–07. Dave's jury—and the judge that sentenced him to death—were unaware of this evidence. Counsel was ineffective for failing to properly elicit the complete version of the co-defendant's confession. *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9thCir.1994)(IAC for failing to investigate and introduce at trial another suspect's confession).

Counsel's failure to call Shell was prejudicial as he was the only witness who could establish that Dave was not the actual killer, rebut the prosecution's allegation of premeditated murder, and rebut the (F)(6) aggravator. "When defense counsel fails to introduce…evidence that corroborates a key defense witness whom the jury might otherwise not believe…confidence in the outcome is necessarily undermined." *Hart v. Gomez*, 174 F.3d 1067, 1073 (9thCir.1999). Shell's testimony would have supported a lesser-included conviction, undercut aggravation, and provided powerful mitigation of lesser participation. *Ramonez v. Berghuis*, 490 F.3d 482, 491 (6thCir.2007)(IAC for failure to interview potential witnesses whose testimony could have corroborated defendant and rebutted state's witness; "even though the jury could have discredited the potential witnesses…based on factors such as bias and inconsistencies…there nonetheless remained a reasonable probability that the jury would not have").

### iii.    Failure to Investigate Other Witnesses (Amended Petition Claim A(4))

The duty to investigate encompasses, at minimum, investigating key prosecution witnesses. That duty "is especially pressing where, as here, the witnesses and their credibility are crucial to the State's case." *Reynoso v. Giurbino,* 462 F.3d 1099 (9thCir.2006).

Counsel failed to investigate or interview co-defendant Charlton, who had the ultimate incentive to lie. He secured a plea deal that gave him 10.5 years for kidnapping (with parole-eligibility after two-thirds time) instead of the death penalty—or even life—for first-degree murder. 7-ER-1447–48; 8-ER-1791. Charlton ultimately served only eight years and eight months. 2-ER-414,¶13.

Charlton initially told police that after Dave allegedly "raped" Ms. Souter, he asked Charlton "if [he] wanted a shot at it." 8-ER-1818–19. Charlton did not imply that Ms. Souter was dead at the time. *Id.* Almost a year later—*after* finalizing his plea agreement with the prosecution—Charlton claimed Dave said: "it's dead but it's warm. Do you want a shot of it?" 8-ER-1762; 8-ER-1795. Charlton repeated this belated accusation at trial. 7-ER-1422. Charlton's story was a boon for the prosecution, as the court described the alleged statement as "almost a dictionary definition of depravity." 6-ER-1246. Counsel neither asked the court to suppress the recently-fabricated statement nor cross-examined Charlton about it.

34

Had counsel investigated Charlton's plea deal, he would have discovered that in July 1990, Charlton's counsel initially proposed a deal for manslaughter and kidnapping. 8-ER-1797. Yet the prosecution ultimately offered a significantly better plea—for only kidnapping. 8-ER-1791. An obvious reason for this enormous, unsolicited benefit could be the highly aggravating, late allegation by Charlton. Counsel also did not investigate or cross Charlton on the terms of the suspiciously beneficial portion of the plea that released him for 60 days to the custody of his employers, Betty and Clarence Belleville, after testifying but before serving his sentence. 7-ER-1434–35; 8-ER–1792; 7-ER-1433–34, 1442–76. Had counsel investigated Charlton's deal, he would have found that Charlton admitted to violating his terms of release—and in doing so, demonstrating his propensity to lie to authorities. 8-ER-1792; 2-ER-413,¶¶10, 11. Betty and Clarence left the state, leaving Charlton unsupervised, in violation of his conditions of release. 2-ER-413,¶11. When they returned home early unexpectedly, Charlton accosted Clarence with a machete, wielding it "like a killer." *Id.* Clarence reported this incident, including his impression that Charlton approached him "like a killer[,]" to the official in the County's Pretrial Services offices who was responsible for monitoring Charlton. *Id.* This additional evidence of Charlton's propensity for violence, tendency to use knives to attack, and history of lying to authorities would have been valuable impeachment.

Counsel also failed to conduct any investigation of Charlton's background, character, or beliefs, even though counsel's defense centered on Charlton's racism and

prior violent tendencies. 6-ER-1373–76. Counsel did not ask investigator James Williams to interview witnesses with information about Charlton's involvement in the Aryan Brotherhood, even though Williams believed such investigation could establish Charlton's motive for the killing. 6-ER-1219. Preliminary indications of Charlton's racism and violent tendencies were present in the record and should have led a reasonable counsel to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361-62 (5thCir.2005). Counsel knew that Charlton wore grim reaper earrings (a symbol of death and Nazi sympathizing),[5] had "FTW" ("Fuck the World" or "Forever Truly White")[6] carved on one of his knives, and voiced racist beliefs to his then-wife Deborah Hatfield, calling black people "mud ducks." 7-ER-1453, 1473, 1494–95.

Had counsel bothered to investigate Charlton or interview people who knew him, he would have discovered further evidence of Charlton's racism. John Hershiser,

---

[5] Charlton's grim reaper earring was an expression of white power iconography. *See e.g. Mahoney v. Diaz*, No. SACV 13–1082–GW (JPR), 2014 WL 2985720, *5 (C.D.Cal. July 1, 2014)(noting Nazi connection to skull imagery); 4-ER-885.

[6] Both meanings of "FTW" are associated with white supremacist gangs, including the Aryan Brotherhood. *See e.g. Eberle v. Wilkinson*, No. 2:03–CV–272, 2010WL4068511, *1 (S.D.Ohio Oct. 14, 2010)(FTW as slogan of the Aryan Brotherhood); Glendale (CA) Police Dep't, *Gang Training Manual*, at 50, available at https://www.ojp.gov/pdffiles1/Digitization/148396NCJRS.pdf (FTW as slogan of white supremacist motorcycle gangs); Gregg W. Etter, *Totemism and Symbolism in the White Supremacist Movements: Images of an urban tribal warfare culture*, 8:2 J. Gang Res. 49, 54 (2001)(FTW "an old biker philosophy adopted by many skinheads and other neo-Nazi groups").

Charlton's ex-brother-in-law, would have testified that he had heard Charlton make racist statements about black people. 2-ER-398, 399,¶¶9, 13.

Evidence of Charlton's racism, violent tendencies, habitual untruthfulness, and mental instability was important because that evidence supported Shell's testimony that Charlton killed Ms. Souter out of racist rage because she was involved in a sexual act with Dave. 7-ER-1647–48 (Shell explaining Charlton was angry with Dave because "he was kissing with a gal that had just ripped him off and that…Detrich was a nigger lover"); 4-ER-889 (Charlton referred to Ms. Souter as a "black bitch"). This Court previously recognized that trial counsel's failure to develop and introduce evidence of Charlton's Aryan Brotherhood connection, as well as additional evidence of Charlton's racism, "may have prejudiced Detrich." *Detrich V*, 740 F.3d at 1255-56.

Additionally, had he investigated, counsel would have discovered evidence of Charlton's violent tendencies and mental instability. According to Charlton's former girlfriend, Maxine Shaffer, Charlton hung multiple nooses from the pipes of her basement and had a toolbox with "Satan is Lord" written on it. 2-ER-418–19,¶7. Charlton's violent tendencies were corroborated by his ex-wife, who asserts that "[A]lan could just as well killed that woman if he was drunk or high." 2-ER-421. Charlton also exhibited consciousness of guilt. Upon arrest, police confiscated Charlton's suicide note indicating plans to kill himself that night. 2-ER-412,¶7.

Charlton's reputation for untruthfulness also went uninvestigated by counsel. For example, he lied to military officials about his drug use to escape service in the

army. 2-ER-397,¶4. This evidence would have supported the trial theory that Charlton lied to the state to obtain his beneficial plea. Charlton's propensity for lying was corroborated by a witness who says he was "always telling outrageous stories…He told lies and stories and bragged about things.…It was clear to me that he was being untruthful and just wanted to look important." 2-ER-393–94,¶22.

Had trial counsel conducted a sufficient investigation and obtained necessary expert assistance, he would have found that Charlton's story is inconsistent with the physical evidence, as described in subsection (iv), *infra*. First, Charlton's story of how Dave and Souter were seated to his right during the attack and he was "poked" in the arm while driving is contradicted by the physical evidence of cuts on his *left* arm. 2-ER-403–04,¶¶15(c), (d). Second, Charlton's story of Dave stabbing Souter while on top of her is contradicted by the orientation of a wound to her thigh, which was "unlikely to have been inflicted" by an assailant in the position described by Charlton. 2-ER-404,¶15(e). Third, Ms. Souter's postmortem wounds indicate that two people moved her body, contradicting Charlton's story that Dave did this alone. 2-ER-402,¶15(a).

Counsel failed to ask Charlton about any of these issues because he did not sufficiently investigate or obtain expert assistance to guide him. 7-ER-1442–76. This was deficient. *Steinkuehler v. Meschner*, 176 F.3d 441, 444-45 (8thCir.1999)(IAC for failure to impeach critical prosecution witness with available evidence of untruthfulness).

Trial counsel also failed to cross-examine Charlton on record-based inconsistencies with his story. First, counsel failed to cross-examine Charlton on the fact that his timeline leaves several hours unaccounted. Witnesses reported that Dave and Charlton arrived at Ms. Souter's house between 11:30p.m. and 1:00a.m., stayed a short while, and left. 7-ER-1510, 1517–18, 1520, 1545. Charlton testified that they left Ms. Souter's body at Ryan Field and went to Charlton's friend William Carbonell's trailer. 7-ER-1423–25. Charlton testified that he was unsure when they arrived, but implied they went straight to Carbonell's. *Id.* Carbonell stated in his initial interview with police that the men arrived at his trailer at 6:00a.m.; later he stated it could have been around 4:00a.m. 8-ER-1803–04; 7-ER-1564, 1566–67. Thus, between three to over six hours elapsed between their departure from Ms. Souter's house and their arrival at Carbonell's.

Charlton knew the area around Ryan Field well, having once lived nearby. 7-ER-1442. The distance between Ms. Souter's residence and the location in Ryan Field where she was discovered is 21 miles, an approximate 35-minute drive. 6-ER-1367–68; 8-ER-1866–67. The distance between Ryan Field and Carbonell's residence is seven miles, an approximate 10-minute drive. 6-ER-1368–69. The total drive time was approximately 45 minutes, yet they were gone between three and six-plus hours. Charlton has no explanation for this significant time gap, and counsel failed to cross him on it. The gap is accounted for if Dave, Charlton, and Ms. Souter spent time parked behind a bar, as Charlton admitted to Shell. 7-ER-1646–47.

Second, counsel failed to cross Charlton on inconsistencies about the professed motive for the killing. Charlton claims the motive was to find out who sold them bad drugs, but according to Charlton himself, Dave was with Ms. Souter the entire time she was buying the drugs. 7-ER-1409, 1422.

Counsel had multiple opportunities—through a pretrial interview, deposition, or cross-examination—to explore the serious problems with Charlton's testimony and prior statements, but he did not. Counsel had no strategic reason. Counsel simply mistakenly believed he had "no right at this point to interview Charlton, he was interviewed before and testified and whatever." 7-ER-1582.

Counsel's failure to investigate and attack Charlton's credibility when he had such an obvious motivation to lie fell below the standard of care. *Reynoso*, 462 F.3d at 1113-14; *Grant v. Lockett*, 709 F.3d 224, 234 (3dCir.2013)(IAC for failing to investigate and impeach key prosecution witness). Counsel's failure was prejudicial. Charlton's status as a former co-defendant turned informant, as well as his reputation for untruthfulness, violence, and racism, made him highly impeachable. *See In re Peasley*, 90 P.3d 764, 768,¶10 (Ariz.2004)(witness "highly impeachable…because he was a drug addict with multiple felony convictions and agreed to testify to avoid prosecution and a potentially lengthy prison sentence on another charge").

"[W]hen the prosecution emphasizes a witness's testimony, impeachment of that witness may significantly damage the prosecution's case." *Reynoso*, 462 F.3d at 1117 (citing *Horton v. Mayle*, 408 F.3d 570, 580 (9thCir.2005)). The prosecution here

40

heavily emphasized Charlton's testimony and attested to its veracity. 6-ER-1391 ("[W]hen you look at Charlton's testimony compared to everything, there is no question he is *telling the truth* probably about everything except for the stuff about the change of appearance had nothing to do with him wanting to buy some time. You look at it. He *told the truth*.")(emphasis supplied); *see also*, 7-ER-1503–06; 6-ER-1370–72, 1381, 1384—90.

The prosecutor had to emphasize Charlton's testimony to get a conviction, since no physical evidence pointed to the actual killer, Charlton confessed to Shell that he was the actual killer, Charlton's knife was the most consistent with Ms. Souter's wounds, and Charlton and Dave were the sole eyewitnesses to her death. By failing to investigate, counsel allowed the prosecution to bolster this indispensable witness by falsely asserting that allegations of Charlton's racist motivations were untrue. 6-ER-1388 ("I can assure you that if any of that were true, that Charlton didn't like blacks and has a grudge against them…you would have seen a line of witnesses come up to the witness stand. They weren't called because it simply isn't true."). *See United States v. Tucker*, 716 F.2d 576, 584 (9thCir.1983)(IAC for failure to interview witnesses who would have corroborated defense heightened by prosecutor's argument of lack of corroboration). The jury did not unanimously convict on a premeditation theory, demonstrating they did not entirely believe Charlton. *Detrich V*, 740 F.3d at 1249. There is a reasonable probability that had counsel investigated and competently cross-examined Charlton, Dave would have been acquitted of

premeditated murder. Similarly, there is a reasonable probability that the sentencer would not have found Dave solely responsible for the killing. 1-ER-269 ("[I]t has been proven beyond a reasonable doubt, based on the evidence adducted at trial, and on the verdicts of the jury, and *in particular on the testimony of Mr. Charlton*…that the defendant alone killed the victim in this case.")(emphasis supplied).

Counsel also failed to investigate Charlton's friend Carbonell, who testified that Dave said that he killed Ms. Souter. 7-ER-1565. This testimony "was devastating" but also "inconsistent with what Carbonell had stated in a pre-trial interview with investigators." *Detrich V*, 740 F.3d at 1258-59. During that interview, Carbonell said Dave had *not* confessed, and he was only told later by Charlton that Dave was responsible. 8-ER-1692. Yet the jury "never heard Carbonell's prior statement because Detrich's trial counsel failed to introduce it." 740 F.3d at 1259. Instead, counsel relied on prior counsel's paltry interview and Carbonell's prior testimony, even though he knew of prior counsel's drug addiction and lack of investigation. 2-ER-552–53,¶¶7, 11.

This inconsistency was not the only reason to be skeptical of Carbonell. When asked about his priors during a 1990 interview with defense counsel, Carbonell only mentioned a few arrests for domestic disputes. 8-ER-1699–1700. Yet, not long before that interview, Carbonell was charged with criminal assault, leaving the scene of an accident causing death or injury, and driving with a suspended license, and there was an active warrant for his arrest for failing to appear. 8-ER-1798–99, 1790. Counsel

failed to uncover this. Carbonell also stole valuable equipment from his employer, a witnesses interviewed by police, but counsel knew nothing about this impeaching behavior because he did not interview her. 2-ER-391, 395–96,¶¶13,32. The net effect of these failures was the corroboration of Charlton's account by a witness who was eminently impeachable.

### iv. Failure to Obtain Necessary Expert Assistance (Amended Petition Claim A(5))

One of defense counsel's most vital duties is to investigate potential challenges to the state's physical evidence. In 1994, it was firmly established that expert assistance may be necessary to uphold that duty. 1989 ABA Guidelines, 11.4.1(D)(7). *See also Harris*, 64 F.3d at 1436 (IAC where counsel did not obtain independent evaluation of state's forensic evidence); *Duncan*, 528 F.3d at 1235-36 (same). Dave's counsel failed to obtain an expert to evaluate the State's physical evidence supporting his conviction and death sentence.

Expert testimony would have demonstrated that the physical evidence contradicts Charlton's story about Ms. Souter's killing. Charlton testified that while he was driving, Ms. Souter was "slid down on the car seat with [Dave] on top of her humping her" and that Dave stabbed her. 7-ER-1419–20, 1424. However, Ms. Souter had a wound on her left thigh that ran from "back to front, left to right and slightly upwards." 2-ER-404,¶15(e); 8-ER-1854. An independent pathologist would have testified that the angle of this wound indicates it was likely not inflicted by an attacker

43

positioned on top of her, as Charlton described. 2-ER-404,¶15(e). Further, cuts on

Charlton's *left* arm were inconsistent with him driving while Dave attacked Ms. Souter

to his right. 2-ER-403,¶¶15(c),(d).

Additionally, Charlton claimed that Dave *alone* moved Ms. Souter's body out of

the car without his help. 8-ER-1818, 1821–22; 7-ER-1680, 1675, 1423–24. An

independent pathologist would have testified that the location of post-mortem scrapes

on Ms. Souter, the positioning of her body, and the condition of the scene were

inconsistent with her having been moved by a single person. 2-ER-402–03,¶15(a)-(b).

Thus, the physical evidence indicates that two people likely moved her body from the

car. This physical evidence corroborates Carbonell's original statement, that Charlton

confessed that *he and* Dave moved Ms. Souter's body, saying "*we* dropped the body

off." 8-ER-1808. Had counsel obtained an independent pathologist, he could have

presented this evidence demonstrating that Charlton was minimizing his role in the

crime.

Because trial counsel failed to retain an expert, the only expert testifying to Ms.

Souter's wounds and circumstances of death was the state's pathologist, Dr. Henry.

Dr. Henry identified three potentially fatal wounds: Injury #11, wound to the front of

the neck, right carotid artery and thyroid cartilage; Injury #18, wound to the left of

the neck and left jugular vein; and Injury #26, wound to the left anterior abdomen. 7-

ER-1531–33, 1536–38. The prosecutor asked Dr. Henry how long Ms. Souter would

have remained conscious for each *individual* potentially fatal wound. 7-ER-1537–39.

Dr. Henry testified: 1) Injury #11 alone would not have rendered Ms. Souter "immediately unconscious[;]" 2) Injury #18 alone would not cause unconsciousness "immediately[,]" instead causing unconsciousness after "an hour or two, maybe a little longer even[;]" and 3) Injury #26 would not cause unconsciousness "in and of itself" until more than an hour. *Id.*

An independent pathologist would have rebutted Dr. Henry's testimony regarding Ms. Souter's consciousness. Injuries #11, #18, and #26 were sufficient to cause unconsciousness by themselves. *See e.g.,* 2-ER-405,¶¶15(h)(Injury #11); *id.* at 405,¶15(i)(Injury #18); *id.* at 405,¶15(k)(Injury #26); *see also id.* (a person goes into irreversible shock resulting in unconsciousness and death when they lose 20-25% of their blood volume; Ms. Souter lost over 15% of her blood volume from Injury #26 alone). The blunt force head injury alone also could have caused unconsciousness. *Id.* at 405,¶15(j)(blunt force injury to head).

Further, the most relevant consciousness consideration is the effect of the *combination* of injuries. Although the prosecutor asked Dr. Henry whether the combination of wounds would cause *death* more quickly than any individual wound, no counsel asked how it would affect *consciousness*. An independent pathologist would have testified, "A combination of all injuries, both sharp and blunt force, would have rendered Ms. Souter unconscious more quickly than any single injury…[S]he could have been conscious for only a few minutes at most, possibly less." 2-ER-405,¶15(k). Had trial counsel presented this evidence, there is a reasonable probability that the

45

sentencing court would not have found the especially cruel aggravator. Claim B(a), *infra*.

Expert testimony also would have rebutted Charlton's allegation that Ms. Souter "gurgled" in response to a question by Dave during the attack. An independent pathologist would have testified that even if Ms. Souter emitted a gurgling sound, it is "unlikely to be reflective of a conscious attempt to talk." 2-ER-405–06,¶15(l). Instead, the sound was more likely from the involuntary passing of blood through the airway or the expelling of blood through the airway, "even if a person is unconscious or dead." 2-ER-405–06,¶15(l).

The court used the "gurgling" evidence to find that Dave killed Ms. Souter, 1-ER-269–70, and partially based its "especially cruel" finding on it. 1-ER-271–72. The court would not have drawn these conclusions with an independent pathologist's findings. *See* Claim B(2)(ii)(a), *infra*.

Moreover, both Dr. Henry and the independent pathologist agree the order of Ms. Souter's injuries is unknown. 7-ER-1535–36; 2-ER-405,¶15(j). The head injury could have been the first, or one of the first, wounds. If so, she could have been unconscious prior to receiving any other wounds, negating evidence of conscious suffering under (F)(6). *See* Claim B(2)(ii)(a), *infra*.

An independent pathologist's findings also would have rebutted Dr. Henry's testimony that Ms. Souter could have lived for 15-20 minutes after receiving Injury #11, and for 1-2 hours after receiving Injury #18. 7-ER-1533, 1538–41; *see also* 8-ER-

1840–65; 7-ER-1598–1626. In fact, Dr. Henry's time estimations regarding Injury #11 and #18 are "unsupported" by medical literature. 2-ER-406–07,¶¶15(n), (o). An independent pathologist would have testified, "Injury #11 is a significant injury that would have bled vigorously and by itself could have rendered Ms. Souter unconscious and led to her death." 2-ER-405,¶15(h). Injury #11 *alone* would have caused Ms. Souter's death in "less than 6 minutes[,]"—not 15-20 minutes as Dr. Henry testified. *Compare* 2-ER-406,¶15(n) *with* 7-ER-1539. Similarly, Injury #18 "would have also resulted in significant blood loss" and that injury *alone* likely would have caused death in a "matter of minutes"—not the one to two hours to which Dr. Henry testified. 2-ER-405–07,¶¶15(i),(o); 7-ER-1538. Injury #18 also could have created an air embolus, which *alone* could cause unconsciousness and death. 2-ER-405,¶15(i).

Further, the combination of injuries would have hastened Ms. Souter's death. 2-ER-407–08,¶15(s). Given the totality of her injuries that also resulted in blood loss, Ms. Souter "could have lived for a maximum of only a few minutes after the infliction of the first injury. Death could have occurred much sooner as multiple mechanisms…were at play." *Id.* Had this testimony been presented, there is a reasonable probability that the sentencer would not have found that "from the testimony of the pathologist at trial, that the victim was alive during a significant period of the time that the wounds were inflicted and after struggled." 1-ER-271.

Counsel's failure to "investigate the State's forensic evidence…had a palpably adverse effect on the defense." *Elmore v. Ozmit*, 661 F.3d 783, 851 (4thCir.2011). A

47

reasonable probability exists that the jury, which was already divided on premeditation, would have rejected the state's theory of premeditation had counsel developed any of the above evidence that discredits Charlton's account of the crime. 2-ER-415–16 (evidence of how the victim was killed was important to juror). A reasonable probability also exists that, had counsel developed the evidence undermining the medical examiner's testimony, the sentencing court would not have found (F)(6)'s "especially cruel" prong. *See* Claim (B)(2)(ii)(a), *infra*.

### 3. District Court Analysis

The district court did not rule on the merits of the failure to present a coherent defense allegation, reasoning that the *Christensen*-related arguments were outside this Court's remand. 1-ER-76–77. This was erroneous. This Court remanded under *Martinez* "with respect to all [guilt-phase IAC] claims that Petitioner has raised." *Detrich V*, 740 F.3d at 1267 (Graber, J., dissenting). Moreover, this Court specifically authorized the district court to evaluate *Strickland* cause and prejudice for the claims covered by the remand. *Id.* at 1248. The *Christensen* arguments—the viable, alternative defense not pursued due to counsel's lack of investigation—demonstrate prejudice. Accordingly, these arguments were within the scope of the remand.

As to counsel's failure to call Shell live, the district court found it was outside the scope of *Martinez* because it was adjudicated on the merits by the PCR court but not fairly presented to the Arizona Supreme Court. 1-ER-66–67. *Martinez*'s holding "does not concern attorney errors in other kinds of proceedings, including appeals

48

from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." 566 U.S. at 16. The district court agreed that in capital cases the Arizona Supreme Court's review is not "discretionary review" within the meaning of *Martinez*, but concluded that it counts as an appeal from a collateral proceeding and was thus was outside of *Martinez*'s exception. 1-ER-66.

The district court also concluded that the new evidence—Shell's and Juror Ripplinger's declarations, and defense investigator Williams' interview—which were developed after initial PCR, did not fundamentally alter the claim to as render it unexhausted and thus within the scope of *Martinez*. 1-ER-68; *see Dickens v. Ryan*, 740 F.3d 1302, 1318-19 (9thCir.2014). It suggested that this new evidence "casts additional aspersions on counsel's performance" but does not place the claim in a substantially different or stronger position than when it was before the PCR court. *Id.*

The district court was wrong on both points. First, while this claim was absent from the body of the petition for review, postconviction counsel attached the full petition—including this claim—in the appendix to the Arizona Supreme Court. 5-ER-1148. This sufficed to satisfy the fair presentation requirement. *Scott v. Schriro*, 567 F.3d 573, 582 (9thCir.2009)(claims contained only in appendix to petition for review fairly presented to Arizona Supreme Court). Further, this claim was presented again in successive postconviction proceedings in 2005. 4-ER-822–23; 3-ER-739–40. Thus, this claim and supporting evidence was before the Arizona Supreme Court well before

the district court's 2007 ruling, let alone in 2022, and was therefore not outside *Martinez*'s scope.

Alternatively, the new evidence fundamentally alters this claim, rendering it unexhausted and reviewable under *Martinez*. Initial PCR counsel made a bare allegation that live testimony would have been more compelling. 6-ER-1199–1200. The court summarily dismissed this claim as "speculative at best." 1-ER-262. Evidence presented after initial PCR shows that prejudice was not mere speculation. Juror Ripplinger admitted that he discounted Shell's testimony specifically because he was not present at trial. 2-ER-416,¶7. Shell admitted that his 1990 testimony—read into the record in 1994—was not as compelling as it could have been because he was under severe stress then, having spent a year in jail wrongfully accused of a murder, held over as a material witness after acquittal, and enduring divorce, financial troubles, and his wife's severe illness. 4-ER-889–90. Because of his exhaustion and counsel's incompetent examination, Shell "didn't get to explain about Mr. Charlton's confession as much as I wanted to[.]" *Id.*

This new information places this claim in a significantly different and stronger evidentiary posture than it was when the state courts considered it. *Dickens*, 740 F.3d at 1318. These new facts alter the claim, rendering it unexhausted. For the reasons explained above, the claim was substantial, as indicated by the district court's issuance of a COA. PCR counsel was therefore ineffective for failing to adequately raise it. *See* subsection (2)(i)(b), *supra*. It is therefore within *Martinez*'s scope.

As to counsel's failure to investigate the full benefit to Charlton, the district court found no prejudice because "[t]here is no evidence in the record suggesting that Charlton received, or expected to receive, any additional benefit for testifying a second time." 1-ER-81. This erroneously focused solely on the second trial. Counsel failed to investigate the plea he reached before the *first* trial, in which he received a deal that was substantially more favorable than even what his own lawyer proposed. *Compare* 8-ER-1797 *with* 8-ER-1791. As explained, Charlton offered the most prejudicial testimony against Dave only *after* securing this deal. Counsel's failure to impeach Charlton with this information at the second trial was ineffective. *Reynoso*, 462 F.3d at 1115 (IAC for failing to cross-examine witness about motive for testifying); *Campell v. Reardon*, 780 F.3d 752, 768-69 (7thCir.2015)(IAC for failing to investigate and impeach witnesses receiving immunity in exchange for testimony).

The district court further concluded that counsel's failure to cross-examine Charlton is beyond the scope of the claim that counsel failed to investigate Charlton's plea. 1-ER-81. That conclusion is nonsensical—the value of such investigation is the ability to impeach Charlton with the plea information, and counsel's inability to impeach Charlton is what establishes prejudice for his lack of investigation.

The court found, alternatively, no prejudice resulted from counsel's failure to cross Charlton. 1-ER-82 (finding it unlikely that using the plea to cross-examine Charlton on his recently-fabricated "dead but warm" statement "would have resulted in a different outcome"). The court conceded the statement "factored significantly

51

into the trial court's finding of depravity," yet held the "heinous and depraved" prong was established by other factors, including gratuitous violence. 1-ER-83–84. The court also noted the (F)(6) aggravator was separately established by "especial cruelty." 1-ER-85–86.

These conclusions ignore critical facts and misstate Arizona law. As discussed in Claim (B)(2)(ii)(a), *infra*, trial counsel could have refuted the especial cruelty finding if he had retained an independent pathologist. Additionally, the district court's summation of Arizona "heinous or depraved" law is wrong. The court rejected the argument that a finding of depravity "must be based on the mental state of the defendant," concluding that a depravity finding based on gratuitous violence can be based solely on the defendant's actions, including the number of wounds inflicted. 1-ER-84 (citing *State v. Clark*, 616 P.2d 888 (Ariz.1980)). Rather, to establish gratuitous violence, the prosecution must prove that a defendant continued to inflict violence *after knowing that a fatal action had occurred. State v. Bocharski*, 189 P.3d 403, 421,¶¶86-87 (Ariz.2008). The number of wounds, alone, does not establish gratuitous violence. *See e.g. id.* at 421-22,¶¶85-90 (no gratuitous violence despite 24 stab wounds to head and face); *State v. Wallace (Wallace III)*, 191 P.3d 164, 169,¶¶18-26 (Ariz.2008)(no gratuitous violence despite victim being struck 10 times with bat and stabbed). Both the evidence that Charlton was the killer and Dave's impulsivity casts doubt on whether Dave possessed the requisite mental state to establish this aggravator. *See* subsections (2)(i)-(iv), *supra* & Claim (B)(2)(ii)(b), *infra*.

In short, the "dead but warm" statement was powerfully aggravating—"almost a dictionary definition of depravity." 6-ER-1246. Counsel's failure to investigate prevented effective impeachment of Charlton regarding this statement, to devastating effect. The other bases for finding (F)(6) were relatively weaker—and would be weaker still but for counsel's numerous other deficiencies.

Regarding evidence of Charlton's racism, the district court clearly erroneously found no evidence of Charlton's Aryan Brotherhood membership at the time of the offense and that other evidence documenting his racism were cumulative to the trial testimony. 1-ER-87–90. At the time of the offense, Charlton possessed grim reaper earrings and the "FTW" knife, symbols associated with the Aryan Brotherhood/white supremacist gangs. Defense investigator Williams stated that Charlton's Aryan Brotherhood affiliation was known at the time of trial, per Charlton's own wife. 6-ER-1219,¶4; 5-ER-1114. Evidence that Charlton did not merely harbor racist beliefs but identified with a white supremacist organization recasts the other evidence of his propensities and is not cumulative. As the plurality noted, "Even if the jury believed that Charlton did not like black people, it would have been qualitatively different to know that he was involved in the Aryan Brotherhood, whose members commit racially motivated murders." *Detrich V*, 740 F.3d at 1257. Such evidence would have bolstered the defense by corroborating other evidence and provided additional, compelling evidence for Charlton's motive. *See Washington v. Smith*, 219 F.3d 620, 634 (7thCir.2000)(IAC for failing to present additional alibi evidence where alibi central to

defense). Evidence is only cumulative where it supports a fact whose existence is no longer in dispute. *Id.* Charlton's racism was disputed by the prosecution which argued, it "simply isn't true" that Charlton "didn't like blacks and has a grudge against them" and testimony to the contrary was a lie. 6-ER-1388. Evidence of Charlton's white supremacist affiliations would have foreclosed such argument.

The district court erroneously concluded that allegations that counsel failed to investigate Charlton's propensities for violence and lying were not presented in the amended petition and thus outside the scope of the remand. 1-ER-90–91. The petition indeed alleged that counsel failed to thoroughly investigate "backgrounds of critical state's witnesses, including the racist, violent background of Charlton." 5-ER-935. These allegations were fairly presented.

The court alternatively concluded that counsel's failure to develop evidence of Charlton's violence and dishonesty is insufficient to establish prejudice. 1-ER-90–92. It based that conclusion on an unreasonable appraisal of the evidence. For example, while the court suggested that a witness only accused Charlton of bragging, *id.*, she actually stated that he "told lies" and was "untruthful." 2-ER-393–94,¶22. Similarly, in dismissing a statement from Charlton's ex-wife that she believed Charlton could have killed the victim, the court noted she "was not present during the murder." 1-ER-90–92. But this has no bearing on Charlton's *propensity* for violence. The court similarly minimized a declaration from Charlton's ex-girlfriend stating, nearly 30 years after their relationship ended, that she remained afraid of him. *Id.*

54

In sum, there was ample available evidence that Charlton was an unreliable, violent white supremacist. Given Charlton's centrality to the state's case in guilt and aggravation, counsel's failure to develop and impeach Charlton with this evidence was prejudicial.

In concluding that trial counsel was not ineffective for failing to impeach Carbonell with his untruthfulness, the district court adopted mistaken interpretations of the evidence and Arizona law. For example, in minimizing the impeachment value of Carbonell lying about his arrest record, the court described Carbonell as providing an "incomplete recitation of his arrests four years before his interview[.]" 1-ER-96. In fact, the interview occurred a mere five months after the arrests, not four years. *Compare* 8-ER-1682–1700 *with* 8-ER-1798–99. The Court's implication that Carbonell was simply forgetful due to the passage of years is unsupported.

The court, citing Arizona Rule of Evidence 608(b), also concluded that Carbonell's thefts would be inadmissible impeachment. However, a witness's prior misconduct may be inquired into on cross-examination when it is "probative of the [witness's] character for truthfulness or untruthfulness." Ariz.R.Evid.608(b)(1). *Accord State v. Woods,* 687 P.2d 1201, 1205 (Ariz.1984). Counsel could have impeached Carbonell with these thefts had he investigated.

As to counsel's failure to secure expert assistance to rebut Charlton's "gurgling" allegations, the district court found it was not presented to the Arizona Supreme Court on petition for review, and thus falls outside the scope of *Martinez.* 1-

55

ER-100. This is again incorrect. The petition for review alleged counsel's ineffectiveness for failing to retain a forensic expert to test "whether or not Mr. Charlton's version of events was plausible." 5-ER-1151–52. Charlton's version of events includes the "gurgling" allegation, which came only from him. Thus, this allegation was part of the petition for review and therefore remains within *Martinez*'s scope. Further, as explained above, the inclusion of the full postconviction petition in the appendix to the petition for review constitutes a fair presentation of this claim to the Arizona Supreme Court. *Scott*, 567 F.3d at 582.

Next, the district court treated as separate the IAC allegation of failing to retain a pathologist who could 1) rebut Charlton's story, 2) rebut the state's pathologist, and 3) present evidence about Ms. Souter's wounds that would undermine the State's aggravation. 1-ER-100–01. It reasoned that these specific allegations "were not presented in his Amended Petition," "were not found procedurally defaulted by this Court," and therefore "were not remanded by the Ninth Circuit," rendering the district court "without jurisdiction to consider them." *Id.* This was erroneous.

Initial postconviction counsel alleged that counsel was ineffective for failing to retain a forensic expert to test "whether or not Mr. Charlton's version of events was plausible." 5-ER-1151–52. This fairly encompassed rebuttal of the forensic evidence corroborating Charlton and the aggravation based on his testimony. Additionally, this Court's remand permitted the district court to consider any issues relevant to sentencing. *Detrich V*, 740 F.3d at 1249. Because these allegations all ultimately bear

on sentencing, they are within the scope of the remand and the district court's jurisdiction.

### 4. AEDPA Does Not Bar Relief

The state court did not rule on the merits of the failure to present a coherent defense or failure to investigate other witnesses allegations (subsections (2)(i)&(iii), *supra*). When these allegations were raised in a successive PCR, the court denied relief exclusively on procedural grounds. 1-ER-260. Therefore, §2254(d) does not apply and this claim is entitled to *de novo* review. *Johnson v. Williams*, 568 U.S. 289, 303 (2013)(*de novo* review where habeas petitioner overcomes rebuttable presumption that claim was dismissed on merits); *James v. Ryan*, 733 F.3d 911, 914 (9thCir.2013)(dismissal on procedural grounds overcomes the *Williams* presumption).

Initial PCR counsel's failure to raise these allegations is excused under *Martinez*. "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. To establish cause, a defendant must demonstrate that 1) the claim is substantial, and 2) counsel was ineffective during collateral review proceedings. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)(citing *Martinez, supra*, at 13-17).[7]

---

[7] As this Court recognized, the two other *Martinez* "cause" requirements are clearly satisfied here. *Detrich V*, 740 F.3d at 1245.

These allegations are substantial. "To show that his claims are 'substantial,' a petitioner must demonstrate that they have 'some merit.'" *Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9thCir.2019)(quoting *Martinez*, 566 U.S. at 14). In determining substantiality, the Supreme Court "has cited as analogous the standard for granting a certificate of appealability ("COA") under 28 U.S.C. §2253." *Leeds v. Russell*, 75 F.4th 1009, 1018 (9thCir.2023)(citing *Martinez, supra*, at 14). "For a…[COA]…to issue, a habeas petitioner must show 'that reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement.'" *Id.* (quoting *Apelt v. Ryan*, 878 F.3d 800, 828 (9thCir.2017)(quotations omitted)). Here, the district court issued a COA for these allegations, demonstrating substantiality. Further, for the reasons explained above, these allegations have more than "some merit"—they warrant relief.

Second, initial PCR counsel was ineffective. A petitioner "need show only that…PCR counsel performed in a deficient manner" and "need not show actual prejudice…over and above his required showing that the trial-counsel IAC claim be 'substantial' under the first *Martinez* requirement." *Detrich V*, 740 F.3d at 1045-46. The relevant question is whether a "reasonable [state] court *could* have granted [Dave's] post-conviction petition" had PCR counsel raised this claim. *Leeds*, 75 F.4th at 1023 (emphasis supplied). "In practical effect, the prejudice analysis under both the first and second *Martinez* requirements is the same." *Creech v. Richardson*, 59 F.4th 372, 387

(9thCir.2023). Because a reasonable court could have granted Dave relief on these *Strickland* allegations, initial PCR counsel was ineffective for failing to raise them.

As to counsel's failure to call Shell live and failure to retain forensic assistance (subsections (2)(ii), (iv), *supra*), this Court should review the deficiency prong of these allegations *de novo* because the state court dismissed it on prejudice grounds alone. 1-ER-262; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534. Alternatively, if this Court finds that AEDPA applies to both *Strickland* prongs, then relief is appropriate because the state court decision was an unreasonable application of *Strickland* and based on an unreasonable determination of the facts.

### i. The State Court Decision Was Based on an Unreasonable Application of *Strickland*

The state court summarily dismissed counsel's failure to call Shell as "speculative…because Petitioner presented no legal authority to support it."[8] 1-ER-262. The court also concluded that "the overwhelming evidence of Petitioner's guilt and the fact that the first jury convicted him, despite its opportunity to hear [Shell]'s live testimony" prevented a prejudice finding. *Id.* These conclusions are unreasonable. §2254(d)(1).

First, it is unreasonable to conclude that failing to call a critical live witness is not deficient. Courts have frequently found deficiency for such error. *See e.g. Ramonez*,

---

[8] The state court record at times mistakenly refers to Shell as "William Schell." *Detrich V*, 740 F.3d at 1271 n.11 (Graber, J., dissenting).

490 F.3d at 491. Arizona law has long recognized the great probative value of live testimony. *State v. Talmadge*, 999 P.2d 192, 195,¶14 (Ariz.2000)(Arizona Supreme Court "stated a clear preference for live testimony in a manner that suggests having live witnesses is the most advantageous way to proceed: 'The live testimony of the proposed witness as opposed to the written interrogatories could have been the difference between conviction and acquittal.'")(quoting *State v. Brady*, 594 P.2d 94, 96 (Ariz.1979)). The state court's dismissal of this error as mere speculation is unreasonable. *Ramonez*, *supra*, at 491 (unreasonable application of *Strickland* to conclude defendant not prejudiced by counsel's failure to interview corroborating witnesses and secure live testimony).

The state court also unreasonably discounted the value of Shell's testimony. The "overwhelming" evidence of guilt was primarily the testimony of Charlton, which would have been significantly undermined by Shell. The state court's pat assessment of the evidence was unreasonable. *Liao v. Junious*, 817 F.3d 678, 693-94 (9thCir.2016)(unreasonable application where state court assumes no prejudice based on strength of prosecution's case without assessing impact of counsel's errors); *Lord*, 184 F.3d at 1095-96.

The state court finding of no prejudice because Shell's live testimony in 1990 did not result in an acquittal was also unreasonable. There were critical differences between Shell's testimony in 1990 and the testimony he could have provided at retrial. In 1990, Shell testified while handcuffed and wearing jail clothes, and was under

duress from being detained as a material witness and other life-stressors. This impaired his credibility before the jury. *Harrell v. Israel*, 672 F.2d 632, 635 (7thCir.1982)(shackling of defense witness "may harm [defendant] by detracting from his witness' credibility). At retrial, Shell was a free man and would have testified in street clothes. Further, as outlined above, Shell's 1990 testimony omitted numerous details that would have undermined Charlton's credibility had counsel elicited them at retrial. In short, Shell's testimony in 1994 would have been far more probative and persuasive than his compromised 1990 testimony, and the state court's failure to consider that difference constitutes an unreasonable application of *Strickland*. *Hinton v. Alabama*, 571 U.S. 263, 275-76 (2014)(*per curiam*)(IAC for selecting inexperienced expert; although more experienced expert would have provided same opinion, reasonable probability that jury would have found more experienced expert more credible); *Washington v. Smith*, 219 F.3d 620, 634-35 (7thCir.2000)(unreasonable application of *Strickland* where counsel did not call additional alibi witnesses; uncalled witnesses "more credible" than those who testified).

The state court also summarily denied relief for counsel's failure to retain an expert to rebut the "gurgling" evidence (subsection (2)(iv), *supra*), reasoning it was "merely speculative to assume that the victim's attempt to respond occurred after the most serious" of the four wounds on her neck" and "overwhelming evidence apart from Charlton's testimony" demonstrated that Dave committed the murder. 1-ER-263.

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Counsel's performance is *per se* deficient "when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" *Rios*, 299 F.3d at 805 (quoting *Sanders*, 21 F.3d at 1456). When a failure to investigate prevents counsel from successfully challenging key prosecution witnesses, the defendant is prejudiced. *Hardy*, 849 F.3d at 823-24 (IAC for lack of investigation preventing cross-examination of key prosecution witness with evidence he was actual killer). This is true even when—unlike here—there is substantial other evidence of guilt. *Daniels*, 428 F.3d at 1206-08, 1210 (despite "overwhelming" evidence of culpability, IAC for failing to investigate and present defense which could have resulted in conviction of lesser degree of homicide). Counsel's failure to conduct any investigation into the circumstances of the victim's death was deficient; no reasonable jurist could conclude otherwise.

Here, the only witness to the homicide was Charlton, who cast Dave as directly responsible. With expert assistance, counsel could have rebutted Charlton's account, impeached the prosecution's star witness, and corroborated Shell's testimony. An expert could also have rebutted the medical examiner, whose unchallenged testimony buttressed Charlton. With the jury already divided on a theory of culpability, there is a reasonable probability that the jury would have found Dave not guilty of premeditated murder. *Duncan*, 528 F.3d at 1235-36; *Kelsey v. Garrett*, 68 F.4th 1177, 1188-90

(9thCir.2023)(IAC for not consulting with forensic pathologist who could have supported defense theory and rebutted state's experts).

### ii. The State Court Decision was Based on an Unreasonable Determination of the Facts

When the state factfinding process is flawed, its decision is based on an unreasonable determination of the facts under §2254(d)(2). "[U]nreasonable determination[s] of the facts" by a state court include: neglecting to find a fact that it should have; factfinding under a misapprehension of the correct legal standard; making evidentiary findings without a hearing; misapprehending or misstating the record in its findings; or ignoring evidence of a claim before it. *Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9thCir.2004)(*abrogated on other grounds by Pinholster*, 563 U.S. 170). The fact-finding process was unreasonable here because the state court refused to grant expert assistance or a hearing where issues of material fact existed.

Initial PCR counsel sought expert assistance and a hearing on the allegations regarding counsel's failure to secure Shell's live testimony and obtain expert assistance (subsections (2)(ii)&(iv)). 6-ER-1200, 1207–08. The state court denied a hearing and relief, finding the allegations not "colorable" and lacking prejudice. 1-ER-262–63. Under state law, however, the colorable claim standard is low—a petitioner is entitled to a hearing where his claim presents "issues of material fact." Ariz.R.Crim.P.32.8(a)(1999). This claim satisfied that low bar. PCR counsel made allegations about what Shell would have testified to at retrial and disputed trial

counsel's assertion that Shell was unavailable. 6-ER-1199–1200. Initial PCR counsel supported the expert allegation with an expert affidavit challenging Charlton's gurling testimony and flagging the need for an independent pathologist. 6-ER-1225,¶5. By denying relief on this record "without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process…is deficient' and not entitled to deference." *Hurles v. Ryan*, 752 F.3d 768, 790 (9thCir.2014)(quoting *Taylor*, 366 F.3d at 1001)).

In analyzing prejudice, the state court found "overwhelming" evidence apart from Charlton's testimony pointed to Dave committing the murder, but did not identify what that evidence was. It is difficult to imagine what it could be given that Charlton and Dave were the only possible eyewitnesses to the murder. The court's conclusion that Dave's direct responsibility for the crime was provable absent Charlton's unchallenged testimony is simply unsupportable. This misapprehension of the evidence was an unreasonable determination of the facts. §2254(d)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)(*Miller-El I*); *Wiggins*, 539 U.S. at 528.

### 5. Evidentiary Development

Originally, the district court found PCR counsel diligent. DCT.Dkt.93 at 37-38 (diligence in seeking appointment of forensic expert). The district court denied a hearing, finding Dave "failed to demonstrate how the examination of forensic evidence could establish a reasonable probability that the outcome of trial would have been different" and failed to "allege[ ] any facts that could demonstrate that the state

court's resolution of this claim was an objectively unreasonable application of *Strickland*." 1-ER-197. On remand, the district court again denied a hearing, reasoning that PCR counsel had defaulted the allegation related to the victim's consciousness, that Dave had not satisfied *Martinez* to overcome the default, and that *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), did not excuse counsel's lack of diligence. 1-ER-100, 110. This is erroneous. This allegation was not defaulted, as PCR counsel clearly alleged it in his petition and included it in the appendix to his petition for review. *See* discussion, subsection (4), *supra*. Counsel was diligent in seeking investigative assistance, a forensic expert, and a hearing. 6-ER-1200; 6-ER-1225,¶5; 1-ER-262. Counsel also unsuccessfully sought evidentiary hearings in successive postconviction in 2005 and 2016. 4-ER-877; 1-ER-260; 2-ER-375; 1-ER-8. "A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim and therefore satisfies §2254(e)(2)." *Stanley*, 598 F.3d at 624; *Williams v. Taylor*, 529 U.S. 362, 435 (2000)(diligence requires prisoner seek hearing in state court in manner prescribed by state law). Because of these efforts, §2254(e)(2) is satisfied and evidentiary development was warranted.

This Court should find postconviction counsel was diligent, and the district court abused its discretion in denying an evidentiary hearing. Additionally, this Court may consider all exhibits attached to the supplemental *Martinez* briefing in support of this claim because Respondent did not object to, and the district court granted, expansion of the record to include all such exhibits. 1-ER-110–11.

Should this Court find that initial PCR counsel's factual development efforts fell short, it should find he was ineffective under *Martinez* and that evidence developed after initial PCR fundamentally alters the claim. *Dickens*, 740 F.3d at 1318. Under these precedents, Dave must establish: 1) post-conviction counsel failed to establish the facts to show trial counsel was ineffective, 2) new facts developed after postconviction place the claim in a "significantly different and stronger evidentiary posture," and 3) the claim is "substantial."

Dave has explained why PCR counsel was ineffective for failing to bring or adequately plead this claim. *See* subsection (4), *supra*. Dave has also explained why the new evidence places this claim in a significantly different and stronger posture. *See* subsection (3), *supra*. Finally, this claim is substantial. In addition to the analysis above, the district court issued a COA on it. *See* subsection (4), *supra*; *Leeds*, 75 F.4th at 1018.

Once this Court finds *Martinez* and *Dickens* satisfied, it can review the evidence developed after initial PCR because Dave returned to state court *twice* with said evidence—first in 2005 and again in 2016. The Supreme Court recognized that a habeas petitioner might have the opportunity to return to state court to develop facts:

> …[A] federal court is not required to automatically deny unexhausted or procedurally defaulted claims. When a claim is unexhausted, the prisoner might have an opportunity to return to state court to adjudicate the claim.

*Ramirez*, 142 S.Ct. at 1732; *see also, Jones v. Chappell*, 31 F.Supp.3d 1050, 1059 (C.D.Cal.2014)("…if an inmate discovers new facts in the federal proceeding that

66

were not before the…[state court]…that inmate must generally halt the federal proceeding and return to…[state court]…by way of an exhaustion petition to present to it the new facts and exhaust the state remedy")(*overruled on other grounds by Jones v. Davis*, 806 F.3d 538 (9thCir.2015). Respondents have publicly acknowledged that returning to state court is the proper method for federal courts to reach facts developed after initial PCR. *Ramirez*, 142 S.Ct. 1718, Transcript of Oral argument at 26-27, (No.20-1009)(available at https://www.supremecourt.gov/oral_arguments/ argument_transcripts/2021/20-1009_5j31.pdf).

For all these reasons, the district court abused its discretion by refusing to grant a hearing and this Court can consider the evidence developed after initial PCR.

### 6. Conclusion

This Court must consider the cumulative effect of counsel's numerous errors. *Silva v. Woodford*, 279 F.3d 825, 836 (9thCir.2002). The state court's decision was an unreasonable application of *Strickland*. §2254(d)(1). Trial counsel's deficient performance culminated in an incoherent defense that omitted critical evidence, undermining confidence in the verdict. *Strickland, Wiggins, Rompilla, Hinton, supra.* The state court's fact-finding process was flawed and unreasonable. §2254(d)(2). The district court's factual findings were clearly erroneous. Dave is entitled to a new trial, or at minimum, a hearing. *Hurles*, 752 F.3d at 778. Alternatively, this Court should find cause and prejudice established pursuant to *Martinez* and consider the new

evidence of prejudice because it was presented to the state court and admitted into the record below. U.S. Const. Amends. V, VI, XIII, XIV.

**B. COUNSEL'S FAILURES TO INVESTIGATE & CHALLENGE THE STATE'S AGGRAVATING EVIDENCE & INVESTIGATE & PRESENT MITIGATING EVIDENCE VIOLATED DAVE'S RIGHT TO EFFECTIVE ASSISTANCE OF SENTENCING COUNSEL**

**1. Standard of Review**

*See* Claim(A)(1), *supra*.

**2. Circumstances Requiring Relief**

**i. Counsel Failed to Develop & Present Mitigating Evidence**

**a. Deficiency**

Counsel spent 10.5 hours preparing for Dave's sentencing hearing, beginning only after his conviction. 6-ER-1352. Counsel failed to retain a mitigation specialist, collect a single record, or conduct anything approaching a reasonable investigation into Dave's life history. He interviewed no family members, neighbors, teachers, doctors, military personnel, friends, or anyone familiar with Dave's life. Instead, counsel submitted a three-page sentencing memorandum listing conclusory "proposed mitigating factors," including: "diminished capacity/voluntary intoxication," "abusive background," "lack of previous convictions of matters involving serious injury or threat thereof," "defendant's stated remorse for victim," and "minimal sentence received by co-defendant." 6-ER-1273.

At the 11th hour, counsel presented the court with letters from Dave's sister, Jo. The defense contacted Jo before sentencing and told her, "You need to write a letter about [Dave's] childhood." 2-ER-538. She "didn't have a clue" what to include in the letter. *Id.* Jo touched on Dave's use of drugs and alcohol in childhood, a serious car accident he was involved in as a teenager, physical abuse their mother experienced at the hands of their stepfather, Dave's efforts to improve his life through military service and taking care of his family, and his lifelong struggle with sobriety. 6-ER-1276–78. Jo also wrote a letter to the court, expressing regret that she could not afford to travel to Arizona to attend the sentencing proceedings and support her brother. 6 -ER-1269–72. The letter included a second "statement" with some additional mitigating evidence, including that the Detrich children were forced to stay with their father and stepmother after what they thought was a two-week visit. 6-ER-1263. The statement provided a cursory description of Jean's "physical abuse," including slapping the children, spanking Dave and tying him up outside for wetting the bed, pushing their older brother Danny down the stairs, and threatening Danny with a gun. 6-ER-1264–65. The sentencing court received the supplemental statement on the morning of the aggravation/mitigation hearing. Counsel also possessed a letter written by Dave's mother Pat, discusssing Dave's childhood drinking, being encouraged to drink by his stepfather, and his difficulty dealing with his brother's death that exacerbated his alcohol dependency. Inexplicably, counsel did not submit Pat's letter to the sentencer. 7-ER-1627–28; 2-ER-548.

At the hearing, counsel told the sentencing judge that the letters "talk about, as a child, physical abuse, mental abuse, introduction to drinking by parents. The Court can read that and come to its own conclusions." 6-ER-1314. Counsel also mentioned Dave's minimal criminal record, that he was a father to a ten-year-old child, and Charlton's culpability and lenient sentence. 6-ER-1315–16.

The only evidence of Dave's psychological functioning came from a court-ordered evaluation,[9] which counsel "was not certain" if he had "ever seen or not." 1-ER-1286. The report was based on police reports, an interview with Dave, and a personality test. 7-ER-1630. The report identified Dave's alcoholism and provided some additional instances of self-reported abuse, including Jean holding Dave underwater in the bathtub. 7-ER-1632. The report also described Dave's mother's home as "chaotic," with both parents abusing substances and Skip being "physically abusive" "at times" to Pat. *Id.*

Lastly, Jo's statement and the Presentence Report included glimmers of Dave's lifelong struggles with addiction. 6-ER-1277, 1344–45, 1345, 1276–77.

Counsel's failure to conduct a mitigation investigation violated the well-established performance standards for capital defense attorneys at the time. *Wiggins*, 539 U.S. at 524 (failure to conduct an independent investigation into client's life

---

[9] A Pima County Court Clinic psychologist conducted the 1991 psychological report upon referral by the probation department. 7-ER-1630.

history falls below the standard of care); *Rompilla*, 545 U.S. at 389-90 (counsel's failure to review the court file falls below the standard of care); *Avena*, 932 F.3d at 1248 ("Up through jury selection, [counsel] billed only fifty-three hours…From jury selection through the end of the sentencing phase, he billed another forty-one hours. The small number of hours…is a striking indication of his deficient performance for the penalty phase." Counsel called no witnesses to testify at the penalty phase and offered no evidence); *Libberton v. Ryan*, 583 F.3d 1147, 1166-73 (9thCir.2009)(IAC where counsel presented two mitigation witnesses and the only information from defendant's family came in the presentence report; "During the four months between conviction and the sentencing hearing…[counsel]…spent very little time preparing for sentencing….No possible strategy could justify this lack of diligence in pursuing mitigating evidence."); 1989 ABA Guidelines 11.4.1 (duty to collect evidence related to medical history, educational history, employment and training, prior correctional record, education, etc.).

Not only did counsel fail to undertake an independent investigation, he "ignored 'tantalizing indications in the record'" that would have led "'a reasonable attorney to investigate further.'" *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9thCir.2007)(quoting *Stankewitz v. Woodford*, 365 F.3d 706, 719-20 (9thCir.2004)). Through Jo's statements, counsel was aware of Dave's use of drugs and alcohol in childhood; a major auto accident at age 16 where his pickup rolled; a "turbulent," "verbally and physically abusive" home; and a lifelong struggle with addiction. 6-ER-

71

1243–44. This put counsel on notice that investigation, record collection, and expert assistance were needed. It is well-established that counsel's failure to look beyond such evidence falls below the standard of care. As the Supreme Court explained:

> In *Wiggins*…we held counsel "fell short of…professional standards" for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records. Here, counsel did not even take the first step of interviewing witnesses or requesting records…. Beyond that, like the counsel in *Wiggins*, he ignored pertinent avenues for investigation of which he should have been aware.

*Porter v. McCollum*, 558 U.S. 30, 39 (2009)(quoting *Wiggins*, 539 U.S. at 524). As explained below, had counsel conducted the investigation, he would have found voluminous material demonstrating Dave is deserving of a life sentence.

The district court correctly found Dave satisfied *Strickland*'s deficiency prong as to penalty. 1-ER-139; *Strickland*, 466 U.S. at 688-90; *Wiggins*, 539 U.S. at 524.

### b.  Prejudice

The evidence developed after Dave was sentenced to death is vastly superior in both quantity and quality to that presented to his sentencer and undermines confidence in the outcome of his sentencing. This evidence raises "a reasonable probability that, but for counsel's unprofessional errors, the result of [sentencing] would have been different. *Strickland,* 466 U.S. at 694.

### 1) Mitigation Developed in Initial Postconviction

In initial PCR, Dave was represented for the first time by counsel who interviewed social history witnesses, collected records, and sought to present evidence

demonstrating that Dave deserved to live. While the sentencer learned that Dave was born with a cleft palate, PCR counsel offered a declaration from Dave's mother describing the severity of the condition and that it required numerous surgeries when Dave was an infant, including when he was just a few days old. 6-ER-1221,¶3. These surgeries resulted in Dave being separated from his mother for days as a newborn. *Id.* After one of his surgeries, at age three, Dave "had excessive bleeding down his throat that caused him to stop breathing…He was rushed back into surgery to correct the problem." 6-ER-1221,¶6.

Pat's declaration described the physical abuse Dave suffered as a child. At age five, he "would get in a lot of fistfights with other children" at the encouragement of his older brother Danny. 6-ER-1223,¶15. When Dave was around six, he and his siblings were kidnapped by their father and stepmother. 6-ER-1221–22,¶8. All the kids were beaten by Jean, but Dave got the worst of the abuse "almost daily because" he wet the bed. 6-ER-1222,¶11.

Pat also described that to cope, 11-year-old Dave started drinking out of the "gallon jugs of whiskey and kegs of beer" that her husband Skip kept around the house. 6-ER-1222,¶12. Dave also started using marijuana around this time. *Id.*

Dave's sister, Jo, provided a substantially more detailed description of their childhood. Jo reported that after kidnapping them, their father was mostly absent from the home, leaving the kids victim to Jean's "physical and emotional abuse." 6-ER-1216,¶5. Dave received the worst of the abuse; Jean hit him "with hands, fists,

73

belts, fly swatters, metal kitchen tools, and whatever else might be at hand." *Id.* Jo described how Jean hid the abuse by focusing her blows on the children's heads and under their clothes. 6-ER-1216–17,¶6. When the bruising was too visible, risking the discovery of the abuse, Jean kept the children home from school. *Id.* Dave was beaten almost every day because he wet the bed. *Id.* Although his siblings would help him try to hide his soiled bedsheets, Jean usually discovered them and became "furious," causing her to hang the sheets in the front of the house to humiliate Dave and tie him outside like a dog. *Id.*

Jo also described Jean's psychological cruelty. After kidnapping the children from their mother, Jean presented herself as their biological mother. 6-ER-1217,¶7. She dyed her hair to match the kids and forbade them from mentioning their real mother. *Id.* Jean told the kids their mother did not want them anymore. *Id.*

In PCR, counsel offered a declaration from Dave's stepfather Skip, describing head injuries that Dave experienced as a child when he rolled a car and when he wrecked a motorcycle while performing a jump. 6-ER-1229,¶¶6-10, 1223,¶14.

PCR counsel also retained neuropsychologist Dr. Briggs to evaluate Dave. Dr. Briggs found that on 30% of the component tests of the Halstead Impairment Index, Dave scored "within the brain-damaged range," including on the Category Test, which measures executive functioning. 5-ER-1174; Boyle, G.J. *What does the neuropsychological Category Test measure? Arch. Clin. Neuropsych,* 1988, *3*, 69–76 (HCT measures a patient's ability for abstract reasoning, sustained attention, and to apply

74

feedback to modify one's behavior). Dr. Briggs concluded that—after 10 years of incarceration and sobriety—Dave has "mild neuropsychological deficits" and that his overall neuropsychological functioning was barely within the normal range. 5-ER-1174; 5-ER-1178 (evaluation shows "a recovered picture," as "improvement in function occurs as time (and sobriety) from the [head injuries and substance abuse] increase.").

Dr. Briggs further found that Dave's test results were consistent with children raised in violent homes, who tend to experience anxiety, depression, and other mental health problems. 5-ER-1175. Dr. Briggs reported that Dave "seems plagued by anxiety and worry about the future. He feels hopeless at times and feels that he is a condemned person." 5-ER-1175. Dr. Briggs identified Dave's "decision-making, especially when compromised by alcohol" as being driven by "instinct," rather than "any consequence-driven thought process." 5-ER-1178.

### 2) Mitigation Developed After Initial PCR

Dave has a genetic predisposition for addiction and a multigenerational history of substance abuse. 2-ER-434–35, 436–39, 524–25; 3-ER-613,¶4, 636,¶7, 642,¶2, 644,¶15, 645,¶¶17-18, 647,¶31, 639,¶2, 658,¶11. The sentencer was aware of Dave's substance use but was never presented with evidence of multigenerational addiction or that it was Dave's stepfather Skip who cultivated his addiction. 2-ER-526, 528–29, 530, 531.

Dave's parents struggled with addiction. Pat drank during her pregnancy with Dave, resulting in his cleft palate and multiple, traumatic medical interventions. 2-ER-506; 3-ER-614,¶7, 656–57,¶¶4,5; 2-ER-440–42. Dave's cleft palate also resulted in developmental delays, with Dave being slow to speak, malnourished and small for his age, and socially isolated and bullied by his peers. 3-ER-614,¶¶7,9; 2-ER-506, 512–14; 3-ER-593,¶2, 650,¶47. Dave was weak and so small that his sisters dressed him in doll clothes. He had a concave chest and was knock-kneed, pigeon-toed, and clumsy. 3-ER–595. He could not tie his shoes or button his clothes until the third grade. 3-ER–596. He was easily confused and could not find his way around without help. 3-ER-595,¶5. He developed a sleep disorder. 3-ER-609,¶67, 621,¶46, 640,¶6. His speech was notably delayed; he could hardly speak until three or four years old and was still hard to understand throughout most of his childhood, even with years of speech therapy. 2-ER-512–13; 3-ER-614,¶8, 596,¶¶8-9, 657,¶8, 667,¶4, 677,¶8. At age four, Dave fell through a floor vent and got his head stuck in the opening. 3-ER-596,¶7. Dave's parents could not afford proper medical care. 3-ER-647,¶¶28-30, 595,¶4. The sentencer did not have these details.

Dave's family has a long history of intergenerational trauma, beginning decades before Dave's birth. 2-ER-507–08; 3-ER-642–44,¶¶4-5,12,15. Based partly on their own traumatic upbringing and partly because they married as teenagers, Norm and Pat's parenting skills were atrocious. 2-ER-509; 3-ER-593,¶3, 658,¶¶12-14; 667–68¶¶3-10. They were incapable of parenting a child with Dave's special needs. Pat

went out most nights during the week, leaving the children alone. 3-ER-593,¶5, 647–48,¶¶31-32. The children rarely saw Norm and were so neglected by Pat that Norm asked a relative to take custody of the children. 2-ER-510–11; 3-ER-614–15,¶12, 659,¶39, 658,¶¶12-13, 593,¶¶5-6; 2-ER-549,¶5; 3-ER-668,¶10. Dave's childhood home was hazardous and filthy with cockroaches and moldy dishes. 3-ER-593,¶6, 648,¶¶33-34, 602,¶38. It smelled like urine. 3-ER-667,¶8. Often there was no clean underwear for the children, and the children had to scrape together whatever food they could find. 3-ER-602,¶37, 615,¶14, 648,¶35. After Norm and Pat divorced, Norm's child support checks bounced; Pat struggled to provide for the children even as she worked two jobs. 3-ER-615,¶14, 602,¶37, 658,¶¶12-13. The sentencer did not know that Dave suffers from PTSD, and thus "it would have been impossible for the trial judge [ ] to have assessed the petitioner's actions in light of his disorder." *State v. Amaral*, 368 P.3d 925, 929 (Ariz.2016)(discussing *State v. Bilke*, 781 P.2d 28 (Ariz.1989)).

Nor did the sentencer know the extent of the abuse Dave endured. When suffering at Jean's hands, Dave and his siblings sought help from the neighbors but were turned away. 3-ER-617,¶24. Although Dave's siblings wanted to help him because he received the worst of the beatings, they could not intervene because it was too dangerous for them. *Id.* Once the children were returned to the custody of their mother, Dave witnesses shocking violence between his mother and stepfather. Skip sent Pat to the hospital with broken bones and, in one instance, Pat fired a gun at Skip. 2-ER-532; 3-ER-626–27,¶¶72-74. Witnessing this violence, Dave was so terrified

that he shook uncontrollably, thinking Skip would kill his mother. 3-ER-606–07,¶54. Pat refused to report Skip to authorities. 3-ER-627,¶¶73-74. She "seemed to stop caring about Dave and abandoned him" as he aged. 3-ER-640–41,¶13. The misplaced anger and constant violence left Dave feeling betrayed and alone. 2-ER-532–34, 460.

Skip also sexually abused Dave, having him watch Skip have sex with a young girl and spurring Dave to do the same. 2-ER-533; 3-ER-626–27,¶72, 671–72,¶13, 605–07,¶¶51-53, 662,¶34; 4-ER-883. Skip was known as a pedophile who met young girls on the school bus he drove. 3-ER-662,¶34. Family members report that Skip also molested Dave's sister, Darci. 3-ER-626–27,¶72, 651–52,¶55. The Detrich children were repeatedly molested and exposed to inappropriate sexual behavior. 3-ER-606,¶52, 662,¶35; 4-ER-883. At age 14, Dave was molested by an adult woman who was having sex with Skip. 3-ER-626–27,¶72, 640,¶11. The sentencer was completely unaware of this sexual abuse.

The sentencer knew almost nothing about Dave's military service. At age 20 he joined the Army and succeeded for a time, but eventually he relapsed and was discharged due to his alcohol use. 2-ER-446. Afterwards, Dave struggled to hold down a job because of his alcoholism. 3-ER-630,¶¶89-90, 654,¶67. The combination of Dave's genetic susceptibility toward addiction, later endurance of physical abuse and neglect, and parental figures' positive reinforcement of drinking created an "environmental…and genetic soup that made it…virtually impossible for [Dave] to avoid being substance dependent and alcohol dependent." 2-ER-451.

Critically, the evidence developed after sentencing explains the consequences of Dave's addiction, neglect, abuse, and head injuries on his brain development and his neuropsychological functioning through childhood and as an adult. As PCR counsel discovered, Dave's executive functioning is impaired, causing impulsivity and unreasoned decision-making "especially when compromised by alcohol" and the violence he experienced in childhood caused him to suffer anxiety and depression. 5-ER-1174–75, 1178. The additional evidence presented after initial PCR offers information "essential [to] understanding the nature of" Dave's "cognitive and emotional functioning" and his impairments. 2-ER-545,¶5. Dave's cleft lip and palate—which was mentioned only in passing in the 1991 psychological report, 7-ER-1630, is closely related to his Cognitive Disorder NOS, a disorder characterized by "frontal lobe abnormalities," including "[l]ack of impulse control, the difficulty with abstraction, difficulty with problem solving… destructibility." 2-ER-467; 3-ER-576. These symptoms are also consistent with ARND, a disorder resulting from maternal alcohol consumption and causing impulsivity, poor planning, poor executive functioning, poor goal setting, and creating obstacles to relationship development, bonding, and social competence. 2-ER-493, 494, 498. The sentencer possessed none of this clinical information.

Dave's childhood physical abuse and neglect also impaired his brain development, a point Respondents' neuropsychologist conceded. 2-ER-427–28 The abuse also caused PTSD, with long-lasting symptoms including paralyzing fear,

intrusive thoughts, sleep disturbances, and hypervigilance. 2-ER-459, 474–78, 482–83, 485–86, 490, 541, 542–43, 443. Dave began drinking as a child to help alleviate his PTSD symptoms, resulting in a worsening of his other disabilities and brain dysfunction. 2-ER-461, 467–71, 472–73. The sentencer did not know that Dave suffers from PTSD.

Dave's numerous head injuries also contributed to his brain damage. 2-ER-456. Specifically, neuropsychological testing shows damage to Dave's frontal lobe, which is "highly susceptible to damage and closed head injuries," such as those experienced by Dave during his childhood and adolescence. 2-ER-456. The sentencer knew nothing of Dave's frontal lobe damage.

Despite his many struggles, Dave has adapted well to structured environments with clear rules. 2-ER-488–89; 3-ER-701, 583. He is an "exemplary prisoner and [has] adapted well and developed a life…in prison." 2-ER-452. He is a skilled artist, who regularly shares his works as gifts for others. 3-ER-654–55,¶68, 611–12,¶78. He has a strong network of supporters—particularly his family members who love him and would be devastated by his execution. 2-ER-501; 3-ER-634,¶111, 594,¶11, 675,¶35, 612,¶79. The sentencer lacked this evidence. *Skipper v. South Carolina*, 476 U.S. 1 (1986)(a defendant's good jail record is relevant mitigation).

### ii. Counsel Failed to Investigate or Challenge the State's Aggravation

Investigation and rebuttal of aggravating evidence is a crucial part of counsel's professional obligation at a capital sentencing. *Rompilla*, 545 U.S. 374 (IAC at capital sentencing for failure to investigate noticed aggravating circumstance). Here, sentencing counsel failed to investigate or challenge the sole aggravating factor—that the crime was committed in an "especially cruel, heinous, or depraved manner." A.R.S. §13-703(F)(6).

Counsel provided no strategic reason for this failure, but instead simply did not think Dave's case was a "death case." 5-ER-1086. This fell far below the standard of care in a capital sentencing. *Correll*, 539 F.3d at 947-48 (IAC where "sentencing memo…[failed]…to rebut three of the five aggravating factors" and counsel's "virtual concession" of most of the alleged aggravators made the imposition of the death penalty the "obvious" outcome); *Rompilla*, 545 U.S. at 383.

### a. "Especially Cruel" Was Rebuttable

The "especially cruel" prong of (F)(6) requires proof beyond a reasonable doubt that "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *State v. Trostle*, 951 P.2d 869, 883 (Ariz.1997)(internal citations omitted). A finding of "especially cruel" cannot be supported if evidence of the victim's consciousness is

speculative or where the victim was conscious only briefly during the attack. *E.g. State v. Montaño*, 77 P.3d 1246 (Ariz.2003).

The especial cruelty evidence was premised on Charlton's inherently unreliable account of the crime and the medical examiner, Dr. Henry's, testimony. As discussed above, Claim A(2)(iii)&(iv), counsel failed to competently cross-examine Charlton or Dr. Henry or retain an independent pathologist. As a result, the sentencer did not hear significant evidence rebutting the State's theory that Ms. Souter experienced conscious suffering to the degree required by (F)(6).

Counsel's failure to competently cross-examine Dr. Henry was prejudicial as the (F)(6) aggravator turns on conscious suffering. Dr. Henry testified that Ms. Souter could have been conscious for up to an hour. 7-ER-1537. However, Ms. Souter sustained multiple stab injuries, and three were sufficient to cause unconsciousness by themselves within minutes. 2-ER-405,¶15(h)(Injury #11), 405,¶15(i)(Injury #18), 405,¶15(k)(Injury #26). While Dr. Henry admitted the combination of wounds would cause *death* more quickly than any individual wound, counsel did not ask how the combination would affect Ms. Souter's *consciousness*—the relevant inquiry under (F)(6). In actuality, Ms. Souter, "could have been conscious for only a few minutes at most, possibly less." 2-ER-405,¶15(k). Further, Ms. Souter was extremely intoxicated, with a blood alcohol content between .32 and .39, which also would have affected her perception. 7-ER-1544; *Newton v. City of New York*, 566 F.Supp.2d 256, 263, n.5 (S.D.N.Y.2008)("A BAC of .385 causes severe intoxication and can cause memory

loss, loss of conscious control over mental and physical functioning, coma, and death."). Ms. Souter's consciousness was highly challengeable.

Moreover, both Dr. Henry and the independent pathologist agree the order of Ms. Souter's injuries is unknown. 7-ER-1535–36; 2-ER-405,¶15(j). Counsel failed to ask Dr. Henry about the blunt force injury, which alone could have caused unconsciousness and may have been inflicted first. 2-ER-405,¶15(j). If the blunt force injury was the first, or one of the first, wounds, Ms. Souter could have been rendered unconscious prior to receiving any of the other wounds, negating evidence of conscious suffering under (F)(6). *Compare* 6-ER-1245 (sentencer finding especial cruelty from "the number and severity of the cut and stab wounds inflicted on the victim, finding that she must have undergone excruciating pain and suffering during the infliction of death") *with State v. Wallace (Wallace I),* 728 P.2d 232, 238 (Ariz.1986) ("Where the state fails to prove beyond a reasonable doubt that the victim was conscious at the time of death, this court has held that a finding of cruelty is inappropriate…*the record is inconclusive as to whether any of the victims were even conscious following the initial blow to the head.*")(cleaned up; emphasis supplied); *State v. Villafuerte,* 690 P.2d. 42, 50 (Ariz.1984)(reversing "especially cruel" finding where medical examiner could not say to a reasonable degree of medical certainty that victim was conscious after initial blow to the head). Had counsel competently crossed on the blunt force injury, or retained an independent pathologist, he would have shown the State's failure to prove conscious suffering beyond a reasonable doubt.

In *Montaño*, 77 P.3d. at 1249-50,¶¶16-18, the victim, a prisoner, was stabbed

179 times and—unlike here—"screams of pain and torture emanated from [his] cell."

The medical examiner testified that the victim could have been alive up to ten minutes

after the first fatal stab wound, depending upon which wound was inflicted first, and

would have lost consciousness after losing two to three pints of blood. *Id.* at ¶16.

Despite this evidence, the Arizona Supreme Court found *Ring* error not harmless

because of the possibility that the victim lost consciousness after being hit by the

defendants before the stabbing began. *Id.* at ¶¶17-18. *See also*, *State v. Soto-Fong*, 928

P.2d 610, 627-28 (Ariz.1996)("where shots, stabbings, or blows are inflicted in quick

succession, one of them leading rapidly to unconsciousness, a finding of cruelty,

without any additional supporting evidence, is not appropriate").

An independent pathologist's findings also would have rebutted Dr. Henry's

testimony regarding the length of time Ms. Souter could have lived. Dr. Henry

testified that Ms. Souter could have lived for 15-20 minutes after receiving Injury #11,

and for 1-2 hours after receiving Injury #18. 7-ER-1533, 1538–41; *see also* 8-ER-1840–

65. An independent pathologist would have testified, "Injury #11 is a significant

injury that would have bled vigorously and by itself could have rendered Ms. Souter

unconscious and led to her death." 2-ER-405,¶15(h). Injury #11 *alone* would have

caused Ms. Souter's death in "less than 6 minutes[,]" not 15-20 minutes as Dr. Henry

testified. *Compare* 2-ER-406,¶15(n), *with* 7-ER-1539. Similarly, Injury #18 "would have

also resulted in significant blood loss" and that injury *alone* likely would have caused

death in a "matter of minutes"—not the one to two hours to which Dr. Henry testified. 2-ER-405–07,¶¶15(i),(o); 7-ER-1538. Injury #18 also could have created an air embolus, which *alone* could cause unconsciousness and death. 2-ER-405,¶15(i). The independent pathologist found Dr. Henry's time estimations regarding Injury #11 and #18 to be "unsupported" by medical literature. 2-ER-406–07,¶¶15(n),(o).

Additionally, the combination of all injuries would have hastened Ms. Souter's death. 2-ER-407–08,¶15(s). Given the totality of her injuries that resulted in blood loss, Ms. Souter "could have lived for a maximum of only a few minutes after the infliction of the first injury. Death could have occurred much sooner as multiple mechanisms…were at play." *Id.* Had this testimony been presented, there is a reasonable probability that the sentencing court would not have found that "from the testimony of the pathologist at trial, that the victim was alive during a significant period of the time that the wounds were inflicted and after struggled." 1-ER-271.

Even with Charlton's testimony, there is a reasonable probability that counsel could have rebutted the especially cruel allegation with competent investigation. Charlton testified that Ms. Souter "was placed in the car" without speaking. 7-ER-1418–19. Charlton never testified that she resisted or spoke while in the car. 7-ER-1422–23. Charlton testified the victim made a gurgling sound after her throat was cut, and the sentencing court based its "especially cruel" finding in part on this gurgling evidence. 6-ER-1244–45 (finding Ms. Souter was "conscious and able to respond in some way to questions by the defendant, but due to the injuries…she was only able to

85

gurgle rather than to make understandable answers"). This was already weak evidence of consciousness, *compare with Montaño*, 77 P.3d. at 1249,¶18 (victim made "screams of pain and torture"), however, Dave's sentencer was not aware that this sound was "unlikely to be reflective of a conscious attempt to talk." 2-ER-405–06,¶15(l). Instead, the sound was more likely the involuntary passing of blood through the airway or the expelling of blood through the airway, "even if a person is unconscious or dead." *Id.* Years prior to Dave's sentencing, the Arizona Supreme Court recognized the limitation of sounds as evidence of conscious suffering. *State v. Jimenez*, 799 P.2d 785, 795 (Ariz.1990)(defendant's confession that victim cried between two incidents of strangulation "inconclusive to establish beyond a reasonable doubt" that the victim suffered within the specific legal meaning of §13-703(F)(6) partly because "the state did not present any expert or other testimony that this 'cry' was evidence of the victim's consciousness and not merely the involuntary reflex of an unconscious victim").

In addition, Shell's testimony that Charlton was the actual killer undercut the subjective element of especial cruelty. *State v. Carlson*, 48 P.3d 1180, 1193-94, ¶¶45-47 (Ariz.2002)(requirement that defendant "intended that the murder be committed in such a manner as to cause the victim to suffer or, absent intent, knew it would be so"). Shell testified that Charlton attacked Souter while she and Dave were kissing, demonstrating nothing of Dave's knowledge or intent. *Carlton, supra.* Shell's testimony is supported—and Charlton's contradicted—by the physical evidence. The orientation

of a wound to Ms. Souter's thigh was "unlikely to have been inflicted" by an assailant in the position described by Charlton, and cuts on his *left* arm are inconsistent with him driving while Dave attacked Ms. Souter to his right. 2-ER-403–04,¶¶15(c),(d),(e). This evidence would have significantly diminished Charlton's accusations and the State's proof of subjectivity. Counsel's failure to develop this evidence was prejudicial as the jurors already were not unanimous on premeditation. Even had the jurors believed that Dave was the killer, counsel could have challenged the subjective element of cruelty by investigating Dave's biopsychosocial history. *See* subsection (i)(b), *supra*; *State v. Moody*, 94 P.3d 1119, 1167 (Ariz.2004)(court could not conclude beyond a reasonable doubt a jury would have found that defendant knew or should have known that the victims were suffering because of his intoxication and mental impairments). Especial cruelty was rebuttable had counsel bothered to try.

### b. "Especially Heinous or Depraved" Was Rebuttable

The "especially heinous or depraved" prong of the (F)(6) aggravator focuses on the mental state of the defendant at the time of the killing. *State v. Gretzler*, 659 P.2d 1, 10-11 (Ariz.1983). Focus on a defendant's mental state satisfies constitutional narrowing. *Zant v. Stephens*, 462 U.S. 862 (1983). Because the term "especially heinous or depraved" is facially vague, it relies on interpretive factors to render it constitutional. *Walton v. Arizona*, 497 U.S. 639, 649 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). A crime may be "especially heinous or depraved" if: 1) the defendant used gratuitous violence, 2) the defendant mutilated the victim, 3)

the defendant relished the killing, 4) the victim was helpless or 5) the killing was senseless. *Gretzler*, 659 P.2d at 9-12.

At resentencing, the State alleged: gratuitous violence, relishing, helplessness, and senselessness. Because senselessness and helplessness alone are insufficient to prove (F)(6), *State v. Hyde*, 921 P.2d 655, 684 (Ariz.1996), they are of minimal value in the aggravation analysis. The two *Gretzler* factors necessary to uphold (F)(6) here, gratuitous violence and relishing, are based on Charlton's testimony. Had counsel developed the credibility challenges to Charlton's testimony, including the forensic challenges discussed *supra*, he could have disproven or significantly undercut the evidence of "especially heinous or depraved."

First, counsel could have argued that relishing was unsupported because it was based exclusively on Charlton's unreliable testimony. To establish relishing, the State must prove beyond a reasonable doubt the defendant said or did something that indicates he savored the murder. *State v. Roscoe*, 910 P.2d 635, 651 (Ariz.1996); *State v. Doerr*, 969 P.2d 1168 (Ariz.1998)(relishing found where defendant described the sensation he experienced from playing with the victim's blood). As explained above, counsel could have obliterated the reliability of Charlton's "dead but warm" testimony Claim A(2)(iii), *supra*. The Arizona Supreme Court has long held that the uncorroborated testimony of an accomplice regarding the defendant's state of mind near the time of an offense is untrustworthy and falls short of proving relishing beyond a reasonable doubt. *State v. Smith*, 673 P.2d 17, 24 (Ariz.1983)(uncorroborated

testimony of co-defendant that defendant requested they play "We Are The Champions" after the killing insufficient to support relishing).

Second, had counsel developed the forensic evidence corroborating Shell's testimony regarding Charlton's confession, gratuitous violence could not have been imputed to Dave. Proof of gratuitous violence requires the inflicted wounds reflect the *defendant's* especially heinous or depraved state of mind. *State v. Jeffers*, 661 P.2d 1105, 1130 (Ariz.1983)(especial heinousness or depravity focuses upon "the mental state and attitude of the perpetrator as reflected in his words and actions")(emphasis added). *Carlson*, 48 P.3d at 1192,¶46 ("Mere foreseeability as a benchmark for death in capital cases would not permit the aggravators to serve their constitutional purpose of narrowing the class of first-degree murderers who can be sentenced to death.").

There is also reasonable probability that counsel could have rebutted the gratuitous violence allegation, even if imputed to Dave. A finding of gratuitous violence requires the State to prove beyond a reasonable doubt that the defendant used "violence in excess of that necessary to commit the crime." *State v. Gulbrandson*, 906 P.2d 579 (Ariz.1995). Here, the trial court based the gratuitous violence finding simply on the fact that "more than 40 wounds were inflicted on the victim…a far greater number than necessary to cause death." 6-ER-1246. This, in and of itself, was insufficient as a matter of law. *E.g., State v. Bocharski*, 189 P.3d 403 (Ariz.2008) (reversing gratuitous violence where defendant stabbed the victim 24 times in rapid succession; court uncertain as to when fatal wounds were inflicted or whether the

defendant continued to stab the victim after the infliction); *Montaño*, 77 P.3d. at

1249,¶16 (gratuitous violence not alleged where victim suffered 179 stab wounds).

Moreover, it is undisputed that the order of the wounds could not be determined,

making it impossible to know whether more violence than necessary was used. *State v.*

*Wallace* (*Wallace IV*), 272 P.3d 1046, 1052-53 ¶¶26,35 (2012)(defendant inflicted more

injury than necessary to kill, however, evidence failed to establish that he continued to

inflict injury after *he knew or should have known* that he had inflicted a fatal wound).

Furthermore, had counsel investigated Dave's biopsychosocial history and

known of his impulsivity, counsel could have demonstrated that the sheer number of

wounds did not demonstrate the vile state of mind necessary to support heinousness

or depravity. Instead, counsel could have demonstrated that Dave's involvement in

the crime—whether he was the actual killer or an accomplice—reflected his inability

to curb his impulses, change course of action midstream, and appreciate the natural

consequences of his actions, and that all these conditions would be exacerbated by

intoxication. 3-ER-702 ("Under the influence of alcohol and other drugs, Mr.

Detrich's ability to inhibit, plan ahead, make decisions, and perform in an error-free

fashion would be significantly reduced, especially given his neurological damage.");

*Correll*, 539 F.3d at 954 (IAC at sentencing for, *inter alia*, counsel's failure to present

expert testimony regarding the effect of Petitioner's drug use on his judgment and

consciousness at the time of the crime); *Moody*, 94 P.3d at 1167 (drug intoxication

relevant to defendant's state of mind). Had that evidence been presented at

sentencing, there is a reasonable probability that the sentencer would have found that Dave did not possess the requisite "shockingly evil state of mind" required under (F)(6), or at minimum, its aggravating weight would have been diminished.

This same evidence challenging Charlton's version of events and demonstrating Dave's impulsivity would have also undermined the *Enmund/Tison* finding. The jury came back with non-unanimous premeditation and felony murder verdicts yet the sentencer found Dave eligible for death "based on the evidence adduced at trial…and *in particular on the testimony of Mr. Charlton*…that the defendant alone killed the victim in this case" and that he intended to do so. 1-ER-269–70 (emphasis supplied). Evidence undermining Charlton's version of events or demonstrating Dave's impulsivity would have impacted the sentencer's *Enmund/Tison* finding. *State v. Miles*, 414 P.3d 680, 685,¶¶22-23 (Ariz.2018)(mental health evidence can negate *Enmund/Tison mens rea*).

### 3. District Court Analysis

Had the above available mitigation and aggravation challenges been presented at sentencing, it would have entirely changed the "substance and tone of the sentencing hearings." *Wallace v. Stewart*, 184 F.3d 112, 1116 (9thCir.1999); *Wiggins,* 539 U.S. at 537. The district court erroneously found, "[t]he majority of the information presented at the evidentiary hearing merely provides additional detail and examples of the same type of evidence considered by the sentencing judge." 1-ER-143; *see also, e.g., id.* (mischaracterizing the only new evidence as Dave's exposure to his stepfather's inappropriate sexual activity and the loss of his farming career); 1-ER-147–48 (finding

genetic predisposition to alcohol "sympathetic," but "not much more so" than being encouraged to abuse substances at a young age and familial history of substance abuse to be a contributing factor to dysfunctional childhood, which was considered at sentencing).

The district court's findings were clearly erroneous. The sentencer was aware of some mitigating facts supporting a few general mitigation categories, but the mitigation was cursory and incomplete, in contrast to the detailed and compelling mitigation developed after sentencing. The sentencer was informed that Dave had been slapped and humiliated by his stepmother but did not learn that he was beaten bloody and bruised on a near-daily basis with instruments, and that he feared for his life. The sentencer learned of Dave's cleft palate, but not of the long-lasting psychological trauma caused by the numerous surgeries he was subjected to in infancy or the developmental problems caused by malnutrition and the fact that his family could not afford to care for his disabilities and medical needs. The sentencer knew nothing of the sexual abuse Dave experienced and witnessed in the home of his mother and stepfather, or that he feared he would watch his stepfather kill his mother. The sentencer was not informed of the consequences of the childhood trauma and how it resulted in Dave suffering from PTSD, permanent neurological defects, and a lifelong addiction as a coping mechanism.

Had counsel investigated Dave's life, he would have established new or thoroughly explored key categories of mitigation including:

92

1)    *In utero* exposure to alcohol, causing impaired development;

2)    The severity of Dave's cleft palate stunting his physical and emotional growth;

3)    The trauma Dave suffered from repeated cleft palate surgeries and surgical complications;

4)    The separations between Dave and his mother as a result of repeated hospitalizations when he was an infant;

5)    The trauma Dave suffered by being rejected by his peers and his family due to his cleft palate, developmental delays, and speech impediment;

6)    Dave's genetic propensity toward addiction, spanning several generations;

7)    Dave's self-medication with drugs and alcohol, beginning at age 10, to cope with trauma and cognitive impairments;

8)    The toxic combination of Dave's genetic susceptibility toward addiction, suffering from abuse, parental encouragement of drinking, and constant exposure to alcohol which made it virtually impossible for him to avoid becoming drug and alcohol dependent;

9)    Dave being raised in a filthy, neglectful, and chaotic home;

10)   Dave's parents' inability to properly feed, clean, obtain medical care for their children;

11)   Norm and Jean kidnapping Dave and his siblings from their mother;

12)   Jean's physical abuse, including daily beatings with household objects and threatening to kill the Dave and his siblings;

13)   Jean's psychological cruelty, including punishing and humiliating Dave for wetting the bed, denying the children contact with their mother, and portraying herself to the community as their mother;

14)   Norm's refusal to stop Jean's physical and psychological abuse;

15)   The failure of the community to provide aid to the Detrich children when they sought relief from Jean's abuse;

16)     Norm's emotional and physical abandonment of Dave and his siblings;

17)     The violent abuse Skip perpetrated against Dave's mother and the resulting terror Dave felt;

18)     Pat's neglect and abandonment of Dave;

19)     Skip's abandonment of the family that also destroyed Dave's dream of working on the farm;

20)     The sexual abuse Dave witnessed and suffered;

21)     Dave's repeated head injuries from numerous motorcycle and car accidents resulting in loss of consciousness, contributing to the damage in the frontal-subcortical region of Dave's brain, and causing problems with impulsivity and self-monitoring;

22)     Dave's repeated, sustained exposure to toxic pesticides as an adolescent;

23)     Dave's characteristics as a follower and desperate need to please others even when they harmed him;

24)     Dave's military service and efforts to abstain from drug and alcohol use during that service;

25)     Dave's emotional devastation after, and inexplicable blaming himself for, his brother Danny's accidental death;

26)     Dave's repeated suicide attempts;

27)     Dave's PTSD diagnosis, caused by severe physical and emotional abuse, which worsened his neurocognitive abilities, made him withdraw emotionally, impaired his school performance, and created paralyzing anxiety;

28)     Dave's Polysubstance Dependence diagnosis;

29)     Dave's Cognitive Disorder NOS Secondary to Congenital Defects diagnosis;

30)     The effects of Dave's disabilities and poor executive functioning, causing impulsivity and an inability to change course;

31) The worsening of Dave's disabilities by circumstances out of his control including repeated exposure to multiple risk factors and a lack of protective factors;

32) Dave's neurodevelopmental and physical disabilities consistent with a diagnosis of ARND;

33) The effects of Dave's lifelong neurological handicaps—including a tendency to perseverate, lack of inhibition, inability to plan ahead, the re-experiencing PTSD symptoms outside of a controlled environment, and his inability to appreciate or control his actions or to foresee the grave risk of harm or death to the victim;

34) Dave's successful performance in structured environments;

35) The love numerous friends and family members feel for Dave because he is a loving, talented, and kind person;

36) The devastating effect Dave's execution would have on his friends and family members.

All the new mitigation significantly strengthens support for the mitigation presented at sentencing and includes entirely new categories of mitigation. The mitigation developed after sentencing "bears no relation to the few naked pleas for mercy actually put before the sentencer." *Rompilla*, 545 U.S. at 393.

The district court also erred when it refused to give the new mitigation more than *de minimis* weight because it was not causally connected to the crime. 1-ER-143–44 (finding Dave's traumatic childhood of "less significant mitigating value" because he was thirty at time of crime); 1-ER-155–57 (finding impulsivity not inherently mitigating and crime not impulsive); 1-ER-157 (affording little weight to neurological impairments because impairments not a "major contributing cause" of crime). Dave is not required to demonstrate a causal connection, *Tennard*, 542 U.S. at 287, and the

95

district court's minimization of mitigation for supposed lack of causal connection failed to give effect to mitigation as required by law. *Penry v. Johnson* (*Penry II*), 532 U.S. 782, 797 (2001); *Lambright*, 490 F.3d at 1114 (rejecting district court's prejudice analysis because "it is apparent from the district court's order that it either did not consider mitigating any evidence without an explicit nexus to the crime, or that it gave such evidence de minimis weight").

While not required, Dave offered expert testimony demonstrating how his deficits affected him throughout his life, including during the crime. 2-ER-450, 453 (Dave has trouble controlling his behavior; his impulsivity has "a significant impact on his behavior in the real world"); 3-ER-702 (when under influence of drugs and alcohol, "Mr. Detrich's ability to inhibit, plan ahead, make decisions, and perform in an error-free fashion would be significantly reduced, especially given his neurological damage"); 2-ER-450 (Dave's deficits impair his ability to problem solve and control his impulses). *See Williams v. Alabama*, 73 F.4th 900, 911 (11thCir.2023)(though substantial time had passed between petitioner's childhood abuse and the crime, expert testimony explained the "damaging impact" abuse had on petitioner's life and behavior at the time of the crime). The district court ignored this evidence.

The district court also erred by finding Dave suffered from PTSD but declining to give this any weight because it was "coterminous" with the abuse that caused it. 1-ER-144. Suffering from PTSD in response to trauma is a distinct mitigating factor. *Bean v. Calderon*, 163 F.3d 1073, 1079 (9thCir.1998)(IAC prejudice where petitioner

"presented abundant new mental health evidence," including PTSD resulting from childhood abuse); *State v. Bilke*, 781 P.2d at 53 (recognizing PTSD is a relevant sentencing consideration).

The district court found no prejudice from trial counsel's failure to challenge Charlton's testimony. 1-ER-92; *discussed* Claim A(2)(iii), *supra*. The court also found the opinions of the independent pathologist as they related to Charlton's "gurgling" accusations not fairly presented because initial PCR counsel failed to include those allegations in his petition for review to the Arizona Supreme Court. 1-ER-99–100. The court found the opinions of the independent pathologist as they relate to consciousness outside the scope of the remand. 1-ER-101. The court relied on the Arizona Supreme Court's especial cruelty finding, concluding "without a doubt, [the murder was] especially cruel." 1-ER-85–86, 90. This was erroneous.

As explained above, initial PCR counsel presented the IAC allegations as to counsel's failure to investigate the forensics in the appendix, which satisfies the "fairly presented" inquiry. *Scott*, 567 F.3d at 582. Furthermore, successor PCR counsel have twice since presented said allegations, including Dr. Haddix's 2015 report. Similarly, the court's conclusion that the IAC allegations regarding challenges to the victim's consciousness were outside the scope of the remand is incorrect. First, this Court's remand permitted the district court to consider any issues relevant to sentencing. *Detrich V*, 740 F.3d at 1249. IAC for failure to challenge the aggravating evidence falls squarely within the scope of the remand. Moreover, the district court was incorrect

that such allegations were not presented in the amended petition. 5-ER-950; 1-ER-192. The amended petition argued that counsel was ineffective for failing to consult with an independent pathologist, who would have established Charlton's statements regarding the circumstances of the victim's death were impossible. 5-ER-946–51, 955, 1025. These allegations were properly before the district court.

The district court's refusal to consider the evidence developed in initial and successive PCR—the challenges to Charlton's version of events, including the opinion of an independent pathologist that undercuts the medical examiner's testimony at trial—was erroneous. 6-ER-1225,¶5; 2-ER-400–09. This evidence supports Shell's testimony that Charlton was the actual killer. Further, the district court erroneously found that under Arizona law, the "especially cruel factor is not dependent on Detrich's state of mind while murdering the victim, but on whether the victim consciously suffered physical pain or mental distress." 1-ER-90 (citing *State v. Amaya-Ruiz*, 800 P.2d 1260, 1285 (1990)). As discussed, this was erroneous as especial cruelty contains a subjective element— there must be a finding that the defendant "intended that the murder be committed in such a manner as to cause the victim to suffer or, absent intent, knew it would be so." *Carlson*, 48 P.3d at 1193-94,¶¶45-47. The subjective element of cruelty is highly problematic if Charlton was the actual killer, *Carlton*, *supra*, or even if Dave was, *Moody*, 94 P.3d at 1167 (court could not conclude beyond a reasonable doubt jury would have found defendant

knew or should have known the victims were suffering because of his intoxication and mental impairments).

The district court similarly mischaracterized especial heinousness or depravity as being "based on the perpetrator's 'words and acts' not on a subjective mental state." 1-ER-195; *id.* ("a defendant's brain function or mental health is not assessed in applying the (F)(6) prong"); 1-ER-84–84. In fact, an examination of the defendant's subjective mental state is exactly what a finding of especial heinousness or depravity requires. *Summerlin*, 427 F.3d at 641-42 (psychiatric evidence of petitioner's lack of impulse control and organic brain dysfunction could directly counter the alleged (F)(6) aggravator); *Moody*, 94 P.3d at 1168 (defendant's mental health problems could demonstrate he "lacked the requisite state of mind" to satisfy especial heinousness or depravity under (F)(6)). In Arizona, a court "must necessarily consider [the defendant's] state of mind at the time of the offense." *State v. Lujan*, 604 P.2d 629, 636 (Ariz.1979). While state of mind may be inferred by defendant's words and actions, a sentencer is not prohibited from considering mental health evidence in addition to words and actions to determine the defendant's actual state of mind. *Id.* To the contrary, when available, such evidence can rebut "especially heinous or depraved." *Summerlin*, *supra*; *Moody*, *supra*.

Moreover, a court may not refuse to consider evidence rebutting aggravation, since doing so is akin to refusing to consider relevant mitigation in violation of the Eighth Amendment requirements of "individualized consideration" and giving "full

effect" to relevant mitigation. *Lopez v. Schriro*, 491 F.3d 1029, 1051-52 (9thCir.2007) (Thomas, J., concurring in part, dissenting in part)(defendant's *mens rea* can be relevant to intent, aggravation, and mitigation findings); *Rompilla*, 545 U.S. at 386,n.5; *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586(1978).

Had counsel presented the above evidence at Dave's sentencing, the outcome surely would have been different. In 1995, little was known of Dave's traumatic upbringing and *nothing* was known of the flaws in the medical examiner's testimony or Dave's mental health problems, including "brain dysfunction, which affects every significant manner of his functioning—cognitive, behavioral, emotional, and social." 3-ER-591,¶17. For all intents and purposes, the sentencer sentenced Dave in the dark. The fact that counsel presented *some* mitigating evidence—through Jo's hasty letters—does not render the later-developed evidence cumulative. This and other courts have regularly found prejudice where sentencing counsel presented some mitigation in a cursory manner. *See, e.g. Correll*, 539 F.3d at 954,n.8 ("bare facts" without "contextual evidence and argument" lack mitigating impact and may "demonize" defendant); *Lambright*, 490 F.3d at 1123 (finding that mitigation developed in habeas was "largely" the same as that presented at sentencing clearly erroneous; evidence presented at sentencing "was inaccurate, undeveloped, and unsubstantiated"); *Bean*, 163 F.3d at 1081 (9thCir.1998)("family portrait painted at the federal habeas hearing was far different from the unfocused snapshot handed the superior court jury.")

### 4.     AEDPA Does Not Bar Relief

### i.     The Deficiency Prong Should be Reviewed *de Novo*

Like the district court below, 1-ER-138, this Court should review the deficiency prong of this claim *de novo* because the state court dismissed the claim on prejudice grounds alone. 1-ER-264; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534. If this Court disagrees and finds AEDPA deference applies to both *Strickland* prongs, then it should find the state court decision was both contrary to and an unreasonable application of *Strickland* and based on an unreasonable determination of the facts.

### ii.     The State Court Decision was an Unreasonable Application of *Strickland*

The same judge who sentenced Dave to death also rejected his IAC at sentencing claim in initial PCR, finding that he had "not presented a colorable claim…for failing to have Dr. Briggs, a neuropsychologist, testify on Petitioner's behalf or to present additional evidence of Petitioner's abusive background…[which] would have been merely cumulative…." 1-ER-264. The court also found "Petitioner's claim that expert rebuttal testimony would have discredited Charlton's credibility…unavailing, where overwhelming evidence apart from Charlton's testimony supported the finding that Petitioner committed the murder." 1-ER-263. The court dismissed the claim without a hearing. 1-ER-265.

If this Court applies AEDPA deference on deficiency, it should find the decision was an unreasonable application of *Strickland*. §2254(d)(1). PCR counsel

provided the court with ample evidence that sentencing counsel's performance fell below professional norms, including that counsel "did nothing, did no psychological investigation…did nothing to try to develop what psychological harm is done by [childhood abuse.]" 5-ER-1165. Counsel's performance was nearly identical to that in *Wiggins*, with counsel spending only 10.5 hours preparing for sentencing, failing to hire a mitigation specialist, requesting no expert assistance, failing to collect collateral records, and failing to call any witnesses to testify in support of life. 6-ER-1352. The presentence report, 1991 psychological report, and Jo's letters would have led "a reasonable attorney to investigate further." 539 U.S. at 527. Based on the PCR record, "no reasonable jurist would conclude" that counsel's performance was not deficient. *Andrews v. Davis*, 944 F.3d 1092, 1110 (9thCir.2019)(*en banc*).

It was also unreasonable for the state court to conclude Dave suffered no prejudice from counsel's performance because the evidence offered in PCR was cumulative. PCR counsel offered detailed depictions of trauma and abuse only cursorily mentioned at sentencing and was prepared to call live witnesses. In *Porter*, 558 U.S. at 42, the Supreme Court held that a state court unreasonably applied the *Strickland* prejudice prong where, like the PCR court here, it found "counsel's failure to conduct a thorough—or even cursory—investigation" did not prejudice the defendant. In *Porter*, as in Dave's case, the sentencer knew "hardly anything about him other than the facts of his crimes," while "the new evidence described his abusive childhood…his long-term substance abuse, and his impaired mental health…." *Id.* at

102

449. Even though the sentencer learned some facts about Dave's background, the undeveloped evidence "revealed very little about the true extent of [Dave's] troubled upbringing and family history." *Williams*, 73 F.4th at 910. Furthermore, it is "counsel's obligation to explain the relevance" of mitigation, such as childhood abuse, to the sentencer." *Waidla v. Davis*, 68 F.4th 575, 588 (9thCir.2023)(IAC where the sentencer heard an "incomplete picture" of the available mitigation). In PCR, counsel presented substantially more evidence regarding Dave's abusive upbringing, rather than the bare, undeveloped evidence presented at sentencing. The state court decision that Dave was not prejudiced by sentencing counsel's failure to conduct any investigation was an unreasonable application of *Strickland*.

Further, the PCR court's decision was "objectively unreasonable" because it applied *Strickland* unreasonably to the aggravation allegation. *Williams*, 529 U.S. at 407-08. As explained (subsection (2)(ii)), the evidence in aggravation was rebuttable if counsel had bothered to investigate the forensic evidence, extent of Charlton's bias, and Dave's cognitive impairments. Indeed, taking these steps would have "opened up" a "range of mitigation leads," *Rompilla*, 545 U.S. at 390, including demonstrating Charlton was lying about how Ms. Souter was killed, undercutting the (F)(6) aggravator, and increasing the mitigating value of the sentencing disparity. Concluding otherwise is objectively unreasonable.

### iii. The State Court Decision was Based on an Unreasonable Determination of the Facts

The district court correctly found that PCR counsel "alleged a colorable claim for relief and the state court did not allow significant development of this claim or hold a hearing." 1-ER-199. The state court denied PCR counsel's requests for investigative funding and an evidentiary hearing. 1-ER-262–65; *discussed* Claim A(4)(ii), *supra* (state court fact-finding not entitled to deference where petitioner denied an opportunity for evidentiary development). PCR counsel's presentation of this claim plainly indicated "issues of material fact" existed. Ariz.R.Crim.P.32.8(a)(1999). The court denied resources for a mitigation investigator and did not grant any funding for Dr. Briggs until the State conceded such funding was necessary—after briefing was complete—thus depriving counsel the opportunity to incorporate the results of the neuropsychological evaluation into the petition. 6-ER-1236; 1-ER-266; 6-ER-1230 (denying funding because "[t]he Court is familiar with defendant's file…"); 5-ER-1181–83. PCR counsel repeatedly requested evidentiary development and a hearing. 6-ER-1234–37; 6-ER-1231–33; 5-ER-1184; 6-ER-1186, 1193, 1198, 1200, 1214. Yet the state court denied these requests then concluded that additional mitigation "would have been merely cumulative" and that "Dr. Briggs found that [Dave's] general neuropsychological functioning was normal and showed an absence of cognitive dysfunction." 1-ER-264. This was procedurally unreasonable, mischaracterizes Dr. Briggs' report, and renders the state court decision unreasonable under §2254(d)(2).

*Hurles*, 752 F.3d at 790 (finding (d)(2) satisfied; state court decision "especially troubling" where factual findings were based on the court's "untested memory and understanding of the events").

The state court decision was also based on an unreasonable determination of the facts because the state court made findings of fact that are contrary to the record before the court. *Miller–El I*, 537 U.S. at 346 (unreasonable factual determination where state court "had before it, and apparently ignored," evidence supporting petitioner's claim); *Taylor*, 366 F.3d at 1001 (unreasonable determination of facts "where the state court[ ]…plainly misapprehend[s]…or misstate[s]…the record in making [its] findings" or where the court "has before it, yet apparently ignores, evidence that supports petitioner's claim."). The state court rejected the IAC at sentencing claim based, in part, on its finding that Dave's neuropsychological functioning is "normal." 1-ER-264. Dave's performance on the General Neuropsychological Deficit Scale was barely normal, but his performance on two subtests of the Halstead Impairment Index demonstrated brain damage. 5-ER-1174. One such subtest was the Category Test, on which Dave's performance showed impulsivity. *Id.* Dr. Briggs also explained that the evaluation showed a "recovered picture" because it was administered after a long period of abstinence from drugs or alcohol and during which Dave had not suffered additional head injuries. 5-ER-1179. The state court's finding regarding Dr. Briggs' report was objectively unreasonable considering the record before it. §2254(d)(2) poses no barrier to relief. Once this

Court considers, *de novo*, the evidence developed after initial PCR proceedings, there is *substantial* evidence of Dave's brain damage, particularly to his frontal lobe which is responsible for executive functioning. 3-ER-697–98,¶¶31-36; 2-ER-493–94, 498.

Similarly, state court fact findings related to the aggravation allegation are unreasonable as they both misstated the record and were not fairly supported by the "evidence presented in…State court." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)(*Miller -El II*); *Wiggins*, 539 U.S. at 528; *Miller-El I*, 537 U.S. at 346. In challenging the evidence of especial cruelty, initial PCR counsel provided the court with the opinion of a criminalist who opined, "[with] the wound penetrating all the way back to her neck bone, there is very little probability that the victim would have been engaging in conversation of any nature, and the possibility of any prolonged consciousness after the removal of the oxygen supply to the brain of the victim would not be likely." 6-ER-1225,¶5. In response, the state court unreasonably found "there was no testimony that the victim 'engaged in conversation' or was conscious for a long period of time" and that it is "merely speculative to assume that the victim's attempt to respond occurred after the most serious wound." 1-ER-263. Yet, the court's finding of especial cruelty was explicitly based "on the testimony that when she was asked questions about the drugs, she was only able to make a gurgling sound, indicating she was conscious and was attempting to respond in some way to questions by the defendant, but due to the injuries to her throat and body, she was only able to gurgle rather than make any understandable answers." 1-ER-271–72. And to the

extent it is speculative to assume that the gurgling sound came after the most serious wound, it is likewise speculative to assume it did not. Under *Strickland*, the burden was to demonstrate that but for counsel's failure to challenge the aggravation, there is a "reasonable likelihood" that the outcome would have been different. In the (F)(6) cruelty context, this meant demonstrating there is a reasonable doubt regarding the victim's consciousness. Expert testimony indicating the gurgling noises were likely reflexive bodily sounds versus attempts to speak would have certainly created doubt relevant to especial cruelty. Indeed, the report of an independent pathologist after initial PCR confirms that the sentencer was seriously misled about Ms. Souter's consciousness due to counsel's failures. Based on the state court's own aggravation findings, these two postconviction findings were unreasonable.

The state court's third finding, that "overwhelming evidence apart from Charlton's testimony supported the finding that Petitioner committed the murder," is both inaccurate and irrelevant to the inquiry of whether counsel was ineffective for failing to challenge aggravation. As explained in Claim A(2), *supra*, apart from Charlton's testimony there is simply not overwhelming evidence that Dave killed the victim. To the contrary, Charlton is the one who confessed and exaggerated Dave's role to save his own skin. Furthermore, responsibility for the murder is assumed under the (F)(6) inquiry and *Zant*, 462 U.S. 862. It was wholly unreasonable for the state court to reject the IAC at sentencing claim on this factfinding. *See e.g. Caliendo v. Warden,* 365 F.3d 691, 698 (9thCir.2004)(unreasonable determination of facts by

107

applying erroneous legal standard in making the factual determination). §2254(d)(2) does not limit relief.

### 5.    Evidentiary Development

While "AEDPA's statutory scheme is designed to strongly discourage" habeas petitioners from presenting new evidence in federal court, *Pinholster*, 563 U.S. at 185, the district court properly found that initial PCR counsel was diligent in developing the penalty-phase allegations and, therefore, evidentiary development appropriate. 1-ER-199, 202. Because the state court decision was unreasonable under §2254(d)(1)&(2), this Court may consider *de novo* the evidence developed after initial PCR proceedings. *Pinholster*, 563 U.S. at 185; *see also Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)(AEDPA deference to state court decision not required where §2254(d)(1) has been satisfied). Further, the evidence supporting this claim was presented to the state court *twice* in successive postconviction petitions. *See discussion* Claim A(5), *supra* (citing *Ramirez*, 142 S.Ct. at 1732; *Jones*, 31 F.Supp.3d 1050 at 1059; 4-ER-822; 3-ER-739–40; 2-ER-299–331.

Regarding the aggravation allegation, the district court correctly found counsel was diligent as to certain forensic challenges but denied relief without granting a hearing. DCT.Dkt.93 at 37-38; 1-ER-198. The district court wrongly found the gurgling allegations defaulted. This was plainly erroneous. *See* discussion Claim A(3)(describing PCR counsel's diligence, including attaching an affidavit by forensic expert contesting the gurgling and stating a pathologist was needed). The court's

denial of a hearing was an abuse of discretion because, as explained above in subsections (2)&(3), the allegations, if true, entitle Dave to relief. *Hurles*, 752 F.3d at 791-92. This Court should find these allegations exhausted and, because counsel was diligent, remand for a hearing below.

### 6. Conclusion

Counsel entirely failed to challenge the sole aggravator or conduct anything approaching a reasonable investigation into Dave's life. Counsel's errors, considered individually and cumulatively, require relief. *Silva, supra*. The state court decision was an unreasonable application if *Strickland*. The state court decision was also an unreasonable determination of the facts due to the court's denial of investigative resources and a hearing. This Court should remand with instructions to grant the writ or, at a minimum, should remand for an evidentiary hearing on the aggravation allegations. U.S. Const. Amends. V, VI, XIII, XIV.

## UNCERTIFIED ISSUES

## C. THE STATE COURT'S CAUSAL CONNECTION LIMITATION ON MITIGATION VIOLATED DAVE'S RIGHTS TO DUE PROCESS & TO BE FREE FROM CRUEL & UNUSUAL PUNISHMENT

### 1. Standard of Review

A COA must be granted where the appellant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason *could disagree* with the district court's resolution of his constitutional claims or that jurists *could conclude* the issues presented

are adequate to deserve encouragement to proceed further." *Miller-El I*, 537 U.S. at 327 (emphasis supplied).

Arizona applied an unconstitutional causal nexus test to restrict the consideration of Dave's mitigation. This Court must grant relief where a such a constitutional error results in "substantial injurious effect or influence." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *McKinney*, 813 F.3d at 821(*Brecht* applies to causal nexus claim).

## 2.       Circumstances Requiring Relief

"'[I]n capital cases, the fundamental respect for humanity underlying the Eighth Amendment…requires consideration of the character and record of the individual offender and the circumstances of the…offense as a constitutionally indispensable part of the process of inflicting the penalty of death.'" *Lockett*, 438 U.S. at 604 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)); *see also Eddings*, 455 U.S. at 114; *Tennard*, 542 U.S. at 287; *Smith v. Texas*, 543 U.S. 37, 45 (2004). The "mere mention of 'mitigating circumstances'" does not satisfy the Eighth Amendment—a sentencer *must* "'consider and *give effect to*'" mitigation. *Penry*, 532 U.S. at 797 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989))(original emphasis). Arizona violated these decades of precedent by refusing to give effect to mitigation not causally connected to the crime.

Although counsel was ineffective in failing to investigate mitigation, Dave's sister's letters provided some mitigation from which the sentencer should have

determined that life was the appropriate sentence. 6-ER-1241–42. Dave's use of drugs and alcohol beginning in childhood, a serious car accident at age 16, witnessing violence between his mother and stepfather, Dave's efforts to improve his life through military service and care for his family, and his lifelong struggles with sobriety all supported a life sentence. 6-ER-1276–78. Counsel also offered a description of physical abuse in the Detrich home, including stepmother Jean slapping the children, pushing older brother Danny down the stairs, spanking Dave, and tying him outside like a dog for wetting the bed. 6-ER-1264–65. Counsel urged the court to review a 1991 psychological evaluation, which offered additional evidence of Jean's abuse, including when she held Dave underwater in the bathtub. 7-ER-1632. The psychological report also described Dave's alcohol and drug use around age ten, his mother's addiction to prescription drugs, and his stepfather's alcoholism. *Id.* The report described the home of Pat and Skip as "chaotic" where Skip sometimes physically abused Pat. *Id.*

The sentencing court also had before it evidence regarding Dave's efforts to abstain from alcohol use as an adult. In 1979, Dave joined the Army and was stationed in Germany. 6-ER-1277. While there, his older brother died in a car accident, and Dave went through a period of heavy drinking, requiring him to complete a program for alcohol abuse. *Id.* Following his discharge from the Army, Dave repeatedly tried and failed to stay sober. He attempted to address his addiction by attending Alcoholics Anonymous meetings and completing an inpatient alcohol

treatment program. *Id.*; 6-ER-1345. He had not used alcohol for almost a year and a half prior to the events leading up to his arrest. 6-ER-1345; 6-ER-1278.

Trial evidence showed that the night of the crime, Dave drank approximately two cases of beer, Mad Dog 20/20 (a fortified wine), and that he injected some unknown drug that was possibly cocaine. 7-ER-1402–09; 6-ER-1340–41. He and co-defendant Charlton picked up the victim Ms. Souter, stopped at a bar, and then continued to her apartment. Before arriving at Ms. Souter's home, Dave blacked out, something he had done many times before. *Id.*

Lastly, the sentencer had evidence of family support. Jo explained, "I love my brother dearly" and touched on her regret for not being able to testify in person on his behalf, at which time she could have "shown to the world that this is a man with a family & lots of support."[10] 6-ER-1270–71. The defense also argued that Dave had a son who was ten years old at the time and who needed a fatherly influence. 6-ER-1316.

The State argued in the aggravation-mitigation hearing that evidence of Dave's turbulent, abuse-filled childhood was *not mitigating* without a causal nexus to the offense. 6-ER-1330; 6-ER-1256 ("There is *no causal connection* between [Dave's] abusive family background or his dysfunctional family background.")(emphasis supplied); 6-

---

[10] The reason she did not testify in person was she could not afford travel from Kansas and defense counsel failed to inform her there were State funds available to cover her expenses. 6-ER-1270.

ER-1257–58 ("Whatever his circumstances, they *do not explain, justify, or offer up a causal connection*" between the circumstances and the offense)(emphasis supplied). The court found the mitigation not sufficiently substantial and sentenced Dave to death.

On direct appeal, the Arizona Supreme Court entirely ignored the bulk of the mitigating evidence, addressing only the sentencing disparity between Dave and Charlton, Dave's remorse, and his alcohol use at the time of the crime. 932 P.2d at 1340. Although the sentencer and the Arizona Supreme Court did not specifically refer to the lack of causal nexus to reject Dave's mitigation, this Court has found the Arizona Supreme Court's application of a causal nexus test was "articulat[ed] and appli[ed]" consistently in the relevant time period. *McKinney*, 813 F.3d at 803. For a period of "a little over fifteen years, the Arizona Supreme Court routinely articulated and insisted on its unconstitutional causal nexus test…" *Id.* at 815 (citations omitted). As this Court recognized, "[t]he Arizona Supreme Court articulated the causal nexus test in various ways but always to the same effect: As a matter of law, a difficult family background or mental condition did not qualify as a nonstatutory mitigating factor unless it had a causal effect on the defendant's behavior in committing the crime at issue." *Id.* at 816. This was the law in Arizona from 1989 until 2005. *Id.* at 815-17 (citations omitted). Dave was resentenced to death in 1995 and his direct appeal was issued in 1997—clearly within the relevant time period.

The Supreme Court made it clear in the decades since *Lockett* that "a state cannot bar" consideration of evidence that "'could reasonably [be found to] warrant[]

a sentence less than death.'" *Tennard*, 542 U.S. at 284-85 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990)). In *McKoy*, the Supreme Court established a very low relevancy standard for mitigation. 494 U.S. at 440-41. "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.*" Id.* at 440 (quotations and citation omitted). "Once this low threshold is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." *Tennard*, 542 U.S. at 285 (quoting *Boyde v. California*, 494 U.S. 370, 377-78 (1990)(citations omitted)). By failing to even *acknowledge* Dave's mitigating evidence, the Arizona Supreme Court violated his Eighth Amendment right to an individualized sentencing and to be free from cruel and unusual punishment.

The Arizona Supreme Court's error here had a "substantial and injurious effect" on Dave's sentence. *Brecht,* 507 U.S. at 637. Because the mitigating evidence rejected by the Arizona Supreme Court was "'central to' [Dave's] plea for leniency," the error was harmful. *Spreitz v. Ryan*, 916 F.3d 1262, 1279 (9thCir.2019)(quotations omitted). Like the *McKinney* case, Dave relied on evidence of childhood abuse to support his case for life. *Compare* 6-ER-1275, *with McKinney*, 813 F.3d at 823 ("McKinney presented evidence of severe, prolonged childhood abuse…"). Dave's upbringing and intoxication at the time of the crime were central to his plea for leniency, and the Arizona Supreme Court's rejection of that mitigation had a

114

substantial and injurious effect on his sentence. This Court must remand with instructions to grant the writ.

### 3.     District Court Analysis

The district court denied relief on this claim, wrongly concluding that the superior court and the Arizona Supreme Court "both considered all of Detrich's evidence offered in mitigation and found it insufficient to outweigh the serious aggravating factor." 1-ER-118.

The Arizona Supreme Court plainly did *not* consider *and give effect to* all the mitigation. Rather, the court identified the limited mitigation it considered—the sentencing disparity, remorse, and Dave's "alcoholic state"—all factors related to the crime event/case. 932 P.2d at 1340. Dave's other mitigating evidence was discarded, consistent with state law at the time.

### 4.     AEDPA Does Not Bar Relief

The Arizona Supreme Court's error was a violation of and contrary to Dave's Eighth Amendment rights. Thus, AEDPA is not a bar to relief. 28 U.S.C. §2254(d)(1). Clearly established law requires a "sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record…that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original); *Eddings*, 455 U.S. at 110 (same). Even if particular mitigating evidence does "not relate specifically to…[the defendant's] culpability for the crime he committed," the defendant is constitutionally

entitled to offer such evidence because it might "serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 4-5 (*quoting Lockett*, 438 U.S. at 604). "The sentencer…may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." *Eddings*, 455 U.S. at 115-16. But at Dave's capital sentencing and appeal, Arizona law precluded full consideration of relevant mitigation unless the defendant proved a causal nexus between the mitigation offered and the offense. The state court's decision is contrary to clearly established federal law. *McKinney*, 813 F.3d at 823-24. Therefore, §2254(d)(1) poses no bar to relief.

### 5.  Conclusion

Consistent with its 15-year practice, the Arizona Supreme Court unconstitutionally rejected Dave's mitigation for lack of causal nexus. Because the rejected mitigation was the basis for a life sentence, the State cannot prove harmless error. There has been "a substantial showing of the denial of a constitutional right" and Dave is entitled to a COA. 28 U.S.C. §2253(c)(2); *Miller-El I*, *supra*.

## VII. <u>CONCLUSION</u>

Dave's convictions and sentences are unconstitutional, and the state court was objectively unreasonable in denying relief. This Court should remand with instructions to grant the writ.

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2023, I transmitted the foregoing Replacement

Opening Brief with the Clerk of Court for the United States Court of Appeals for the

Ninth Circuit by using the appellate CM/ECF system. I certify that all participants are

registered CM/ECF users and the service will be accomplished by the CM/ECF

system.

   *s/ Amy Armstrong*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 08-99001

I am the attorney or self-represented party.

**This brief contains** 27,999 **words,** including [              ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated 10/13/2022 .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Amy Armstrong **Date** 9/21/23
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*