No. 08-99001

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

DAVID SCOTT DETRICH,

*Petitioner-Appellant,*

v.

RYAN THORNELL, et al.

*Respondents-Appellees.*

On Appeal from the United States District Court
for the District of Arizona
No. CV–03–00229–TUC–DCB

_____

## RESPONDENTS-APPELLEES' REPLACEMENT ANSWERING BRIEF

_____

Kristin K. Mayes
Attorney General
(Firm State Bar No. 14000)

Jason D. Lewis
Deputy Solicitor General/
Section Chief of Capital Litigation

Laura P. Chiasson
Assistant Attorney General
Capital Litigation Section
400 W. Congress, S–215
Tucson, Arizona 85701
Telephone: (520) 628-6520
Laura.Chiasson@azag.gov
CLDocket@azag.gov
(Bar Number 19025)

Attorneys for Respondents-Appellees

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................4

CERTIFIED ISSUES ........................................................7

UNCERTIFIED ISSUE ......................................................7

STATEMENT OF THE CASE.............................................8

SUMMARY OF THE ARGUMENT ....................................14

    Claim A............................................................................14

    Claim B. ...........................................................................16

    *McKinney* claim ............................................................16

STANDARDS OF REVIEW AND APPLICABLE LAW.......................17

    A. Standards of review .................................................17

    B. Applicable law ........................................................17

ARGUMENTS .......................................................................21

    I.    THE DISTRICT COURT CORRECTLY FOUND THAT *MARTINEZ* COULD NOT EXCUSE THE DEFAULTS OF DETRICH'S CLAIMS THAT COUNSEL WAS INEFFECTIVE IN THE GUILT PHASE...........................................21

        A. Claim (A)(1): Failure to present a coherent defense.....................21

        B. Claim (A)(3): Shell's testimony ......................................26

        C. Claim A(4): Failure to investigate other witnesses........................38

        D. Claim A(5): Failure to hire independent pathologist to rebut the State's evidence ..........................................................54

II.    THE STATE COURT REASONABLY REJECTED DETRICH'S CLAIM THAT COUNSEL WAS INEFFECTIVE IN INVESTIGATING MITIGATION AND REBUTTING AGGRAVATION ............................................................................63

    A. The state court reasonably rejected Detrich's claim that counsel was ineffective in investigating and presenting mitigation ........................................................................64

    B. The state court reasonably determined that counsel were not ineffective in contesting the aggravating circumstance ................97

III.   THE STATE COURTS DID NOT APPLY AN UNCONSTITUTIONAL CAUSAL NEXUS TEST TO DETRICH'S MITIGATION ...............................................................114

    A. Legal and factual background ......................................................114

    B. The sentencing court did not apply a causal nexus test to Detrich's mitigation ......................................................................116

    C. Detrich has procedurally defaulted his claim that the Arizona Supreme Court applied a causal nexus test to his mitigation ......118

CONCLUSION ....................................................................................122

STATEMENT OF RELATED CASES ................................................................123

CERTIFICATE OF COMPLIANCE....................................................................124

CERTIFICATE OF SERVICE ..........................................................................125

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Bessemer City*, 470 U.S. 564 (1985)................................................93, 94

*Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017 ........................................................119

*Burger v. Kemp*, 483 U.S. 776 (1987) ....................................................................74

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999) ................................................72

*Clabourne v. Ryan*, 745 F.3d 362 (9th Cir. 2014) ..........................................19, 25

*Cook v. Ryan*, 688 F.3d 598 (9th Cir. 2012)..........................................................19

*Cooper v. Calderon*, 255 F.3d 1104 (9th Cir. 2001) .............................................18

*Crittenden v. Ayers*, 624 F.3d 945 (9th Cir. 2010) ...............................................17

*Cullen v. Pinholster*, 563 U.S. 170 (2011)...........................................35, 57, 76, 87

*Detrich v. Ryan (Detrich V)*, 740 F.3d 1237 (9th Cir. 2013) .........................passim

*Detrich v. Ryan (Detrich IV)*, 677 F.3d 958 (9th Cir. 2012) .................................12

*Detrich v. Ryan*, 696 F.3d 1265 (9th Cir. 2012) ....................................................12

*Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) ...................................................62

*Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005).....................................................17

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) .........................................................114

*Greenway v. Ryan*, 866 F.3d 1094 (9th Cir. 2017).........................................118, 119

*Harrington v. Richter*, 562 U.S. 86 (2011)...........................................18, 19, 36, 58

*Husain v. Olympic Airways*, 316 F.3d 829 (9th Cir. 2002) ...................................17

*Larsen v. Soto*, 742 F.3d 1083 (9th Cir. 2013) ......................................................17

*Lockett v. Ohio*, 438 U.S. 586 (1978) ...................................................................114

*Martinez v. Ryan*, 566 U.S. 1 (2012) ...........................................7, 12, 19, 28, 29, 56

*McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015)...................................12, 114, 115

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ..........................................................118

4

*Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007) ................................................33

*Rompilla v. Beard*, 545 U.S. 374 (2005) ..............................................................102

*Ryan v. Detrich*, 563 U.S. 984 (2011) ....................................................................12

*Shinn v. Ramirez*, 596 U.S. 366 (2022) ..................... 20, 39, 48, 50, 54, 61, 63, 113

*State v. Carlson*, 48 P.3d 1180 (Ariz. 2002)..........................................................109

*State v. Christensen*, 628 P.2d 580 (Ariz. 1981)......................................................21

*State v. Detrich (Detrich II)*, 932 P.2d 1328 (Ariz. 1997)...............................passim

*State v. Detrich (Detrich I)*, 873 P.2d 1302 (Ariz. 1994) .........................................8

*State v. Djerf*, 959 P.2d 1274 (Ariz. 1998) ...........................................................105

*State v. Ellison*, 140 P.3d 899 (Ariz. 2006) ............................................................95

*State v. Fulminate*, 778 P.2d 602 (Ariz. 1988) ......................................................111

*State v. Hampton*, 140 P.3d 950 (Ariz. 2006)..........................................................95

*State v. Haskins*, 14 P.3d 997 (Ariz. 2000)..............................................................96

*State v. Lujan*, 604 P.2d 629 (Ariz. 1979) .............................................................111

*State v. Moody*, 94 P.3d 1119 (Ariz. 2005)............................................................110

*State v. Ross*, 886 P.2d 1354 (Ariz. 1994) ............................................................119

*State v. Talmadge*, 999 P.2d 192 (Ariz. 2000).........................................................34

*State v. Wallace*, 773 P.2d 98 (Ariz. 1989)............................................................119

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................... 17, 18, 72, 74, 75, 95

*Townsend v. Sain*, 372 U.S. 293 (1963)................................................................113

*Wiggins v. Smith*, 539 U.S. 510 (2003)....................................................................75

*Williams v. Taylor*, 529 U.S. 420 (2000).........................................................20, 113

*Woodford v. Garceau*, 538 U.S. 202 (2003)..........................................................113

**Statutes**

28 U.S.C. § 2254(d) ............................................................................................75, 113

28 U.S.C. § 2254(d)(1).................................................................................76, 100, 114

28 U.S.C. § 2254(d)(2)......................................................................34, 103

28 U.S.C. § 2254(e)(2).................................................................20, 39, 54

A.R.S. § 13–703(G)(1)............................................................................74

**Rules**

Ariz. R. Evid. 608(b)..............................................................................53

Fed. R. Civ. P. 52(a)(6)...............................................................86, 93, 107, 117

## CERTIFIED ISSUES

1.  Did the district court correctly determine that Detrich's procedurally defaulted claims of ineffective assistance of counsel could not be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012)?

2.  Did the state courts reasonably conclude that trial counsel was not ineffective in investigating and presenting mitigation or in rebutting aggravation?


## UNCERTIFIED ISSUE[1]

3.  Did the district court correctly conclude that the state courts did not impose a causal nexus requirement on mitigating evidence?

_____

[1] Appellees address the uncertified issue pursuant to this Court's order of February 9, 2024.  *See* Doc. 201.

## STATEMENT OF THE CASE

David Scott Detrich[2] was convicted of the first-degree murder, kidnapping, and sexual abuse of Elizabeth Souter. In affirming Detrich's convictions and sentences for the kidnapping and first–degree murder, the Arizona Supreme Court set out the underlying facts in *State v. Detrich* (*Detrich II*), 932 P.2d 1328 (Ariz. 1997):[3]

> Defendant and Alan Charlton worked together at the Ocotillo Motors wrecking yard in Benson, Arizona. On November 4, 1989, a Saturday afternoon, defendant and Charlton left work and headed to a local bar. Charlton estimated that he and defendant each consumed between twelve and twenty–four cans of beer. Two hours after they started drinking, the men drove to Tucson.

> Upon arriving in Tucson, defendant and Charlton visited several more bars and consumed more beer. At some point during the evening, defendant suggested that they "pick up" somebody. When the two men saw the victim, Elizabeth Souter, walking along the Palo Verde bridge, they stopped the car and Souter climbed in. Defendant asked her to help them obtain some cocaine. She agreed and directed the two men to a "roadhouse" where defendant and Souter purchased the cocaine.

---

[2] Although Appellant identified himself as "Mr. Detrich" in the district court and in prior pleadings in this Court, he calls himself "Dave" in his Replacement Opening Brief. Appellees continue to refer to him by his surname.

[3] After Detrich's initial trial, the Arizona Supreme Court affirmed his sexual abuse conviction, but remanded the case for a retrial on his first-degree murder and kidnapping charges. *See State v. Detrich* (*Detrich I*), 873 P.2d 1302, 1307 (Ariz. 1994). All references herein are to Detrich's retrial, unless otherwise noted.

The two men and Souter then drove to Souter's home, where defendant attempted to "cook a spoon," which entailed dissolving the cocaine in a spoon so that it could be injected. Defendant soon became angry because the syringe would not pick up the cocaine. Defendant began "screaming and hollering that the needle wasn't any good, or the cocaine wasn't any good." Defendant told Souter that she was going to pay for the bad drugs by having sex with him—"He told her they could go in the room or do it right there, or they would do it his way, and she did not want to do it his way." Three witnesses, Charlton, Tami Winsett, and Caprice Souter (the victim's daughter), confirmed that defendant was holding a knife against Souter's throat. Additionally, defendant threatened, "You must not believe me, I will kill you."

Defendant then told Souter, "Come on bitch, we are going for a ride." Souter, Charlton, and defendant climbed into Charlton's car. Charlton drove, defendant sat in the middle, and Souter sat up against the passenger door. Defendant ordered Charlton to drive out of town. Charlton testified that, while stopped at a red light, he looked at defendant and saw that defendant was "humping" Souter and asking her how she liked it. Moments later, Charlton again looked and saw that Souter's throat was slit. Charlton indicated that defendant then hit her and asked her "who she got the shit off of." Souter was unable to answer clearly; she just gurgled something. Defendant then hit her with his elbow and asked again who she got the drugs from. She gurgled again in answer. Defendant then asked, "Did you say Mike?" Souter gurgled a third and final time, and Charlton heard no more sounds from her. Although Charlton claims he never saw defendant actually stab Souter, Charlton was himself poked in the arm with the knife three or four times. The pathologist established that Souter was stabbed forty times.

At this point, defendant asked Charlton, "It's dead but it's warm. Do you want a shot at it." Charlton declined. They drove to a remote area approximately fifteen minutes (seven to nine miles) from Souter's home. Charlton pulled the car over at defendant's request, and defendant dragged Souter's body into the desert.

After dumping the body, Charlton and defendant drove to their friend William Carbonell's house in Tucson. Carbonell testified that

the two men showed up at his house at 4:00 a.m. The defendant was covered with blood, but Charlton had blood only on his right side. Approximately an hour later, defendant confessed to Carbonell that he had killed a girl by slitting her throat. Defendant explained that he grabbed the girl at her house and forced her into Charlton's car at knife point, where defendant killed her. Defendant further explained that he killed Souter because the drugs she had purchased were bad.

*Detrich II*, 932 P.2d at 1331–32 (footnotes omitted). Detrich was convicted of sexual abuse, kidnapping, and first-degree murder. The trial court sentenced Detrich to death for the murder. *Id*. at 1332. On independent review, the Arizona Supreme Court affirmed Detrich's death sentence. *Id*. at 1340.

On September 22, 1999, Detrich filed a petition for post-conviction relief. 6-ER-1186–1215. The trial court denied relief on all claims. 1-ER-262–65. The Arizona Supreme Court summarily denied review on April 23, 2003. 1-ER-261.[4]

Detrich filed an amended petition for writ of habeas corpus on April 15, 2004, raising 18 claims. 5-ER-903. Relevant here, the district court found that Claims A(1), A(3), A(4), and A(6)–(10) were procedurally defaulted by Detrich's failure to fairly present them to the Arizona Supreme Court. Those claims alleged ineffective assistance of trial counsel in the pretrial, voir dire, and guilt phases. 1-

---

[4] Detrich filed two successive petitions for post-conviction relief while his federal habeas proceeding was pending. *See* 4-ER-771; 2-ER-333. His petition seeking review of the court's denial of his most recent petition for post-conviction relief is currently pending in the Arizona Supreme Court.

ER-214–15. The district court also found that the portion of Claim A(5) alleging ineffective assistance "related to blood pattern evidence, seat covers and the blue jeans" and the portion of Claim A(2) alleging ineffective assistance "related to prosecutorial vouching during Charlton's testimony" were not procedurally defaulted. 1-ER-216. It found the remaining portions of Claims A(2) and A(5) procedurally defaulted. *Id*.

The district court found that Claim B, alleging that trial counsel was ineffective in investigating and presenting mitigation and in rebutting the aggravating factor, was not procedurally defaulted. 1-ER-212. The court summarily dismissed the portion of Claim B alleging that counsel was ineffective in rebutting aggravation, 1-ER-196, and granted an evidentiary hearing on the portion of the claim alleging that trial counsel was ineffective in investigating and presenting mitigation, 1-ER-198–99. After the hearing, the district court dismissed Claim B and the remaining claims on the merits. 1-ER-179. The court granted a certificate of appealability on the portion of Claim B alleging counsel was ineffective in failing to investigate and present mitigation. *Id*.

On September 8, 2008, Detrich filed his initial Opening Brief in this Court raising the issue certified by the district court, Claim B, and two uncertified claims. *See* Doc. 22 (stricken per Doc. 182). This Court granted a certificate of appealability on the two uncertified claims, which alleged: "(1) trial counsel was

11

ineffective at sentencing because counsel failed to investigate and challenge the prosecution's case in aggravation[]; and (2) Appellant's Sixth and Fourteenth Amendment rights were violated because the trial court (a) excused prospective jurors opposed to the death penalty[]; and (b) allegedly refused to permit voir dire regarding racial bias[.]"  Doc. 50.  A three-judge panel of this Court granted relief on Detrich's claim that trial counsel was ineffective in investigating and presenting mitigation. *Detrich v. Ryan* (*Detrich III*), 619 F.3d 1038, 1068–69 (9th Cir. 2010). The panel did not reach Detrich's claim that his counsel was ineffective in rebutting aggravation.  *Id.* at 1052 n.3.  In a separate memorandum decision, the panel affirmed the district court's denial of relief on Detrich's jury-selection claims. Doc. 85, at 2. The Supreme Court vacated this Court's opinion and remanded the case "for further consideration in light of *Cullen v. Pinholster*, 563 U.S. 170 … (2011)." *Ryan v. Detrich*, 563 U.S. 984 (2011).

On remand, the three-judge panel again granted relief on the mitigation ineffectiveness claim, this time in a divided opinion. *Detrich v. Ryan* (*Detrich IV*), 677 F.3d 958 (9th Cir. 2012), *vacated by Detrich v. Ryan*, 696 F.3d 1265 (9th Cir. 2012) (mem.).  While Respondents' petition for rehearing and rehearing en banc was pending, Detrich filed a motion to remand his case pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012).  *See* Docs. 120, 128.  This Court granted en banc rehearing and, after argument, remanded this case to the district court for

consideration of Detrich's *Martinez* motion. Doc. 138; *Detrich v. Ryan* (*Detrich V*), 740 F.3d 1237, 1259 (9th Cir. 2013). The en banc panel retained jurisdiction over this appeal. *Detrich V*, 740 F.3d at 1259. This Court later expanded the scope of the remand to include the impact of *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015), on Detrich's case. Doc. 177.

On August 16, 2022, the district court held that the defaults of Detrich's Claims A(1), A(4), A(8), A(10), and the unexhausted portion of A(5) could not be excused under *Martinez*. 1-ER-119. It also held that the state courts did not apply an unconstitutional causal nexus requirement in considering Detrich's mitigation. 1-ER-118. The district court granted a certificate of appealability on Claim A. 1-ER-119. On February 9, 2024, this Court ordered Appellees to address Detrich's uncertified claim. Doc. 201.

## SUMMARY OF THE ARGUMENT

### **Claim A.**

The district court correctly held that Detrich failed to establish that the defaults of his guilt-phase ineffectiveness claims could not be excused under *Martinez*. *See* 1-ER-46–120. First, Detrich failed to allege, let alone establish, prejudice resulting from his claim that counsel presented inconsistent defenses (Claim A(1)). 1-ER-76. And the district court lacked jurisdiction to consider his new allegation that counsel should have presented an impulsivity defense, because that claim did not appear in his amended petition and therefore was not remanded by this Court. 1-ER-76–77. Moreover, Detrich does not dispute the district court's finding that his murder of Ms. Souter was not impulsive and therefore he was not prejudiced by the absence of an impulsivity defense.

Second, the district court correctly held that this Court expressly excluded Claim A(3) from the claims remanded to the district court because that claim was decided on the merits by the state post-conviction court. 1-ER-65; *see Detrich V*, 740 F.3d at 1254. The claim was nevertheless procedurally defaulted by Detrich's failure to include it in his petition for review to the Arizona Supreme Court. 1-ER-65–66. Thus, the district court lacked jurisdiction to consider the claim and, in any event, *Martinez* could not excuse its default because post-conviction counsel presented the claim in state court.

14

Third, the district court correctly found that *Martinez* could not excuse the default of his claims that counsel failed to investigate certain witnesses (Claim A(4)). Detrich failed to demonstrate he was prejudiced by counsel's alleged failure to discover that Charlton had connections to the Aryan Brotherhood and sought to benefit from testifying against Detrich. 1-ER-78–92. And the district court correctly determined that it lacked jurisdiction to consider Detrich's new claims (presented for the first time on remand) that counsel failed to investigate Charlton to discover certain information surrounding his plea agreement and his violent background. 1-ER-70–72. The district court also found that Detrich was not prejudiced by counsel's failure to impeach Carbonell with his arrest record and with claims that he had stolen from his former employers. 1-ER-92–97. Accordingly, *Martinez* could not excuse the default of these claims.

Finally, the district court correctly held that *Martinez* could not excuse the default of Detrich's claim that counsel was ineffective in failing to retain a pathologist to test physical evidence and to rebut Charlton's testimony that the victim "gurgled" in response to questions after Detrich slashed her throat (Claim A(5)). 1-ER-99–100. Although Detrich presented the claim in his state petition for post-conviction relief, it was procedurally defaulted because he failed to include it in his petition for review to the Arizona Supreme Court. *Id*. Thus, because the state court decided the claim on its merits, *Martinez* could not excuse

the claim's default.

## Claim B.

Detrich failed to establish that the state court unreasonably rejected his claim that counsel was ineffective in investigating and presenting mitigating evidence. Accordingly, AEDPA bars relief. Although the district court erred by finding that counsel performed deficiently, 1-ER-138–40, it correctly held, after holding an evidentiary hearing, that Detrich was not prejudiced by counsel's claimed failure to investigate mitigation, 1-ER-140–63.

## *McKinney* claim.

The state courts did not refuse to consider any of Detrich's proffered mitigation lacking a causal nexus to his murder of Ms. Souter. Instead, they considered the lack of a causal connection when determining how much weight to give the mitigating evidence. Detrich agrees that neither the sentencing court nor the Arizona Supreme Court made any statements indicating that they were applying a causal nexus test, and none of the "critical factors" leading the *McKinney* Court to find that the Arizona Supreme Court applied a causal nexus test are present here. Moreover, as the district court held and Detrich does not dispute, Detrich's claim that the Arizona Supreme Court applied a causal nexus test is procedurally defaulted and Detrich has failed to establish cause and prejudice to excuse the default. 1-ER-116.

16

## STANDARDS OF REVIEW AND APPLICABLE LAW

**A.     Standards of review.**

This Court reviews *de novo* a district court's decision to grant or deny a petition for writ of habeas corpus as well as its rulings on questions of law. *Crittenden v. Ayers*, 624 F.3d 943, 950 (9th Cir. 2010). "Factual findings and credibility determinations made by the district court in the context of granting or denying the petition are reviewed for clear error." *Larsen v. Soto*, 742 F.3d 1083, 1091–92 (9th Cir. 2013) (quotation marks omitted). If the court's findings are plausible in light of the record as a whole, they are not clearly erroneous. *See Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002). Ineffective-assistance claims are mixed questions of law and fact and thus are subject to *de novo* review. *See Strickland v. Washington*, 466 U.S. 668, 698 (1984). This Court reviews a district court's denial of an evidentiary hearing for an abuse of discretion. *See Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).

**B.     Applicable law.**

    1.     *Ineffective assistance of counsel.*

To warrant relief on an ineffective assistance claim, a petitioner must show that: (1) counsel's performance was deficient under prevailing professional standards; and (2) the prisoner suffered prejudice as a result. *Strickland*, 466 U.S. at 691–92.

A petitioner demonstrates deficient performance by showing "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A petitioner's allegations and supporting evidence must withstand a reviewing court's "highly deferential" scrutiny of counsel's performance, and overcome the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689–90. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689; *see Harrington v. Richter*, 562 U.S. 86, 109 (2011) ("There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'").

A petitioner must also show prejudice to be entitled to relief. *Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). The mere possibility that a petitioner suffered prejudice is insufficient to establish *Strickland*'s prejudice requirement. *See Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001). Rather, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at

694.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id*. (quotation marks and citations omitted).

2.      *Cause and prejudice under Martinez.*

"[U]nder *Martinez*, a petitioner may establish cause for procedural default of a trial IAC claim . . . by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*....' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14). In *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), the Ninth Circuit provided guidelines for applying *Martinez*:

> To demonstrate cause and prejudice sufficient to excuse the procedural default, … *Martinez and Detrich* [V] require that [Petitioner] make two showings. First, to establish "cause," he must establish that his counsel in the state postconviction proceeding was

19

ineffective under the standards of *Strickland*. *Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different. Second, to establish "prejudice," he must establish that his underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

(internal quotation marks and citations omitted).

### 3. *AEDPA's requirements for consideration of new evidence.*

The Antiterrorism and Effective Death Penalty Act (AEDPA) prevents a federal court from considering new evidence "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). The Supreme Court has explained that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence for purposes of the opening clause [of § 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435. "[U]nder § 2254(e)(2), a prisoner is 'at fault' even when state post-conviction counsel is negligent." *Shinn v. Ramirez*, 596 U.S. 366, 384 (2022). Accordingly, post-conviction counsel's failure to develop the factual basis of a claim precludes evidentiary development in federal habeas unless the other

20

stringent requirements of 28 U.S.C. § 2254(e)(2) are met.

## ARGUMENTS

## I

## THE DISTRICT COURT CORRECTLY FOUND THAT *MARTINEZ* COULD NOT EXCUSE THE DEFAULTS OF DETRICH'S CLAIMS THAT COUNSEL WAS INEFFECTIVE IN THE GUILT PHASE.

**A.    Claim (A)(1): Failure to present a coherent defense.**

*1.    Background facts.*

In Claim (A)(1), Detrich alleged that his trial counsel was ineffective in presenting inconsistent defenses of misidentification and mere presence. *See* 5-ER-933–37; 1-ER-75–77. The district court found that Detrich "failed to demonstrate cause, under *Martinez*, to excuse the default of this claim" because he "does not allege, let alone demonstrate, that he was prejudiced" by any deficient performance of counsel in presenting the allegedly inconsistent defenses. 1-ER-76. The court explained that "[a]t worst, any conflict in the presentation of both defenses resulted in the jury concluding that Detrich was with Charlton when Souter was murdered, thus disregarding the misidentification defense. Because Detrich asserts counsel should not have presented [the misidentification] defense, he could not have been prejudiced by the jury's disregard of it." *Id*.

For the first time on remand, Detrich asserted that counsel was ineffective in failing to present an impulsivity defense under *State v. Christensen*, 628 P.2d 580

21

(Ariz. 1981).[5]  The district court explained that, "[b]ecause Detrich did not present this *Christensen* claim in his Amended Petition, the claim could not have been among the claims found defaulted by [the district court] and remanded by the Ninth Circuit."  1-ER-76–77.  The district court rejected Detrich's argument that his *Christensen* claim was "merely additional evidence in support of an existing claim," concluding instead that "the *Christensen* allegations fundamentally alter Claim A(1)."  1-ER-76.  The district court concluded that it "lacks jurisdiction to consider Detrich's guilt-phase *Christensen* claim because the Ninth Circuit did not remand the claim, nor did it authorize [the district court] to review it."  1-ER-77 ("The Court therefore declines to consider Detrich's *Christensen* claim in this remand.").

> 2.    *The district court correctly concluded that it lacked jurisdiction to consider Detrich's* <u>*Christensen*</u> *claim.*

Detrich asserts that the district court erroneously found that his "*Christensen*-related arguments" were outside the scope of this Court's remand. Doc. 191, at 60.[6]  He contends that his *Christensen* (or impulsivity) argument

---

[5] In *Christensen*, the court held that a defendant may present evidence of his character trait for impulsivity to rebut premeditation. 628 P.2d at 583.

[6] Appellees cite the page numbers assigned by the Court's electronic docketing, appearing at the top of each page of the document.

merely presented "the viable, alternative defense not pursued due to counsel's lack of investigation" to establish prejudice for his ineffective assistance claim. *Id*. But Detrich does not dispute the district court's factual findings that: (1) his *Christensen* argument fundamentally altered Claim A(1); (2) he failed to present the *Christensen* argument in his amended habeas petition; and (3) he did not seek to amend his petition to include the *Christensen* claim. *Id*.; *see* 1-ER-76. As a result, the district court lacked jurisdiction to consider the claim under this Court's *Martinez* remand order. 1-ER-77.

In any event, Detrich's *Christensen* argument does not demonstrate that he was prejudiced by trial counsel's presentation of inconsistent defenses. First, the district court found, and Detrich does not dispute, that "the crime was not impulsive." 1-ER-77 n.16 (quoting 1-ER-155); *see also* 1-ER-43 ("This offense was not the result of a poor planning or momentary impulse. Rather, it was an extended event featuring threatening, kidnapping, sexually abusing, striking, slashing, stabbing, and intermittently interrogating the victim."). Second, a *Christensen* defense would have required Detrich to concede that he killed Ms. Souter, contrary to the "mere presence" defense he asserted counsel should have relied on. *See* 5-ER-937 (Detrich asserting that "counsel had substantial information available to him via a reasonable investigation that supported a consistent defense theory of mere presence"). Because the crime was not in fact

23

impulsive, the only purpose a *Christensen* defense would have served was to admit Detrich's guilt.  Accordingly, Detrich has not established a reasonable probability that the jury would not have convicted him of first-degree murder had counsel presented an impulsivity defense.

This Court should affirm the district court's finding that it lacked jurisdiction to consider Detrich's *Christensen* ineffectiveness claim.

> 3.  *The district court correctly determined that <u>Martinez</u> could not excuse the default of Detrich's inconsistent-defense claim.*

Without actually addressing the district court's ruling that *Martinez* cannot excuse the default of his inconsistent-defense claim, Detrich asserts that the claim's default should be excused.  First, he asserts that the district court's issuance of a certificate of appealability on the claim "demonstrat[es] substantiality" under *Martinez*.  Doc. 191, at 70.  But the district court did not consider the merits of this claim, and thus the certificate of appealability on its procedural ruling says nothing about the claim's merits.  *Id*.

Even if the claim is "substantial" under *Martinez*, however, Detrich has not established that post-conviction counsel was ineffective in failing to present it.  *Id.* at 70–71.  Detrich does not challenge the district court's finding that he failed to "allege, let alone demonstrate, that he was prejudiced."  1-ER-76.  Instead, he claims that he "need not show actual prejudice … over and above his required showing that the trial counsel IAC claim be 'substantial' under the first *Martinez*

24

requirement." *Id*. at 70 (quoting *Detrich V*, 740 F.3d at 1245–46).  While Detrich accurately quotes the plurality opinion in *Detrich V*, "[a] majority of the panel … explicitly rejected the view expressed in Judge Fletcher's plurality opinion that 'a prisoner … need not show actual prejudice resulting from his PCR counsel's deficient performance.'"  *Clabourne*, 745 F.3d at 376 (quoting *Detrich V*, 740 F.3d at 1245).  Accordingly, Detrich must (but has failed to) establish *Strickland* prejudice resulting from his post-conviction counsel's failure to present this claim in state court.  His unsupported allegation that "a reasonable court could have granted [Detrich] relief" does not satisfy *Strickland*.  Doc. 191, at 71; *see Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.").  Accordingly, Detrich has failed to establish that *Martinez* can excuse his default of Claim A(1).

### 4. This claim fails even on de novo review.

Because this claim is defaulted, this Court should not consider its merits.  Nevertheless, to the extent this Court does consider the merits of this claim, it must defer to the district court's factual findings, including its unchallenged finding that Detrich failed to allege he was prejudiced by trial counsel's assertion of a misidentification defense.  1-ER-76.  Detrich still fails to do so.  Instead, he asserts that "a lesser-degree of participation or impulsivity defense would have rebutted

premeditation."[7]  Doc. 191, at 42.  As explained above, however, Detrich did not assert in his amended petition that counsel should have presented an impulsivity defense to rebut premeditation.  Moreover, an impulsivity defense was not viable because, as the district court found, Detrich's murder of Ms. Souter was not impulsive.  Thus, such a defense would not have rebutted premeditation and instead would have served as an admission of guilt, contrary to Detrich's continued protestations that he was not the killer.  Even under de novo review, this claim fails.

This Court should affirm the district court's ruling that *Martinez* cannot excuse the default of Detrich's inconsistent-defense claim.

**B.     Claim (A)(3)—Shell's testimony.**

*1.     Background facts.*

Phillip Shell testified at Detrich's first trial that he was incarcerated with Charlton and that Charlton confessed that he, and not Detrich, had murdered Ms. Souter.  7-ER-1645–47.  Shell was unwilling to travel to Arizona to testify at Detrich's second trial in 1994.  Shortly before that trial, counsel told the court:

_____

[7] Detrich does not identify any "lesser-degree of participation" defense, if different from impulsivity, he believes counsel should have presented.

> [A]bout two weeks ago now my investigator found Mr. Schell [sic] in a small way station in Missouri and I have been dealing with Mr. Schell since that time to coerce him to come to Tucson, I guess because I didn't really have time ... to go through the rigmarole of an out-of-state subpoena process, and he led me on and led me on and led me on.
>
> One of the things the Court suggested last week was to send an investigator to Missouri to essentially accompany him back, with a rental car, and after my discussions with Mr. Schell this weekend, it seemed to me that was a risky proposition to go to that expense when there may not be anyone there to pick up. So he is an essential defense witness. He is not going to be here unless he shows up voluntarily, which seems an extremely remote possibility.

7-ER-1580. Because his efforts to bring Shell to Tucson for the second trial were unsuccessful, trial counsel elected to read Shell's testimony from the first trial to the jury. 7-ER-1493.

Detrich asserted in his state post-conviction petition that his counsel was ineffective in failing to have Shell testify in person at the 1994 trial. 6-ER-1189. The post-conviction court rejected the claim. 1-ER-262 ("Petitioner failed to demonstrate that admission of the previously-reported trial testimony prejudiced him, given the overwhelming evidence of Petitioner's guilt and the fact that the first jury convicted him, despite its opportunity to hear Schell's [sic] live testimony."). Detrich did not present this claim in his petition for review to the Arizona Supreme Court and thus failed to properly exhaust it. *See* 5-ER-1135 (listing four claims presented for review); 1-ER-62. Accordingly, the district court found the claim procedurally defaulted. 1-ER-214–15.

27

This Court specifically *excluded* this claim from its order remanding Detrich's claims pursuant to *Martinez*:

> [T]he dissent points out that some of Detrich's trial-counsel IAC claims were adjudicated on the merits by the first state PCR court and were thus never procedurally defaulted. We agree with the dissent that *Martinez* does not apply to such claims, and that **the following three claims were adjudicated on the merits: (1) trial counsel failed to bring witness Shell to court to testify**….

*Detrich V*, 740 F.3d at 1254 (emphasis added).[8]  Because this finding was made by eight judges of the en banc panel, it was binding on the district court. *See* 1-ER-64 (citing *Detrich V*, 740 F.3d at 1254 (Fletcher, J., plurality opinion, with two judges joining)); *id*. at 1268 (Graber, J., dissenting, with 4 judges joining)).

Despite the fact that this claim was not remanded, Detrich asserted on remand that *Martinez* could excuse its default. *See* SER-12–13.  The district court disagreed and affirmed its finding that Claim A(3) was procedurally defaulted because Detrich did not present it to the Arizona Supreme Court. 1-ER-65 ("[T]his

_____

[8] The parties and the district court agreed that the en banc majority's conclusion that this claim was not procedurally defaulted "is not entirely accurate." 1-ER-64. The claim is defaulted because Detrich failed to include it in his petition for review. *Id*.  Nevertheless, the plurality and the dissent correctly held that "*Martinez* does not apply to such claims." *Detrich V*, 740 F.3d at 1254; *see Martinez*, 566 U.S. at 16 (*Martinez* does not permit a court to excuse a default resulting from "attorney errors in ... appeals from initial-review collateral proceedings.").

Court previously held, and continues to maintain, [Claims A(3) and A(8)] were not fairly presented to the State's highest court in order to fully exhaust the claims." (citation omitted)).[9]  It further found that *Martinez* did not excuse counsel's failure to present a claim in an "'appeal[] from initial-review collateral proceedings.'"  1-ER-66 (quoting *Martinez*, 566 U.S. at 16).

The district court also concluded that Claim A(3) was not fundamentally altered by new evidence Detrich presented on remand:

> While the new evidence related to Claim A(3) casts additional aspersions on counsel's performance, it does not fundamentally alter the claim because at its core it is the same claim: counsel's failure to secure Shell's testimony at the trial made Shell a less credible witness. This claim is not significantly different or in a significantly stronger evidentiary posture than it was when it was considered by the state court.

1-ER-68 (citations omitted).  Accordingly, the claim remained procedurally defaulted by Detrich's failure to present it in his petition for review to the Arizona Supreme Court, and the default could not be excused under *Martinez*.

2. *The district court correctly held that* <u>*Martinez*</u> *cannot excuse the default of this claim.*

Detrich asserts that the district court erred by finding that he did not present Claim A(3) in his petition for review to the Arizona Supreme Court.  Doc. 191, at

---

[9] Detrich does not challenge the district court's conclusion that Claim A(8)'s default cannot be excused under *Martinez*.

61.  He notes that he included his post-conviction petition in the appendix to his petition for review and argues that this served to fairly present the claim to the supreme court.  *Id*.  But Detrich *agreed* below that Claim A(3) "[was] not fully exhausted because [it was] not presented in the Petition for Review to the Arizona Supreme Court."    SER-9.    Detrich also agreed that "[t]he Ninth Circuit's conclusion [that the claim was not procedurally defaulted] is not accurate.  [The district court] found, and Respondents concede, that *these claims were procedurally defaulted*."  *Id*. (emphasis added).  Given his agreement on remand that he failed to present the claim in his petition for review, thus procedurally defaulting it, it is disingenuous for Detrich now to assert that he *did* present the claim in his petition for review.[10]

In any event, if Detrich presented the claim in his petition for review, thus properly exhausting it, then the claim was "never procedurally defaulted," as the *Detrich V* plurality found.  *Detrich V*, 740 F.3d at 1254.  Contrary to Detrich's

---

[10]  Detrich also asserts that he presented the claim "again in successive postconviction proceedings in 2005."  Doc. 191, at 61.  The state court, however, dismissed Detrich's successive notice of post-conviction relief because Detrich failed to establish that any of his claims were properly presented in that proceeding.  1-ER-259. The court further held that the "pleadings are frivolous and an abuse of the state post-conviction process."  1-ER-260. In any event, Detrich does not explain how it would help him if the claim had been properly exhausted in that proceeding, because in that circumstance there would be no default for *Martinez* to excuse.

apparent belief, claims properly presented in a post-conviction petition and petition for review are not procedurally defaulted and therefore *Martinez* has no work to do. *See* Doc. 191, at 61–62 (Detrich asserting that "the claim and supporting evidence was before the Arizona Supreme Court … and was therefore not outside *Martinez*'s scope"). This Court should affirm the district court's findings that this claim was not remanded and that *Martinez* cannot excuse its default.

>    3.    *The district court correctly found that this claim was not fundamentally altered by evidence presented on remand.*

Detrich further challenges the district court's conclusion that the new evidence he presented with his *Martinez* brief did not fundamentally alter Claim A(3). *Id*. at 62. This Court need not consider Detrich's argument because, as explained, this claim was not remanded to the district court for consideration under *Martinez*. *See* 1-ER-72 ("[T]he [District] Court lacks jurisdiction to consider any claims other than the IAC claims [it] found procedurally defaulted and that were specifically remanded by the Ninth Circuit."). In any event, Detrich's new evidence did not fundamentally alter the claim.

Detrich relies on a 2015 juror declaration, which he claims establishes that the juror "discounted Shell's testimony specifically because he was not present at trial." Doc. 191, at 62 (citing 2-ER-416, ¶ 7). But the juror merely stated that he thought "that the witness should have been there to testify in person." 2-ER-416, ¶ 7. The juror did not say he discounted Shell's testimony. This declaration—

31

executed more than 20 years after Detrich's trial—adds little, if anything, to the claim presented in state court. Moreover, Detrich first presented the declaration on remand, and therefore any fundamentally-altered claim was not included in his habeas petition. Detrich has not sought to amend his habeas petition to add the claim, and the claim would be untimely if Detrich were to do so. *See* 1-ER-72 ("[E]ven if the [district court] had jurisdiction to allow amendment of the petition, the claims are untimely.").

Detrich also cites Shell's 2004 declaration, in which Shell surmises that his testimony in 1994 would have been more compelling than it was at Detrich's 1990 trial. Doc. 191, at 62 (citing 4-ER-889–90). But even if Shell's in-person testimony would have been more compelling, he refused to come to Arizona to testify. In any event, Shell's declaration does not add significantly to the state court claim, which alleged that "counsel's failure to secure Shell's testimony at trial made Shell a less credible witness." 1-ER-68.

Detrich further asserts he was prejudiced by Shell's absence at his trial because Shell "was the only witness who could establish that [Detrich] was not the actual killer, rebut the prosecution's allegation of premeditated murder, and rebut the (F)(6) aggravator." Doc. 191, at 45. Even if he is correct, however, Detrich does not allege a reasonable probability that the jury would not have convicted him of first-degree murder had Shell testified in person. Given that Shell testified in

person at Detrich's first trial, and the jury nevertheless convicted him, no such reasonable probability exists. This Court should affirm the district court's finding that this claim was not fundamentally altered.

> ### 4.     AEDPA deference applies to the state court's merits ruling.

To the extent this Court considers the merits of this claim despite the fact that it did not remand the claim and the claim's default cannot be excused, it must apply AEDPA deference to the state court's rejection of the claim.[11]   Detrich first asserts that "it is unreasonable to conclude that failing to call a critical live witness is not deficient." Doc. 191, at 71. He asserts that other courts have found counsel deficient "for such error." *Id*. at 71–72. Detrich cites *Ramonez v. Berghuis*, 490 F.3d 482, 491 (6th Cir. 2007), in which counsel was found deficient for failing to present "available corroborating witnesses." But *Ramonez* did not find counsel deficient for presenting a witness' prior testimony in lieu of live testimony. Nor does a court's "preference" for live testimony establish deficient performance where, as here, the witness refused to travel to attend the trial. Doc. 191, at 72

---

[11] Detrich asserts that this Court should apply AEDPA deference only to the state court's ruling on *Strickland*'s prejudice prong "because the state court dismissed it on prejudice grounds alone." Doc. 191, at 71. He is incorrect. The state court in fact found Detrich's claim of deficient performance "speculative" because he provided no support for his claim. 1-ER-262. Only after making this finding did the court hold that Detrich was not prejudiced. *Id*.

33

(citing *State v. Talmadge*, 999 P.2d 192, 195, ¶ 14 (Ariz. 2000)). Detrich fails to establish that his counsel performed deficiently in presenting the transcript of Shell's earlier testimony, given that Shell refused to travel to Arizona to testify at the 1994 trial.

Detrich also disagrees with the state court's conclusion that he was not prejudiced, claiming that the state court "unreasonably discounted the value of Shell's testimony." *Id*. While he claims that Shell's testimony would have undermined Charlton's, he makes no effort to establish that the state court's finding was unreasonable "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Detrich merely disagrees with the state court's "pat assessment of the evidence"; he has not identified anything in the state court record rendering it unreasonable. Doc. 191, at 72.

Detrich next claims that Shell would have been a more credible witness in 1994 because he would not have been "handcuffed and wearing jail clothes" or "under duress from being detained as a material witness and other life-stressors," as he was when he testified in 1990. *Id*. at 72–73. Detrich apparently relies on Shell's 2004 declaration to establish that Shell was "under duress" and had "other life stressors" when he testified in 1990. *See* 4-ER-889–90. But the state court did not have this declaration when it rejected Detrich's claim in 2002. 1-ER-262. This Court's review "under § 2254(d)(1) is limited to the record that was before the

34

state court that adjudicated the claim on the merits," which does not include Shell's 2004 declaration.[12] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In any event, Detrich's claim that Shell's testimony in 1994 "would have been far more probative and persuasive than his compromised 1990 testimony" is speculative and insufficient to establish *Strickland* prejudice even on *de novo* review. Doc. 191, at 73.

Moreover, even if Shell's live testimony would have been more persuasive, Detrich has not established a reasonable probability that Shell would have traveled to Arizona to testify at his 1994 trial. Detrich also has not established a reasonable probability that he would not have been convicted had Shell testified in person in 1994. Even discounting Charlton's testimony, the evidence, including Detrich's confession to Carbonell, overwhelmingly established that Detrich murdered Ms. Souter. *See Detrich II*, 932 P.2d at 1332. Detrich has not established that the state court unreasonably applied *Strickland* in finding his counsel was not ineffective in presenting Shell's 1990 testimony at Detrich's 1994 trial.

To the extent Detrich asserts that the state court unreasonably determined any facts in dismissing this claim, he has not identified any such facts. *See* Doc.

---

[12] Detrich agrees that the state court did not have this information when he asserts the declaration fundamentally altered the claim. *See* Doc. 191, at 62.

191, at 75–76. Instead, he seems to suggest that the state court erred by failing to hold an evidentiary hearing on the claim because "PCR counsel made allegations about what Shell would have testified to at retrial and disputed trial counsel's assertion that Shell was unavailable." *Id*. But the post-conviction court found no facts that were inconsistent with Detrich's claim that Shell was available to testify at his 1994 trial. Instead, the court found that counsel did not perform deficiently in presenting the transcript of Shell's earlier testimony in lieu of his live testimony at the 1994 trial. 1-ER-262. The court also found that Detrich was not prejudiced by the absence of Shell's live testimony, "given the overwhelming evidence of [Detrich's] guilt and the fact that the first jury convicted him despite its opportunity to hear [Shell's] live testimony." *Id*.

Detrich complains that the state court unreasonably failed to describe the "overwhelming" evidence it relied on to find that he was not prejudiced by the absence of Shell's live testimony. Doc. 191, at 76; *see* 1-ER-262. But "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Detrich's claim that "[i]t is difficult to imagine" on what evidence the state court relied is insufficient to meet his burden. Doc. 191, at 76. Moreover, no imagination is needed. The Arizona Supreme Court found the following facts, in addition to Charlton's testimony,

36

supporting Detrich's conviction:

> … Defendant told Souter that she was going to pay for the bad drugs by having sex with him—"He told her they could go in the room or do it right there, or they would do it his way, and she did not want to do it his way." Three witnesses, Charlton, Tami Winsett, and Caprice Souter (the victim's daughter), confirmed that defendant was holding a knife against Souter's throat. Additionally, defendant threatened, "You must not believe me, I will kill you."
>
> Defendant then told Souter, "Come on bitch, we are going for a ride." Souter, Charlton, and defendant climbed into Charlton's car. Charlton drove, defendant sat in the middle, and Souter sat up against the passenger door….
>
> …
>
> After dumping the body, Charlton and defendant drove to their friend William Carbonell's house in Tucson. Carbonell testified that the two men showed up at his house at 4:00 a.m. The defendant was covered with blood, but Charlton had blood only on his right side. Approximately an hour later, defendant confessed to Carbonell that he had killed a girl by slitting her throat. Defendant explained that he grabbed the girl at her house and forced her into Charlton's car at knife point, where defendant killed her. Defendant further explained that he killed Souter because the drugs she had purchased were bad.

*Detrich II*, 932 P.2d at 1331–32. Thus, even if Shell's live testimony would have thoroughly discredited Charlton's testimony, the evidence still established that Detrich forced the victim into the car at knifepoint and confessed to Carbonell that he had "killed a girl by slitting her throat." The state court's determination that Detrich was not prejudiced is not based on an unreasonable determination of facts.

**C.    Claim A(4)—Failure to investigate other witnesses.**

In Claim A(4), Detrich asserted counsel was ineffective in failing to investigate Alan Charlton and William Carbonell.[13]  *See* Doc. 191, at 46–55.  As discussed below, the district court correctly concluded that *Martinez* did not excuse Detrich's default of this claim.

*1.    Alan Charlton.*

Detrich asserted in his amended habeas petition that counsel was ineffective in failing to investigate Charlton's background to discover (a) the benefit he sought to receive for testifying against Detrich; (b) that he received an "award" from his biker gang after allegedly killing Ms. Souter; (c) that Charlton had "connections" to the Aryan Brotherhood; and (d) other witnesses to whom Charlton may have confessed or who had knowledge of his racist beliefs.  1-ER-70.

For the first time on remand, Detrich alleged that counsel was ineffective for failing to discover: (a) that Charlton initially offered to plead guilty to manslaughter and kidnapping, but the final plea agreement required him to plead

---

[13] On remand, Detrich asserted that his counsel was ineffective in failing to investigate other witnesses as well.  *See* 1-ER-97–98.  He does not challenge the district court's conclusion that he failed to identify any new information counsel would have discovered had they investigated these witnesses.  *Id.*; Doc. 191, at 46–55, 63–68.

only to kidnapping; (b) that Charlton's plea agreement allowed him to be released for 60 days before beginning his sentence; (c) that Charlton first recounted Detrich's statement that "it's dead but it's warm. Do you want a shot of it?" after entering into the plea deal; (d) that Charlton had violent tendencies and mental instability; and (e) that Charlton was a "known liar." 1-ER-70–71. Detrich also asserted for the first time on remand that counsel was ineffective in failing to cross-examine Charlton on alleged inconsistencies in his account of the murder. 1-ER-71. Detrich did not dispute that he failed to present these claims in his amended petition. *Id*.

The district court held that it lacked jurisdiction to consider Detrich's newly-presented claims. 1-ER-72. It nevertheless considered the new evidence supporting these claims "to the extent [they] provide additional evidentiary support for claims raised in the Amended Petition, without fundamentally altering those claims." 1-ER-73. But because Detrich was not diligent in presenting his "new" evidence in state court, the district court erred by considering it. *See* 28 U.S.C. § 2254(e)(2); *Ramirez*, 596 U.S. at 389 ("[W]hen a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied.").

Nevertheless, even considering Detrich's new evidence, *Martinez* does not authorize excusing the defaults of his claims.

      a.    <u>Benefits received.</u>

The district court described the facts relevant to this claim:

> After Charlton was arrested in Benson, he agreed to talk to Pima County Sheriff's Detectives during the drive to Tucson. During this interview, Charlton described the kidnapping and murder of Souter. At that time, he told police that Detrich raped and murdered Souter and that Detrich asked Charlton if he "wanted a shot at it," meaning would Charlton like to rape the victim. Almost a year later, after entering into a plea agreement, Charlton was interviewed by Detrich's counsel, James Glanville, before Detrich's first trial. In this interview, Charlton elaborated on his previous statement, adding that, after killing Souter, Detrich asked him, "it's dead, but it's warm" before asking Charlton "Do you want a shot of it?" Charlton also stated that after he declined, Detrich raped the victim.

> In exchange for testifying at Detrich's trial, Charlton secured a plea deal for kidnapping with an agreed upon ten-and-a-half-year-sentence. Charlton admitted that he had testified at Detrich's [first] trial that he only took a plea deal to avoid the death penalty. At Detrich's [second] trial, Charlton testified that he requested "something more," some "additional consideration" from the prosecution to entice him to testify again.

> On the first day of Detrich's 1994 trial, trial counsel asked prosecutor Kenneth Peasley about what additional consideration Charlton hoped to receive from Detective Clark in exchange for his second round of testifying. Peasley stated there "has been no additional consideration afforded Mr. Charlton nor will there be" but he would ask Detective Clark what they were talking about during the interview.

> Though there was nothing further on the record indicating what Charlton and Detective Clark might have discussed regarding the

additional consideration, Higgins cross-examined Charlton on the matter:

> Q: And [Detective Clark] said: Are you going to come down and testify? And you said: Well, I need something more from you. Didn't you?
>
> A: Yes.
>
> Q: You asked for some additional consideration, didn't you?
>
> A: Uh-huh.

1-ER-78–79 (record citations omitted; alteration in original). The district court held that Detrich failed to establish that he was prejudiced by his counsel's "failure to inquire further into the benefits Charlton received or hoped to receive in exchange for his testimony." 1-ER-81. The court noted that Charlton's declaration, submitted with Detrich's supplemental *Martinez* brief, was consistent with Peasley's testimony that Charlton asked for, but did not receive, additional consideration for testifying at the 1994 trial. *Id.* (citing 2-ER-410–14).

Detrich does not dispute these factual findings but complains that the district court "focused solely on the second trial" and that counsel "failed to investigate the plea he reached before the *first* trial," which he claims was "more favorable than even what his own lawyer proposed." Doc. 191, at 63. But the district court explained that the deal was *not* more favorable: "While the plea deal may have been 'better' in the sense it contained fewer charges, Detrich has failed to demonstrate the original plea offered by Charlton would have resulted in a

41

sentencing range any greater than a plea to kidnapping alone." 1-ER-80 n.18. Detrich does not challenge this factual finding. The district court correctly found that *Martinez* could not excuse the default of this claim. 1-ER-92.

Detrich also asserts that counsel should have impeached Charlton's "dead but warm" statement (or moved to suppress it) with the fact that Charlton first alleged Detrich made that statement only after entering into the plea deal. Doc. 191, at 63. The district court, however, found that this claim fundamentally altered, and did not relate back to, Detrich's claim that counsel should have investigated Charlton's plea deal. 1-ER-81–82. Detrich calls this conclusion "nonsensical" and asserts that the reason counsel should have investigated the plea deal was to "impeach Charlton with the plea information." Doc. 191, at 63. But the district court explained that "[t]rial counsel conducted the second interview during which Charlton made the aggravating statement and was thus aware of the statement yet chose not to move to suppress it or cross-examine [Charlton] on the subject." 1-ER-81. "Because these allegations of deficient performance differ significantly from the failure to investigate alleged in the petition, amending the claim to include these allegations would fundamentally alter the claim, and such a claim is not properly before the Court." 1-ER-81–82.

The district court alternatively ruled that Detrich failed to establish prejudice because he did "not identify the grounds on which the 'dead but warm' statement

should have been suppressed," and "there is no reasonable probability that had counsel successfully suppressed the statement or adequately cross-examined Charlton it would have resulted in a different outcome." 1-ER-82. The court explained that, although the trial court relied on the statement to find the murder depraved to satisfy the (F)(6) aggravator, other evidence also supported the depravity finding:

> Other evidence of depravity included: "that the infliction of death encompassed gratuitous violence, in that more than 40 wounds were inflicted on the victim, which was a far greater number than necessary to cause death," the killing was senseless "in that there was no need to kill the victim under the circumstances," and the victim was "helpless, and could not resist the attacks of the defendant and the codefendant in any way."

1-ER-84 (quoting 1-ER-272–73). Thus, even without the "dead but warm" statement there is no reasonable probability that the state courts would not have found the murder depraved.

Moreover, the state courts also found the murder to be especially cruel, which satisfied the (F)(6) aggravator independently from a finding that the murder was depraved. *see* 1-ER-85–86 (quoting *Detrich II*, 932 P.2d at 1338–39). While Detrich asserts that an independent pathologist would have refuted the cruelty finding, at best the pathologist could have contradicted only the findings of physical suffering after the most serious stab wounds. Doc. 191, at 64, 93–99. The pathologist would not have refuted the facts that the victim had defensive

wounds (meaning she was conscious and fighting off her attacker) or that she suffered mental distress as she was dragged to the car and was uncertain of her fate while riding in the car. *Detrich II*, 932 P.2d at 1338–39.

Thus even if, as Detrich claims, counsel could have conclusively rebutted the "heinous or depraved" prong of the (F)(6) aggravator, both the sentencing court and the Arizona Supreme Court still would have found the murder cruel based on the victim's mental anguish and physical suffering. And as the district court held, "[t]he mitigating evidence was not especially powerful." 1-ER-86. Accordingly, there is no reasonable probability "that had trial counsel successfully suppressed Charlton's statement that [Detrich] raped the victim post-mortem, or suppressed or cross-examined Charlton on the 'dead but warm' statement, that Detrich would have received a life sentence." *Id*.

The district court correctly held that Detrich's claim based on the timing of the "dead but warm" statement was outside the scope of this Court's remand and, alternatively, that its default could not be excused because Detrich was not prejudiced by post-conviction counsel's failure to raise it.

   b. <u>Racism.</u>

Detrich asserted in his amended petition that his trial counsel was ineffective in failing to investigate Charlton's racism and connections to the Aryan Brotherhood. *See* 1-ER-87. The district court concluded that Detrich was not

44

prejudiced because he did not establish that Charlton was involved in the Aryan Brotherhood at the time of the murder. 1-ER-88. It also found that the new evidence Detrich presented to establish Charlton's racism—a declaration from Charlton's former brother-in-law, John Hershiser, and Charlton's statement that he wrote a racist letter to the victim's family—was cumulative to that presented at trial.[14] 1-ER-88–89.

Detrich asserts that the district court "clearly erroneously" found that (1) he failed to demonstrate Charlton was involved with the Aryan Brotherhood at the time of the offense, and (2) his evidence of Charlton's racism was cumulative to that presented at trial. Doc. 191, at 65. He claims that Charlton "possessed grim reaper earrings and the 'FTW' knife, symbols associated with the Aryan Brotherhood/white supremacist gangs." *Id*. But Charlton testified at trial that he wore "grim reaper" earrings and had a knife with "FTW" on it. Thus, counsel did

_____

[14] Detrich does not challenge the district court's conclusion that testimony of John Hershiser would have been cumulative to, and less compelling than, the evidence of Charlton's racism presented at trial. *See* 1-ER-88–89; Doc. 191, at 65–66. Nor does he challenge the district court's conclusion that trial counsel could not have discovered that Charlton wrote a racist letter to the victim's family after the murder. 1-ER-89. And he does not dispute the district court's holding that he "failed to establish a reasonable probability that the court would have given Detrich a life sentence had Hershiser testified or had the letter been presented at trial." 1-ER-89.

not fail to discover this information.  *See* 7-ER-1453, 1473.  Moreover, Detrich has not established that the earrings and knife are, in fact, symbols of the Aryan Brotherhood.[15]   In any event, possessing items "associated with" the Aryan Brotherhood does not establish Charlton's involvement with the organization.

Detrich also notes that his investigator stated that "Charlton's Aryan Brotherhood affiliation was known at the time of trial, per Charlton's own wife." Doc. 191, at 65 (citing 6-ER-1219, ¶ 4; 5-ER-1114).  But while the investigator stated in his 1999 declaration that Charlton was in the Aryan Brotherhood, he did not state the source of that knowledge.  6-ER-1219, ¶ 4.  During a later interview, the investigator stated only that Charlton's wife "indicated that [Charlton] was very anti-racist [sic]."  5-ER-1114.  The district court noted that Charlton's wife had told Detrich's investigator of Charlton's racist beliefs.  1-ER-88 (citing 5-ER-1114).  Detrich has not established that the district court clearly erred by finding that he failed to establish that Charlton was a member of the Aryan Brotherhood at the time of the offense.

In any event, counsel presented evidence of Charlton's racism at trial. Charlton's wife testified that "Charlton did not like black people and called them

---

[15] Detrich did not assert on remand that the earrings and knife were symbols of the Aryan Brotherhood, although he argued that the earrings "featured white power iconography."  Dist. Ct. Doc. 403, at 58–59.

'mud ducks.'" *Id*. (quoting 7-ER-1494). Shell also testified that Charlton called Detrich a "Nigger lover" and the victim a "black bitch." *Id*. (citing 7-ER-1648). Detrich asserts that "[e]vidence that Charlton did not merely harbor racist beliefs but identified with a white supremacist organization recasts the other evidence of his propensities and is not cumulative." Doc. 191, at 65. But even if evidence establishing that Charlton was a member of the Aryan Brotherhood would have provided more compelling evidence of his racism, Detrich has not established that such evidence existed. Accordingly, the district court correctly held that Detrich had failed to demonstrate he was prejudiced by his counsel's alleged failure to investigate Charlton's alleged involvement with the Aryan Brotherhood. 1-ER-89.

      c.   <u>Violence.</u>

The district court held that Detrich did not assert in his amended petition that counsel was ineffective in failing to investigate Charlton's violent tendencies and mental instability, and therefore the claim was outside the scope of this Court's remand. 1-ER-90. Detrich asserts that he raised the claim in his amended petition when he stated in passing that counsel failed to investigate, among other things, the "violent background of Charlton." Doc. 191, at 66 (citing 5-ER-935). Even if this bald assertion sufficiently presented the claim, however, it did not provide any basis to find that Detrich was prejudiced.

The court alternatively held that the claim's default could not be excused under *Martinez*. 1-ER-90. Detrich's new evidence of Charlton's alleged violent tendencies consisted of unsworn statements from Charlton's ex-wife (Deborah Hatfield[16]) and former girlfriend (Maxine Shaffer).[17] *See* 2-ER-417, 421. Shaffer, however, refused to sign her declaration and crossed out a statement on the unsigned declaration stating that she would have been willing to testify at Detrich's trial. 2-ER-419–20. The district court correctly concluded that "there is no reasonable probability of a different outcome at trial if counsel had investigated because Shaffer would not have testified favorably at Detrich's trial." 1-ER-91.

In an email, Hatfield asked counsel not to contact her and opined that Charlton could have killed the victim "if he was drunk or high." 2-ER-421. As the district court observed, Hatfield was not present during the murder and was not relating Charlton's confession. 1-ER-91. Moreover, Hatfield's statement contradicts her trial testimony that she did not consider Charlton to be violent. *Id.*

---

[16] At trial, this witness was known as Deborah Charlton.

[17] Because Detrich did not establish he was diligent in developing the evidence in state court, the district court erred by considering the evidence. *See Ramirez*, 596 U.S. at 389 ("[A] federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*" if a prisoner cannot establish he was diligent under 28 U.S.C. § 2254(e)(2).).

(citing SER-135–37). The district court found that Detrich was not prejudiced by counsel's failure to present a statement from Charlton's ex-wife that Charlton "could" have killed the victim. *Id*. Detrich presents his own interpretation of the evidence, but he fails to establish that the court's factual findings are clearly erroneous. *See* Doc. 191, at 66. The district court correctly held that, even considering Detrich's new evidence, Detrich failed to establish he was prejudiced by counsel's alleged failure to investigate Charlton's violent tendencies. 1-ER-91.

      d.   <u>Truthfulness.</u>

The district court held that Detrich did not assert in his amended habeas petition that counsel should have presented evidence that Charlton was a "known liar." *Id*. As a result, the claim was not remanded by this Court, and the district court lacked jurisdiction to consider it. *Id*. While Detrich disputes this finding, he points to nothing in the amended petition asserting that counsel ineffectively failed to present evidence that Charlton was a known liar.[18] Doc. 191, at 66.

The district court alternatively held that Detrich failed to establish that

---

[18] Detrich combines the discussion of his "propensities for violence and lying," as if they alleged the same thing. Doc. 191, at 66. Even if, as he asserts, he asserted in his amended petition that counsel was ineffective for failing to investigate Charlton's violent background, this did not encompass a claim that counsel should have investigated a propensity to lie.

Charlton had a history of lying.[19]  1-ER-91–92.  Detrich disputes only the court's

conclusion that a witness' statement that Charlton "'bragged' to make himself look

better" did not establish he was a liar.  1-ER-92 (citing 2-ER-393–94, ¶ 22); Doc.

191, at 66.  The witness stated:

> Alan was always telling outrageous stories and trying to make
> himself look good. He told lies and stories and bragged about things
> he said he had done. Often when someone told a story about their
> adventures or experiences, Alan would say "oh ... I've done that." It
> was clear to me that he was being untruthful and just wanted to look
> important.  Alan once claimed that he had a rich uncle who left him a
> lot of money. When we asked why he didn't have any money he said
> that he couldn't figure out how to get access to the account where the
> money was located.

2-ER-393–94, ¶ 22.  Detrich claims that this statement establishes that Charlton

was a liar.  Doc. 191, at 66.  But Detrich merely presents another interpretation of

the evidence; he has not demonstrated that the district court clearly erred by

finding the evidence did not establish Charlton's dishonesty but only that he liked

to brag about himself.

This Court should affirm the district court's findings that *Martinez* cannot

excuse the default of this claim.

_____

[19] The district court considered two declarations presented for the first time with
Detrich's supplemental *Martinez* brief.  *See* 1-ER-91–92; 2-ER-388–99.  Because
Detrich was not diligent in presenting these declarations in state court, the district
court erred by considering them.  *See Ramirez*, 596 U.S. at 389.

*2.    William Carbonell.*

Carbonell testified that, when Charlton and Detrich came to his house after the murder, Detrich "was covered with blood, but Charlton had blood only on his right side." *Detrich II*, 932 P.2d at 1332. Carbonell also testified that Detrich confessed to killing the victim. *Id*. Detrich asserted in his amended habeas petition that counsel ineffectively failed to (1) investigate Carbonell, (2) cross-examine Carbonell on inconsistencies in his testimony, and (3) obtain Carbonell's arrest records. 1-ER-92. The district court found these claims defaulted by Detrich's failure to present them in state court. 1-ER-214. On remand, the district court found that the default could not be excused under *Martinez* because Detrich failed to establish he was prejudiced by counsel's alleged failure to investigate Carbonell. 1-ER-92–96.

Detrich challenges only the district court's conclusion that counsel was not ineffective in failing to impeach Carbonell with (1) his arrest record and (2) accusations that he had stolen from his former employers. Doc. 191, at 67; 1-ER-96. Detrich asserted below that trial counsel should have impeached Carbonell with his statement in a 1990 pretrial interview that he had been arrested for "a couple of fights" with his ex-wife. Dist. Ct. Doc. 403, at 71. Detrich argued that

Carbonell was untruthful in the interview because he had actually been arrested for criminal assault, leaving the scene of an accident, and driving on a suspended license. *Id*. The district court rejected this argument, finding that, "[i]n stating that he had been arrested for domestic violence, … Carbonell was responding to the investigator's questioning about whether he had 'any priors—felonies.' The investigator had not asked about his arrest record." 1-ER-96 (citation omitted). Detrich does not challenge this finding.

The district court further held that "[t]here is no reasonable probability that impeaching Carbonell with his incomplete recitation of his arrests four years before his interview in response to a question about his prior convictions would have resulted in a different outcome at sentencing." *Id*. Detrich asserts that the court's statement of the timing of the interview is incorrect because "the interview occurred a mere five months after the arrests, not four years." Doc. 191, at 67. While Detrich is correct, it appears that the district court intended to state that Detrich was not prejudiced by counsel's failure to impeach Carbonell in 1994 with statements made in his 1990 interview. *See* Dist. Ct. Doc 426, at 54 (Respondents arguing, "even had Carbonell's 1990 arrest record been admissible and presented at the 1994 trial, there is no reasonable probability that the jury would have disbelieved Carbonell's entire testimony based on his incomplete recitation of his

arrests 4 years earlier").  While the district court's statement is inartful, the context establishes it is not clearly erroneous.

Detrich incorrectly asserts that the district court implied that "Carbonell was simply forgetful due to the passage of years."  Doc. 191, at 67.  Rather, the court relied on the fact that Carbonell had not been asked to provide a complete history of his arrests: "the context of the [investigator's] question indicates the investigator was asking about any prior felony convictions and Carbonell spontaneously offered the details about his arrest for domestic violence."  1-ER-96.  Detrich does not challenge this factual finding or the court's conclusion that he was not prejudiced by his counsel's failure to impeach Carbonell on this matter.  *See* Doc. 191, at 67.

Detrich also disputes the district court's finding that evidence that Carbonell had stolen items from his former employers would have been inadmissible at Detrich's trial.  *Id.*; 1-ER-96.  Detrich claims that this conclusion was based on an incorrect reading of Arizona Rule of Evidence 608(b).  Doc. 191, at 67.  That rule, however, permits a defendant to cross-examine witnesses on their "character for truthfulness."  Ariz. R. Evid. 608(b).  Detrich has not established that allegations of theft would have been probative of Carbonell's truthfulness.  But even if they would have been, Detrich merely states that Carbonell could have been impeached "with these thefts."  Doc. 191, at 67.  He does not assert that the district court erred

by finding that the evidence "would not have sufficiently discredited Carbonell's testimony to result in a different outcome." 1-ER-96; Doc. 191, at 67.

      *3.    This Court should not review the merits of these defaulted claims.*

As he did with Claim A(1), Detrich notes that the state court did not rule on the merits of Claim A(4) because he did not present the claim to that court. Doc. 191, at 69. Accordingly, if this Court finds that the claim's default may be excused and considers its merits, it would do so *de novo*. Moreover, to the extent this Court undertakes a merits review of defaulted Claim A(4), it must defer to the district court's factual findings and it may not consider Detrich's new evidence presented with his *Martinez* briefing. *See* 28 U.S.C. § 2254(e)(2); *Ramirez*, 596 U.S. at 389. As established above, at a minimum Detrich cannot establish he was prejudiced by his counsel's alleged failure to investigate Charlton and Carbonell.

**D.    Claim A(5): Failure to hire independent pathologist to rebut the State's evidence.**

Detrich asserted in Claim A(5) that counsel was ineffective in failing to hire an independent pathologist to test physical evidence and to challenge Charlton's testimony that the victim "gurgled" in response to Detrich's questions. 1-ER-99–101.

      *1.    "Gurgling" testimony.*

        a.    <u>*Martinez* cannot excuse the default of this claim.</u>

54

Alan Charlton testified that, after her throat was cut, the victim "attempted to answer [Detrich's] questions, but was able only to gurgle in response." *Detrich II*, 932 P.2d at 1338. Both the trial court and the Arizona Supreme Court relied on this testimony, in part, to establish the cruelty prong of the (F)(6) aggravator. *See* 1-ER-271–72; *Detrich II*, 932 P.2d at 1338–39. Detrich asserted in his post-conviction petition that counsel was ineffective in failing to retain a pathologist to rebut the "gurgling" testimony. 4-ER-825–26. The state court rejected the claim, finding that Detrich was not prejudiced in the penalty phase "because evidence other than Charlton's testimony regarding the 'gurgling' sounds independently supported a finding of cruelty at sentencing." 1-ER-263. It further found Detrich was not prejudiced by counsel's failure to impeach Charlton in the guilt phase, because "overwhelming evidence apart from Charlton's testimony supported the finding that [Detrich] committed the murder." *Id*. Detrich did not present this claim in his petition for review to the Arizona Supreme Court. *See* 5-ER-1135.

Detrich presented this claim in his amended habeas petition.[20] 1-ER-99. The district court found the claim defaulted because Detrich presented it "in his

———————————

[20] Detrich also alleged that his counsel was ineffective for failing to have an independent pathologist perform additional testing on the victim's fingernail fragment. 1-ER-100. Detrich does not challenge the district court's conclusion that *Martinez* could not excuse the default of this claim. *See* Doc. 191, at 67–69.

(continued ...)

initial-review post-conviction proceedings yet failed to raise [it] in his petition for review, i.e., his appeal of that decision, to the Arizona Supreme Court." 1-ER-100. Accordingly, the claim's default could not be excused under *Martinez*. *Id*.; *see Martinez*, 566 U.S. at 16.

Detrich agreed below that "PCR counsel failed to fully exhaust [his pathologist] claims to the Arizona Supreme Court on Petition for Review." SER-12–13. He nevertheless asserted that *Martinez* could excuse the defaults. *Id*. at 25. Detrich now contends, however, that he *did* present the claims in his petition for review when he alleged that counsel ineffectively failed to "retain a forensic expert to test 'whether or not Mr. Charlton's version of events was plausible.'" Doc. 191, at 68 (quoting 5-ER-1151–52); *see id*. at 77 (asserting the claim "was not defaulted, as PCR counsel clearly alleged it in his petition and included it in the appendix to his petition for review"). But Detrich asserted in his petition for review only that counsel "did not even ask for an analysis of the seat covers that would have contained a blood pattern caused by the homicide, and which might have been read like a book to determine whether or not Mr. Charlton's version of events was plausible." 5-ER-1151–52. He did not allege a claim related to the

———————————

( ... continued)

56

"gurgling" testimony. In any event, if Detrich presented this claim in his petition for review, then it would be properly exhausted and there would be no default for *Martinez* to excuse.[21] The district court correctly found that *Martinez* does not excuse the default of this claim. 1-ER-100.

> b. To the extent this Court considers the claim's merits, AEDPA and *Strickland* deference apply to the state court's ruling.

If the Court considers the merits of this claim, the state court's ruling is entitled to the "doubly deferential" standard of review that AEDPA and *Strickland* require. *Pinholster*, 563 U.S. at 190. Detrich asserts that deference is not owed because the state court failed to hold an evidentiary hearing, rendering the factfinding process deficient. Doc. 191, at 75–76. But Detrich identifies no factual findings that were rendered unreasonable by the lack of an evidentiary hearing. *Id*. Moreover, as established above, even if Charlton's "gurgling" testimony had been completely rebutted by an expert, there is no reasonable probability that the jury would not have found Detrich guilty or that the court would not have sentenced him to death. Detrich does not demonstrate otherwise, but merely states that "[w]ith expert assistance, counsel *could have* rebutted Charlton's account." Doc. 191, at 74 (emphasis added). This is insufficient to establish *Strickland* prejudice.

--------

[21] Detrich does not dispute that if, as the district court held, the claim is defaulted, then *Martinez* does not excuse its default. *See* Doc. 191, at 67–68.

To the extent Detrich asserts that "there is a reasonable probability that the jury would have found [him] not guilty of premeditated murder" had counsel presented an expert to rebut the "gurgling" testimony, he is incorrect. *Id*. The "gurgling" testimony was irrelevant to Detrich's culpability, and therefore impeaching that testimony would have had no impact on the jury's verdict. Detrich has not established that the state court unreasonably applied *Strickland* in rejecting this claim.

Detrich again claims that the state court unreasonably found that "'overwhelming' evidence apart from Charlton's testimony pointed to [Detrich] committing the murder," because the court did not identify this "overwhelming evidence." Doc. 191, at 76; *see* 1-ER-263. But the state court was not required to identify every fact supporting its ruling. *Richter*, 562 U.S. at 98. Moreover, the Arizona Supreme Court detailed the facts, in addition to Charlton's testimony, supporting Detrich's conviction. *See Detrich II*, 932 P.2d at 1331–32. Even without Charlton's testimony, the evidence established that Detrich forced the victim into the car at knifepoint, arrived at Carbonell's house after the murder "covered in blood," and confessed to Carbonell that he had "killed a girl by slitting her throat." *Id*.

Detrich has failed to establish that the state court's decision is contrary to, or involved an unreasonable application of, clearly established Supreme Court

precedent, or is based on an unreasonable determination of fact.

2.     *Failure to retain a pathologist to rebut State's forensic evidence.*

Detrich asserted on remand that his counsel was ineffective in failing to retain an independent pathologist to rebut the State's forensic evidence. *See* 1-ER-100–01. The district court held that Detrich failed to assert these claims in his amended habeas petition and as a result it lacked jurisdiction to consider them:

> … Detrich's claims alleging ineffective assistance of counsel for failing to retain an independent pathologist to rebut physical evidence, other than the gurgling testimony, were not presented in his Amended Petition and were not found procedurally defaulted by this Court. As a result, these claims were not remanded by the Ninth Circuit, and the Court is without jurisdiction to consider them.

1-ER-101. Although Detrich disputes the district court's conclusion, he does not identify where the claims appear in his federal habeas petition. Doc. 191, at 68. Instead he identifies where he presented the claims in his *state* petition for review. *Id*. ("Initial postconviction counsel alleged that counsel was ineffective for failing to retain a forensic expert to test 'whether or not Mr. Charlton's version of events was plausible.'" (quoting 5-ER-1151–52)). Accordingly, Detrich has not established that the district court erred by concluding that it lacked jurisdiction to consider these claims because he failed to present them in his amended *federal* habeas petition. 1-ER-101.

*3.      Detrich was not entitled to an evidentiary hearing.*

Detrich asserts that the district court erred by finding that his "gurgling" claim was procedurally defaulted and for failing to hold a hearing on the claim.[22] Doc. 191, at 76–77 (citing 1-ER-100, 110).   He argues, once again, that the "gurgling" claim "was not defaulted, as PCR counsel clearly alleged it in his petition and included it in the appendix to his petition for review."  *Id*. at 77.  As explained earlier, however, Detrich agreed on remand that "PCR counsel failed to fully exhaust [his pathologist] claims to the Arizona Supreme Court on Petition for Review," and as a result the claim was defaulted.  SER-12–13.

On remand, the district court was authorized to consider whether an evidentiary hearing was warranted on claims that "*were not presented in state court*," *i.e*., those claims whose default *Martinez* might excuse.   1-ER-109 (emphasis added).   The "gurgling" claim *was* presented in state court, and

_____

[22] Detrich asserts that "the district court found PCR counsel diligent."  Doc. 191, at 76 (citing 1-ER-240–41).  But that finding of diligence applied only to Detrich's claim that counsel "failed to investigate, test or seek expert assistance regarding forensic evidence, specifically, blood pattern evidence, the car seat covers and a pair of blue jeans."  1-ER-240.  The district court did not find Detrich diligent in presenting the factual basis for the "gurgling" claim.

therefore it was *not* among the claims for which the court considered, and denied, evidentiary development. Additionally, because *Martinez* does not apply to claims that were defaulted by counsel's failure to present them in a petition for review, Detrich was not entitled to a hearing to determine whether *Martinez* could excuse the default. Detrich has not demonstrated that the district court erred by failing to hold an evidentiary hearing on his "gurgling" claim.

Detrich alternatively argues that his "new" evidence renders his "gurgling" claim fundamentally altered and procedurally defaulted, and that the default may be excused under *Martinez* because post-conviction counsel was ineffective in failing to present it. Doc. 191, at 78. To the extent he believes he would have been entitled to a hearing on the "fundamentally altered" claim, however, he is incorrect. "[U]nder § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent. In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Ramirez*, 596 U.S. at 384.

In any event, Detrich does not explain what "new evidence" fundamentally alters his claim.[23] To the extent he relies on the 2015 declaration of Dr. Haddix,

_____

[23] Detrich asserts that he showed that post-conviction counsel was ineffective in "subsection (4)" of his opening brief, which is entitled "AEDPA Does Not Bar

(continued ...)

this declaration is consistent with the evidence presented in state court and does not present any "new factual allegations" or "place the case in a significantly different and stronger evidentiary posture." *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (quotation marks omitted); *see* 2-ER-400. Detrich presented a declaration from criminologist Michael Sweedo in state court, opining that "there is very little probability that the victim would have been engaging in conversation of any nature" after her neck was "slit from ear to ear, the wound penetrating all the way back to her neck bone." 6-ER-1225. Dr. Haddix opines that "[w]ith injuries such as Ms. Souter sustained, gurgling sounds can occur even if a person is unconscious or dead and with movement of the body air is expelled from the lungs or the stomach and through the airway. 2-ER-406. Dr. Haddix's declaration merely confirms Sweedo's opinion, but it does not significantly alter the claim or place it in a stronger evidentiary posture.

Moreover, to the extent Dr. Haddix's 2015 declaration does fundamentally alter the claim, the declaration did not yet exist when Detrich filed his amended

—————————————

( ... continued)

Relief." Doc. 191, at 78; *see id*. at 69. The discussion in that section addressed only post-conviction counsel's failure to assert that trial counsel was ineffective in "fail[ing] to present a coherent defense or fail[ing] to investigate other witnesses." *Id*. at 69. Detrich also refers to "subsection (3)" as establishing that the claim is fundamentally altered. *Id*. at 78. There, however, Detrich did not argue that any new evidence fundamentally altered the "gurgling" claim. *Id*. at 67–68.

habeas petition, and therefore his petition does not include the "fundamentally altered" claim. Detrich has not sought to amend his habeas petition to include any "fundamentally altered" claim, and "even if the [district court] had jurisdiction to allow amendment of the petition, the claim[] [is] untimely." 1-ER-72. In any event, the district court expanded the record with the exhibits Detrich attached to his *Martinez* motion, including Dr. Haddix's declaration. *See* 1-ER-110–11.[24]

## II

### THE STATE COURT REASONABLY REJECTED DETRICH'S CLAIM THAT COUNSEL WAS INEFFECTIVE IN INVESTIGATING MITIGATION AND REBUTTING AGGRAVATION.

In Claim B, Detrich alleged that his trial counsel was ineffective in investigating and presenting mitigation and in rebutting the aggravating factor. 5-ER-955–71. The district court dismissed on the merits the portion of Claim B alleging that counsel was ineffective in rebutting aggravation, 1-ER-196, and granted an evidentiary hearing on the portion of the claim alleging that trial counsel was ineffective in investigating and presenting mitigation, 1-ER-199. After the hearing, the district judge dismissed Claim B and the remaining claims

———————————

[24] Although Appellees did not object to expansion of the record, *Ramirez* now establishes that the court may not consider new evidence unless it finds that the petitioner was diligent under 28 U.S.C. § 2254(e)(2), or an exception applies. 596 U.S. at 384.

on the merits.  1-ER-179.  The district court granted a certificate of appealability on the portion of Claim B alleging counsel was ineffective in failing to investigate and present mitigation.  *Id*.  This Court later expanded the certificate of appealability to include the portion of Claim B alleging counsel was ineffective in rebutting aggravation.  *See* Doc. 50.

## A.    The state court reasonably rejected Detrich's claim that counsel was ineffective in investigating and presenting mitigation.

### 1.    *Factual background.*

#### a.    <u>Mitigation presented at sentencing.</u>

At his second sentencing Detrich was represented by Harold Higgins, who presented evidence supporting: (1) diminished capacity/voluntary intoxication; (2) abusive childhood; (3) lack of previous convictions for crimes involving serious injury; (4) remorse; and (5) the lenient sentence imposed on the codefendant.  6-ER-1275.

To establish Detrich's abusive childhood, counsel presented detailed letters from Detrich's sister, Diana Jo Stevens, describing the constant physical and verbal abuse meted out by their stepmother, Jean.  This included: (1) daily slapping one or more of the children across the face; (2) punishing Detrich physically and mentally for wetting the bed by spanking him with a belt, forcing him to wash the sheets, and publicly humiliating him; (3) verbally and physically abusing the children in their father's absence by pinching, slapping, or grabbing an arm and wrenching it;

(4) pushing one of Detrich's brothers down a flight of concrete steps and making the children swear at gunpoint that they would not tell their father; and (5) tying a rope around Detrich's neck and staking him to a post, telling him he was "no better than a dog." 6-ER-1262–67. Jean "put on a 'public' show … of what a great mother she was" and even purported to be the children's birth mother. 6-ER-1264. Diana also described Detrich's early drug and alcohol abuse beginning at the age of 13, which his stepfather, Skip, encouraged. 6-ER-1276. Detrich's drug use included "speed" and marijuana. Diana further described Detrich's rollover accident in his stepfather's truck, that Detrich would "guzzle" alcohol for his stepfather's friends, and that he once accompanied his stepfather on a week-long drinking spree. *Id*.

Diana also chronicled positive aspects of Detrich's social history, including: (1) Detrich "never picked a fight, as a child or as an adult"; (2) he was a "hard worker" and always had good references from employers; (3) he seemed to be "doing great" after he got out of the army; (4) he married and supported his wife and her three children; (5) after his divorce Detrich moved to Michigan, where he "went through all the training and did a great job" working in a home for adults with mental health problems; and (6) there were periods of time when Detrich successfully abstained from alcohol. 6-ER-1277–78.

The presentence report informed the sentencing judge that Detrich was born with a cleft palate that was surgically corrected and that his parents were divorced when he was approximately 2 years old. 6-ER-1344. In addition, Detrich had a "very unstable childhood marred with frequent moves and a considerable amount of abuse and neglect by his stepmother." *Id*. (citing SER-139); *see also* SER-145–47. Detrich and his siblings were shuffled between their parents as the result of a long custody battle. *Id*. Detrich's mother suffered from prescription drug abuse, causing Detrich to move out to live with friends at age 14. *Id*. The report further confirmed that Detrich first used alcohol at age 9 and experimented with "most street drugs during his teenage years." 6-ER-1344.

The family's frequent relocations resulted in the children attending several different schools. Detrich failed to complete a full year of school after the ninth grade and finally dropped out in his senior year. *Id*. After leaving school, Detrich joined the Job Corps in Utah, where he trained as a heavy equipment operator. *Id*. He lived in Oklahoma, Nebraska, Ohio, and Utah before joining the army in 1979 at age 20. *Id*. When Detrich's older brother died in a car accident, Detrich went AWOL and eventually chose an other-than-honorable discharge in lieu of court martial. *Id*. Detrich married his brother's widow in 1983 and had a son. The "turbulent" marriage ended in divorce in 1984. *Id*. Detrich's alcoholism and violence toward his wife increased during the marriage, resulting in Detrich's

arrest and placement in the Larned State Hospital Alcohol Treatment Program because he was a threat to others. *Id*.

Additionally, the sentencing judge had the benefit of a psychological evaluation conducted by Dr. Catherine Boyer, which was requested by the defense and conducted for the first sentencing hearing. 7-ER-1629–37. The report recounts Detrich's parents' divorce and the abuse Detrich suffered from his stepmother, "including her holding him down under water in the bathtub." 7-ER-1632. Dr. Boyer also explained that Detrich's life "with his mother and stepfather appear to have been chaotic" because his mother was addicted to prescription drugs and his stepfather was an alcoholic and was "physically abusive to the mother." *Id*. In addition, Detrich's "stepfather taught him to drink" and Detrich "became involved with alcohol and drug abuse at a very early age, as early as eight or nine years old." *Id*. The report ruled out significant psychiatric problems but diagnosed Detrich as an alcoholic with a history of substance abuse and antisocial personality disorder. 7-ER-1637. Citing Detrich's psychological evaluation and letters from Detrich's sister, counsel addressed at the sentencing hearing Detrich's "long-standing problem" with alcohol abuse, "in particular, the fact that he was apparently encouraged by a parent at a very, very early age to engage in this type of alcohol abuse." 6-ER-1313.

Significantly, the sentencing court found that the defense had proven the statutory mitigating circumstance that "the Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was significantly impaired but not so impaired as to constitute a defense to prosecution." 6-ER-1247. The court also found Detrich's long-standing alcohol and substance abuse to be a non-statutory mitigating circumstance. 6-ER-1254. Additionally, the court found Detrich's abusive background mitigating based on the written statements from Detrich's sister. 6-ER-1248–49. The court also found remorse and lack of prior violent crimes as non-statutory mitigation. 6-ER-1249.

b. First post-conviction proceeding.

In his petition for post-conviction relief Detrich alleged, *inter alia*, that trial counsel was ineffective for failing to obtain Detrich's "complete life history and full psychological and neuropsychological testing." 6-ER-1190. To support this claim, post-conviction counsel provided statements from Detrich's mother, Patricia Koch, describing Detrich's severely deformed cleft palate and the subsequent surgeries to correct it. 6-ER-1221. Detrich's mother also explained that, at 11 years of age, Detrich's stepfather encouraged him to drink alcohol. 6-ER-1222. Detrich's stepfather described Detrich's early drinking habits, but found him to be an "easy going, happy go lucky person" even when drinking or drunk, and never "violent in any way." 6-ER-1229. Detrich's mother echoed that assertion, saying,

"[h]e always had a job," and she had "never known [Detrich] to be a violent adult, and [had] never heard of him being so." 6-ER-1223. Mrs. Koch also corroborated the "severe physical and emotional" childhood abuse suffered by Detrich and his siblings at the hands of their stepmother, although her knowledge was second-hand. 6-ER-1222. Detrich's brother-in-law, with whom Detrich lived for two years, described him as "a happy person," never violent, and very good with children, although he smoked marijuana and used "speed" when he was younger. SER-66.

Diana provided another statement reiterating Detrich's medical difficulties resulting from his cleft palate, but noted "he was in all other respects a normal happy baby." 6-ER-1216. She further stated that their father "was gone most of the time due to his work in the oil fields." *Id*. She again explained that their stepmother subjected Detrich to physical and emotional abuse, almost on a daily basis, due to his bedwetting. 6-ER-1216–17 ("It was a rare day that David was not physically abused because he wet the bed."). And "[b]lows to the head would always be on the back of the head ... so the bruises would not show." 6-ER-1216. Detrich's stepmother called him "pissy" in front of other children; "tied him outside with a chain around his neck, next to a dog bowl of water, and told him he was a dog"; and "hit him from behind with a garden rake." 6-ER-1217. Diana said that Detrich was a "sweet normal child despite his disability" and that he

"never became normal again after the experience with" their stepmother. 6-ER-1217–18. Nevertheless, she had never known Detrich to be violent. 6-ER-1218.

Counsel also presented an evaluation conducted by Dr. Robert Briggs, a neuropsychologist, who opined that Detrich had brain damage, a history of childhood abuse and blows to the head, drug and alcohol abuse, and was susceptible to alcohol addiction. 5-ER-1173–79. Notably, Dr. Briggs found that Detrich's general neurological functioning was normal and he noted an absence of cognitive dysfunction. 5-ER-1174–75. Dr. Briggs also reported that Detrich's personality profile indicated "an extreme pattern of chronic psychological maladjustment," which he attributed to Detrich's childhood abuse, exposure to domestic violence, and substance abuse. 5-ER-1175. Dr. Briggs diagnosed Detrich with an antisocial or paranoid disorder and recommended that he continue in a structured environment and undergo cognitive-behavioral therapy. 5-ER-1177–79.

The post-conviction court found that Detrich "has not presented a colorable claim that trial counsel was ineffective at the sentencing stage of the proceedings for failing to have Dr. Briggs, a neuropsychologist, testify on Petitioner's behalf, or to present additional evidence of Petitioner's abusive background." 1-ER-264. The court explained:

> Dr. Briggs' report was not significantly different from the report considered by this Court [at sentencing]. Indeed, Dr. Briggs found that

70

> Petitioner's general neuropsychological functioning was normal and showed an absence of cognitive dysfunction. Therefore, there is no reasonable probability that this testimony would have compelled this Court to impose a sentence less than death. Moreover, additional evidence of Petitioner's dysfunctional childhood would have been merely cumulative and was not "newly discovered."

*Id*. The post-conviction court summarily dismissed the claim. *Id*. The Arizona Supreme Court denied review. 1-ER-261.

### c. Habeas proceeding.

The district court found that Detrich was diligent in developing the state court record and held an evidentiary hearing on this claim. 1-ER-199 ("Petitioner has alleged significant mitigating information that was never presented to the sentencing court."). In the 4-day hearing held in April and May 2007, the district court received live testimony from Detrich's sister Diana, her husband Garry Stevens, and Detrich's son, Timothy. *See* 2-ER-433, 458, 503. Detrich also submitted numerous statements from friends and family members. *See, e.g*., 3-ER-593, 595, 635, 639, 656. In addition to lay witnesses, Detrich presented expert testimony from Dr. Lauro Amezcua-Patino, a psychiatrist/neurologist; Dr. Christopher Cuniff, a pediatric geneticist; and Dr. Karen Bronk Froming, a clinical neuropsychologist. *See* 2-ER-433, 458, 540. Additionally, the district court heard testimony from the State's experts, psychiatrist Dr. John Scialli and neuropsychologist Dr. James Sullivan. 2-ER-423, 458.

71

The district court found that counsel performed deficiently at Detrich's second sentencing. *See* 1-ER-139. Nevertheless, the court found that Detrich failed to establish he was prejudiced under *Strickland*, explaining that "[t]he majority of the information presented at the evidentiary hearing merely provides additional detail and examples of the same type of evidence considered by the sentencing judge." 1-ER-143. It further held that, "despite extensive additional investigation into Petitioner's background and mental health," Detrich had "not discovered significant new or more weighty mitigation than was considered by the sentencing judge." 1-ER-162. It concluded that the state court reasonably found that Detrich was not prejudiced by counsel's deficient performance, and denied relief. 1-ER-163.

2. *The district court erred by finding that counsel performed deficiently in investigating and presenting mitigation.*

In finding counsel's performance deficient, the district court relied on affidavits from trial counsel Higgins, 2-ER-552, and his investigator, James Williams, 6-ER-1219. *See* 1-ER-138–39. While Higgins stated that he would approach a capital case differently in 2006 (when he executed the declaration), 2-ER-554, focusing on what an attorney would do differently were the trial held more than 10 years later violates *Strickland*'s tenets that the inquiry must address what a competent attorney would have done *at the time of his representation*. *Strickland*, 466 U.S. at 690; *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir.

1999) ("Effectiveness must be judged as of the time the legal services were rendered so as to minimize the distortions of hindsight.").

Higgins, who had served as head of the Pima County Public Defender's Office for two years prior to representing Detrich, noted that he did not remember any mitigation workshops being available at that time. 5-ER-1085. Williams also noted that mitigation specialists were "a new thing, they didn't have mitigation specialists back then." 5-ER-1120. Nevertheless, Higgins said he "would have done whatever [he] thought was the standard of the day":

> I worked hard on my cases back then and I would have done whatever I thought I could do, so it wasn't, it certainly wasn't a matter of being neglectful back then. But certainly by today's standards, whatever presentation, investigation and presentation as to mitigation was done was lacking.

5-ER-1088–89. Williams stated that he "thought [Higgins] did a real good job ... I thought at the time he was doing a really good job, preparing.... Harold's a good attorney, he's been around for a while[,] he's no slouch, he know[s] what he needs to do in cases." 5-ER-1119.

Moreover, Detrich's reluctance to involve his family in the mitigation investigation at the first trial was documented in the presentence report, 6-ER-1345, and confirmed by his sister, who lamented it "may have been a mistake," 6-ER-1271. Williams reported the difficulty he had pursuing mitigation in the second trial:

73

> … I don't think I did hardly anything and his family wasn't willing to communicate … and I made quite a few phone calls to different family members to try pick that up [sic] some of the mitigation back then and nobody ever responded to me ... I had to chase this family all over the place and I don't think anybody, you know, nobody wanted to help David out. He had a very troubled family and so I got nothing out of anybody for mitigation.

5-ER-1120. Despite the family's reticence, Higgins offered Detrich's childhood abuse as a mitigator. 6-ER-1262–68.

Thus, trial counsel's sentencing strategy, although unsuccessful, was the result of "professionally reasonable judgment[]." *Strickland*, 466 U.S. at 699; *see also Burger v. Kemp*, 483 U.S. 776, 788–96 (1987) (failure to present any mitigating evidence, including later-developed evidence of "exceptionally unhappy and unstable childhood" was not deficient performance).

The district court found it was not reasonable for Higgins to rely on information presented in the first sentencing proceeding because that judge did not find any specific mitigating factors. 1-ER-138. At the second sentencing proceeding, however, the trial court had the initial psychological report, the presentence report, counsel's sentencing memoranda, and written statements from Detrich's sister. And Higgins argued additional mitigation, including residual doubt. Higgins' efforts produced significantly different results—the trial court found the statutory mitigating circumstance that Detrich's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of

the law was significantly impaired due to Detrich's alcohol consumption. *See* 1-ER-273–74; A.R.S. § 13–703(G)(1). The court also considered Detrich's history of substance abuse as a non-statutory mitigating circumstance. 1-ER-275. The trial court also found as non-statutory mitigation that Detrich (1) suffered both physical and mental abuse as a child; (2) was remorseful; and (3) lacked prior convictions for violent crimes.[25] 6-ER-1249.

Given the volume of mitigation evidence presented to the sentencing court, this Court should find in its de novo review that, in the "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,'" counsel's mitigation investigation was reasonable under prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 689).

    3.    *The state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law.*

_____

[25] In the special verdict, the court stated, "The fact that the defendant does not have any prior convictions involving violence is not considered to be a relevant nonstatutory mitigating circumstance." 1-ER-275. This appears to be in error, as the sentencing transcript indicates that Detrich's lack of convictions for violence crimes *was* "a relevant and non-statutory mitigating circumstance." 6-ER-1249. The Arizona Supreme Court also noted that this factor was found by the sentencing court. *Detrich II*, 932 P.2d at 1338.

To be entitled to relief, Detrich must demonstrate that the state court's decision is contrary to clearly established federal law or is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). In considering the reasonableness of the state court's ruling under 28 U.S.C. § 2254(d)(1), this Court is limited to the record that was before the state court when it ruled on the claim. *See Pinholster*, 563 U.S. at 185 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").

Detrich asserts that the state court unreasonably concluded that his post-conviction evidence was cumulative to the evidence he presented at sentencing. Doc. 191, at 114. He claims that "[i]n PCR, counsel presented substantially more evidence regarding [Detrich's] abusive upbringing."[26] *Id*. at 115. Detrich does not identify this "substantially more evidence," but to the extent he refers to the evidence he summarizes in § VII(B)(2)(i)(b)(1) of his brief, that evidence did not significantly add to the evidence Detrich presented at sentencing. *See* Doc. 191, at 84–87.

### a. Detrich's cleft palate.

_____

[26] Detrich does not allege that the state court unreasonably applied *Strickland* in rejecting his claim that counsel was ineffective in failing to present Dr. Briggs' report at sentencing. Doc. 191, at 113–15.

Detrich did not present substantially more evidence of his cleft palate during the post-conviction proceeding. *See* Doc. 191, at 85. The sentencing court knew that Detrich had been born with a cleft palate. The presentence report stated that Detrich "was born with a cleft pallet [sic] for which he had surgical correction performed." 6-ER-1344. Detrich's sister elaborated:

> I recall after he was born that David was going to doctors all of the time for his surgeries and treatments. I recall that a few years later he started speech therapy. Although David was born with a congenital deformity and he was treated for that, he was in all other respects a normal happy baby.

6-ER-1216. Dr. Boyer also noted in her 1991 evaluation that Detrich's "physical presentation is significant for surgical correction of cleft lip and cleft palate." 7-ER-1631.

In addition, an evaluation of Detrich conducted in 1985 stated that Detrich "was born with a cleft palate and cleft lip and displays a surgical scar on the left upper lip consistent with corrective surgery for these disorders." SER-142. The report further noted that Detrich had a speech impediment "which is typical of cleft palate and cleft lip." *Id*.

Detrich agrees that "the sentencer learned that [he] was born with a cleft palate" but asserts that his mother's post-conviction declaration "describ[ed] the severity of the condition and that it required numerous surgeries when [Detrich] was an infant." Doc. 191, at 85 (citing 6-ER-1221). While Detrich's mother

provided additional details of the surgeries to repair his cleft palate, *see* 6-ER-1221, ¶¶ 3–6, these details did not significantly change the mitigation picture, which focused on residual doubt and Detrich's abusive childhood.

### b. Detrich's abusive childhood.

Detrich notes that his mother stated in her post-conviction declaration that his brother encouraged him to "get in a lot of fistfights with other children" at the age of 5, that he and his siblings were kidnapped by their father and stepmother when Detrich was 6 years old, and that "Detrich got the worst of the abuse" from his stepmother because he wet the bed. Doc. 191, at 85 (citing 6-ER-1221–23).

While the sentencing court did not know that Detrich's brother encouraged Detrich to "get in a lot of fistfights with other children" when he was 5 years old, this evidence does not significantly add to the mitigation picture and would have conflicted with the mitigation evidence that Detrich was not violent. *Id*. (quoting 6-ER-1223, ¶ 15); *see* 6-ER-1277 (Diana stating that Detrich "never picked a fight, as a child or as an adult"). The evidence was also inconsistent with other evidence presented in post-conviction. *See* 6-ER-1229, ¶ 13 (Detrich's stepfather stating, "I have never known or heard of David Detrich being violent in any way"). Moreover, trial counsel could have reasonably chosen not to present evidence that Detrich was violent as a child, as it could have led the court to find that he could not be rehabilitated.

Moreover, Detrich's mother's statements relating Detrich's kidnapping and abuse by his stepmother provided less compelling evidence than that which the sentencing court had. Diana described the kidnapping and abuse in much more detail in her letters to the sentencing court than did Detrich's mother in her post-conviction declaration. *See* 6-ER-1264–68. The additional detail is unsurprising given that Diana observed the abuse, while Detrich's mother relied on what others told her. *See* 6-ER-1222, ¶ 11 (Detrich's mother stating that she "*was told* that he was beaten almost daily because" of his bedwetting (emphasis added)).

Detrich also claims that Diana's declaration to the post-conviction court "provided a substantially more detailed description of their childhood" than did her statements at sentencing. Doc. 191, at 85 (citing 6-ER-1216, ¶ 5). He is incorrect. The sentencing court knew of the severe abuse Jean inflicted on Detrich because of his bedwetting, including tying a rope around his neck and staking him to a post like dog. *See id*. at 86 (citing 6-ER-1216–17); 6-ER-1267 (Diana's statement to the sentencing court). The sentencing court also knew that Detrich's "siblings would help him try to hide his soiled bedsheets" to escape Jean's wrath. Doc. 191, at 86 (citing 6-ER-1216–17); *see* 6-ER-1265 ("We three kids tried to help [Detrich] by getting him up at night, helping him wash the sheets early in the morning, etc."). Additional information that Jean would hit the children with whatever objects "might be at hand" and that she tried to hide the abuse by hitting

the children so their bruises would not show, did not add significantly to the mitigation picture. Doc. 191, at 85–86.

The sentencing court also knew that "Jean presented herself as [the children's] biological mother." *Id*. at 86 (citing 6-ER-1217, ¶ 7); *see* 6-ER-1264 (Diana stating that Jean "told neighbors and schools that she was our 'birth' mother" and would punish the children if they said otherwise). Diana also related to the sentencing court that Jean "went out of her way to tell us how much she hated us, didn't want us around and how much we were like our mother." 6-ER-1264. Information that Jean "dyed her hair to match the kids" and "told the kids their mother did not want them anymore" did not add significantly to this evidence of her abuse. Doc. 191, at 86.

### c. Detrich's substance abuse.

Detrich cites his mother's post-conviction statement "that to cope, 11-year-old [Detrich] started drinking out of the 'gallon jugs of whiskey and kegs of beer' that her husband Skip kept around the house. [Detrich] also started using marijuana around this time." *Id*. at 85 (quoting 6-ER-1222, ¶ 12). The sentencing judge knew that Detrich started drinking alcohol and using marijuana at an early age, encouraged by his stepfather. *See* 6-ER-1276 (Diana stating that beginning around age 13, "[Detrich] would drink beer with [his] stepfather," sometimes "stay[ing]

out all night long drinking," and "[Detrich] was using drugs by this time"). The evidence presented in post-conviction was cumulative of this evidence.

### d.    Detrich's purported head injuries.

Contrary to Detrich's claim, the declarations from his mother and stepfather presented to the post-conviction court did *not* "describ[e] head injuries that [Detrich] experienced as a child when he rolled a car and when he wrecked a motorcycle while performing a jump." Doc. 191, at 86 (citing 6-ER-1229, ¶¶ 6–10; 6-ER-1223, ¶ 14). Detrich's stepfather stated that he was "*not aware* of the nature of [Detrich's] injuries" when Detrich "was a passenger in a car that rolled over." 6-ER-1229, ¶ 9 (emphasis added). And while Detrich's stepfather stated that he "became aware that [Detrich] wrecked [a] motorcycle while jumping it," he said nothing about any injuries Detrich suffered as a result. *Id.*, ¶ 10. Likewise, Detrich's mother did "not recall the details or what his injuries were" from Detrich's "several automobile and motorcycle accidents." 6-ER-1223, ¶ 14. Thus, no evidence of any injuries, to Detrich's head or otherwise, was presented to the post-conviction court. Moreover, the sentencing court knew from Diana that Detrich had been in an accident in 1974 when he was out drinking one night and "lost control of the vehicle and rolled the truck—totaling the vehicle," but "[n]obody was injured in the accident." 6-ER-1276.

### e.     Dr. Briggs.

Detrich next notes that Dr. Briggs, who evaluated him for the post-conviction proceeding, "found that on 30% of the component tests of the Halstead Impairment Index, [Detrich] scored 'within the brain-damaged range.'" Doc. 191, at 86 (quoting 5-ER-1174).     But Dr. Briggs also concluded that Detrich's functioning was normal.  5-ER-1174 (Detrich's score "represents performance in the normal range of neuropsychological function").  This conclusion is consistent with Dr. Boyer's 1991 assessment that Detrich's "[t]hought processes were logical and coherent.  No bizarre or unusual ideas were expressed.  He denied any experiences of hallucinations which would suggest past psychosis."  7-ER-1631.  And Dr. Boyer concluded that Detrich's "[c]ognitive functioning appeared grossly intact, including attention, concentration, and memory."  *Id*.

Dr. Briggs' conclusion that Detrich's "test results were consistent with children raised in violent homes" is also cumulative to Dr. Boyer's conclusions that his abusive background shaped his adult behavior.  Doc. 191, at 87 (citing 5-ER-1175).  Dr. Boyer explained:

> Mr. Detrich's ability to relate to others appears to have been adversely affected by his developmental experiences. He avoids close relationships, particularly with women, and attributes this to his difficult marriage and the resulting trauma of loss. ***However, it is likely that his early childhood experiences, physical abuse at the hands of his stepmother and apathy from his mother, also had a significant effect on his ability to trust in relationships with women.*** While he states that he has had friendships which are close, because of

his frequent moves, it is questionable how intimate these relationships really become [sic].

7-ER-1635 (emphasis added). To the extent Dr. Boyer did not conclude that Detrich "seems plagued by anxiety and worry about the future" and "feels hopeless at times and feels that he is a condemned person," as Dr. Briggs found, this is not due to any deficient performance of counsel. Doc. 191, at 87 (quoting 5-ER-1175). Rather, this is likely due to the fact that Dr. Briggs evaluated Detrich after he had been incarcerated for more than 10 years, while Dr. Boyer evaluated him just one year after he committed the murder. *See* 1-ER-125 (murder committed on November 4, 1989); 7-ER-1629 (Dr. Boyer's evaluation on December 12, 1990); 5-ER-1173 (Dr. Briggs' evaluation on May 17, 2000).

The mitigation evidence Detrich presented in post-conviction was cumulative to the evidence he presented at sentencing. Detrich has not established that the state court ruled contrary to *Strickland* in finding he was not prejudiced by any deficient performance of counsel.

3.   *The state court did not unreasonably determine any facts in rejecting this claim.*

        a.     **Factfinding procedures.**

Detrich asserts that the state court's factual determinations were unreasonable because the court "denied resources for a mitigation investigator and did not grant any funding for Dr. Briggs until the State conceded such funding was

necessary." Doc. 191, at 116. He complains that the approval of funds to retain

Dr. Briggs came after he filed his petition and reply, and therefore he could not

"incorporate the results of the neuropsychological evaluation into the petition." *Id*.

But Detrich agrees that he *was* able to retain Dr. Briggs, who evaluated Detrich

and provided a report that the post-conviction court considered. *Id*.; *see* 1-ER-264,

¶ 7 (discussing Briggs' report). And counsel was able to present argument to the

court based on the results of Dr. Briggs' testing. *See* SER-64; SER-41–45. Thus,

the post-conviction court had before it the very evidence Detrich sought to present.

As a result, its factfinding was not "procedurally unreasonable" as Detrich claims.

Doc. 191, at 116.

> **b.     The state court's factual findings are not contrary to the state court record.**

The post-conviction court held that Dr. Briggs' report was cumulative to Dr.

Boyer's 1991 report, which the court considered at sentencing. Specifically, the

court observed that Dr. Briggs concluded that Detrich's functioning was normal:

> Dr. Briggs' report was not significantly different from the report considered by this Court [at sentencing]. Indeed, Dr. Briggs found that Petitioner's general neuropsychological functioning was normal and showed an absence of cognitive dysfunction. Therefore, there is no reasonable probability that this testimony would have compelled this Court to impose a sentence less than death.

1-ER-264. Detrich asserts that the court's conclusion that his "neuropsychological

functioning is 'normal'" is contrary to the state court record. Doc. 191, at 117.

But Detrich identifies nothing in the record establishing that his functioning was *not* normal. Instead, he notes that Dr. Briggs' testing indicated that his functioning was "barely normal" and that two subtests administered by Dr. Briggs showed he had brain damage. *Id*. (citing 5-ER-1174). But Dr. Briggs explained that Detrich's functioning was normal despite these scores:

> On tests that are more sensitive to the biological integrity of the brain, the patient earned Halstead Impairment Index of 0.3. This indicates that 30% (two out of seven) of the component tests were within the brain-damaged range. ***A value of this magnitude represents performance in the normal range of neuropsychological function.*** On the General Neuropsychological Deficit Scale, the patient earned a score of 25. ***This score indicates an overall clinical level within the normal range*** (0-26). Mr. Detrich displayed a relatively consistent pattern of neuropsychological results in which he had good and intact functions with a few impaired performances.

5-ER-1174 (emphasis added).

Detrich further notes that Dr. Briggs stated that his evaluation showed a "recovered picture" because he tested Detrich "after a long period of abstinence from drugs or alcohol." Doc. 191, at 117; *see* 5-ER-1178. To the extent Detrich believes that this establishes that his functioning was not in the normal range when he killed Ms. Souter, Dr. Briggs presented no such opinion, and Detrich identifies nothing in the record supporting such a claim. *See* Doc. 191, at 117. Moreover, as explained above, Dr. Boyer evaluated Detrich just one year after the murder (when Detrich was arguably less "recovered") and found that Detrich's "[t]hought processes were logical and coherent. No bizarre or unusual ideas were expressed.

He denied any experiences of hallucinations which would suggest past psychosis. Mood and affect were within normal limits." 7-ER-1631; *see* 7-ER-1636 ("None of the [MMPI-2] scales were significantly elevated, with the exception of one which reflects oppositional tendencies, nonconformity, conflict with authority and antisocial attitudes, beliefs and/or behaviors. There was no indication of significant depression, anxiety, or social introversion."). This likely provided a more accurate picture of Detrich's functioning at the time of the murder than did Dr. Briggs' evaluation. The post-conviction court did not unreasonably conclude that Dr. Briggs found that Detrich's functioning was in the normal range.

  4. *The district court's factual findings are entitled to deference.*

  To the extent this Court determines that de novo review of this claim is appropriate, it must nevertheless defer to the district court's factual findings, which that court made after holding a 4-day evidentiary hearing. *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

### a.    The district court's factual findings.[27]

#### i.    Child abuse.

The district court summarized the new evidence of child abuse Detrich presented at the hearing, finding it largely cumulative to the evidence presented at sentencing:

> … Petitioner's mother and father often fought; when Petitioner's parents got divorced, his father unsuccessfully asked some of his wife's relatives to care for the children because he thought his wife did not take care of the kids. According to their father and a friend, but not reported by the children, Petitioner's mother's house was filthy. Petitioner was traumatized by his parents' divorce and thought it was due to the way his cleft palate made him look. Other kids made fun of Petitioner because of his cleft palate and his bedwetting. Petitioner did not have his own friends and sometimes his siblings picked on him.
>
> Petitioner's stepmother would dress him as a girl for Halloween or events. Sometimes their stepmother would not feed them, and if their father was not home they would eat hot dogs or TV dinners while their stepmother ate steak.  In addition to being tied up in the yard, his stepmother tied Petitioner up in the garage, behind the fence, and in

---

[27] *Pinholster* now establishes that the district court erred by holding an evidentiary hearing without first finding, based on the state court record, that the state court's decision was unreasonable. 563 U.S. at 185 ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review.  If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").  Nevertheless, the district court correctly found that, even considering the new evidence presented at the federal hearing, the state court reasonably concluded that "there is not a reasonable probability that [Detrich's] sentence would have been different."  1-ER-163 (emphasis added).

the basement. All the children in the family had to do extensive chores and were constantly grounded. On occasion their father would slap or beat them as punishment. Petitioner had poor coping skills for dealing with the abuse. After the abuse by his stepmother began, Petitioner became withdrawn, quiet, and sad, and stopped showing emotion. Petitioner slept poorly when he was younger, with his eyes open, and he would sleepwalk and have nightmares. Petitioner would wake afraid, thinking he was hearing his stepmother's voice or that someone was downstairs.

Petitioner idolized his stepfather, the only father figure he ever had; however, his stepfather sometimes became very angry at him. When Petitioner returned to his mother's custody, she essentially abandoned him because she felt left out of the relationship between Petitioner and his stepfather. In addition to her prescription drug addiction, Petitioner's mother drank a lot. When Petitioner was around the age of fourteen, he and his stepfather would watch each other have sex with both girls and women, including an adult married friend of his stepfather. Petitioner's stepfather promised him he would be able to take over the farm where they worked, which was Petitioner's dream, but his stepfather lost the farm due to his drinking; Petitioner was devastated by the loss of the farm and his ability to spend all day with his stepfather. In eleventh grade, Petitioner moved to Michigan to live with his father and stepmother but after a year and a half he returned to Kansas to live with his sister and brother-in-law.

1-ER-142–43 (citations omitted).

The district court concluded that, "[w]ith the exception of [Detrich's] exposure to and participation in inappropriate sexual activity with his stepfather, and the loss of a farming career, the information developed since the time of sentencing [was] not substantively new":

… The majority of the information presented at the evidentiary hearing merely provides additional detail and examples of the same type of evidence considered by the sentencing judge. Counsel specifically argued at sentencing that Petitioner's abusive background,

including the parental encouragement to drink at a young age, was a causal factor in the murder and should mitigate Petitioner's punishment. The limited added information is not of significant weight in light of the substantial information about the constant and severe abuse and neglect Petitioner experienced as a child of which the sentencing judge was well-informed.

1-ER-143 (citation omitted).

> ii.   Post-traumatic stress disorder.

The district court found that Detrich established that he had suffered from PTSD as a child, but concluded that this was entitled to little weight because there was no evidence he suffered from PTSD as an adult:

> Because there is no evidence to the contrary, the Court finds that Petitioner established by a preponderance of the evidence that he suffered from symptoms of PTSD up to the age of nine. Despite a few limited references to symptoms later in life, Petitioner did not demonstrate by a preponderance that he suffered from PTSD in adulthood nor, specifically, at the time of the crime.

> The diagnosed PTSD was a response to the childhood abuse Petitioner experienced and may attest to the severity of the abuse; however, because the abuse and the PTSD were coterminous, the PTSD itself does not carry mitigating weight beyond that given to the childhood abuse.

1-ER-144–45 (citations omitted).

> iii.   Substance abuse.

The district court concluded that Detrich's new evidence suggesting a genetic predisposition to abuse drugs and alcohol did not significantly add to the mitigation presented in state court:

89

… The only new information developed since sentencing is that related to the history of alcohol abuse in Petitioner's family. As stated by one of Petitioner's experts, the significance of the family history is that Petitioner may have had little control over his substance abuse based on his genetics. Although Petitioner's genetic predisposition to alcoholism may be sympathetic, it is not much more so than the fact that his family encouraged him to abuse substances at a young age, a fact that was considered at sentencing. Further, the sentencing judge found that Petitioner had satisfied the (G)(1) statutory aggravator – that his capacity at the time of the crime to appreciate the wrongfulness of his conduct or conform it to the law was significantly impaired – based on his consumption of alcohol and possibly cocaine. A.R.S. §13-703(G)(1). Therefore, there is little additional significance to Petitioner's familial history of substance abuse (other than its contribution to his dysfunctional childhood, which is considered as part of the childhood abuse analysis).

1-ER-147–48.

### iv.   Developmental and mental health issues.

After summarizing the testimony of the defense experts (Dr. Froming, Dr. Amezcua-Patino, and Dr. Cuniff) and the State's experts (Dr. Sullivan and Dr. Scialli), the district court concluded that Detrich established he had some brain dysfunction that manifested as impulsivity:

All of the experts agree that Petitioner is of at least average intelligence and that his neuropsychological functioning is largely normal. However, based on the opinions of Drs. Briggs and Froming, who conducted the only comprehensive neuropsychological testing, the thorough record review conducted by Petitioner's experts, and the concession by Dr. Scialli, ***the Court finds that Petitioner suffers from some brain dysfunction that causes "selected" neuropsychological deficits.*** This medical finding, premised on neurodevelopmental and congenital defects, is new and was not presented at sentencing.

> *The primary notable impact of Petitioner's dysfunction, according to Dr. Froming, is impulse control* (an issue noted repeatedly by mental health professionals who examined Petitioner over the years, including the 1985 psychological and psychiatric reports attached to the PSR). Drs. Froming and Amezcua-Patino noted that Petitioner has behavioral control problems generally, but did not note any specific behaviors other than impulsivity.

1-ER-154–55 (emphasis added). The court nevertheless concluded that any dysfunction did not significantly impair Detrich's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law" as required to satisfy the A.R.S. § 13–703(G)(1) statutory mitigating circumstance[28] because the crime was not impulsive:

> … [T]here is no evidence that the victim initiated the altercation leading to her murder or engaged in any behavior that would trigger an impulsive response from Petitioner. More significantly, the crime was not impulsive. Petitioner harassed and threatened the victim for a period of time before kidnapping her at knife point, removing her from the house to the car, and subsequently murdering her. Thus, the circumstances of the crime do not indicate that Petitioner's impulsivity precluded him from behaving in conformance with the law. Further, the Arizona courts do "not equate impulsivity or poor judgment with mental inability to conform one's conduct to the law."

1-ER-155–56. And the fact that Detrich had no history of violence prior to the murder "undercuts his argument that he could not conform his conduct to the law:"

––––––––––––––––––

[28] The district court noted that the sentencing court had found the (G)(1) circumstance proven by Detrich's intoxication at the time of the murder. *See* 1-ER-155.

There is no evidence that Petitioner's impulsiveness in testing and as noted by others translates to violent behavior in the real world. To the contrary, numerous family members and friends attested that they knew Petitioner to be a non-violent individual even when drinking and Dr. Boyer opined that there was no indication violence was a characterological pattern. In sum, Petitioner has not proven that his neurological impairments standing alone satisfy the (G)(1) factor.

1-ER-156 (record citations and footnote omitted).

The district court also considered whether Detrich's impairments established a non-statutory mitigating circumstance. 1-ER-157. The court found that, "[u]nrelated to the crime, there is nothing inherently mitigating in the fact that [Detrich] is impulsive in his day-to-day life" and as a result his impairments "are entitled to only minimal mitigating weight because he has no history of violence or evidence that the impairments cause aggression, the crime was not impulsive, and the experts agree that [Detrich] is largely cognitively normal with at least an average IQ." *Id.*

v.   Familial love.

The district court found that Detrich "has proven by a preponderance of the evidence that his family loves and supports him. However, the evidence in support of this factor is not significantly different than that provided by his sister at sentencing." 1-ER-158. The court nevertheless afforded this circumstance minimal weight because "it did not prevent [Detrich] from committing a heinous murder." *Id.*

vi.   <u>Adaptation to prison life.</u>

The district court observed that Detrich had established that he "has done and/or would do well in the structure of a prison environment." 1-ER-158. But because he did not "present[] evidence regarding his adaption to prison specific to the period prior to his 1995 sentencing," he did not "prove[] by a preponderance of the evidence that he was well-adapted to prison at the time of his sentencing." 1-ER-159. Accordingly, the court did not "consider this as a mitigating factor." *Id*.

**b.   The district court's factual findings are not clearly erroneous.**

As explained earlier, this Court must accept the district court's factual findings unless they are "clearly erroneous." Fed. R. Civ. P. 52(a)(6). The "clearly erroneous" standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985).

> … If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id*. at 573–74.

93

Detrich asserts that the district court clearly erred by concluding that the evidence presented at the hearing "merely provides additional detail and examples of the same type of evidence considered by the sentencing judge." Doc. 191, at 103 (quoting 1-ER-143). He claims that the sentencer did not know the extent of his childhood abuse, the psychological and developmental trauma caused by the surgeries for his cleft palate, that he was sexually abused, or that he feared he would witness his stepfather kill his mother. He further claims that the sentencer did not know that he suffered from PTSD, neurological defects, and addiction.[29] *Id*. at 104. Detrich then purports to identify 36 areas of "new" mitigation he presented in the evidentiary hearing. *See id*. at 105–07. Notably missing from Detrich's argument, however, is any assertion that the district court's factual findings are not "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574. In fact, he identifies nothing in the record contradicting the court's findings. Instead, he makes a conclusory statement that his "new" mitigation "significantly strengthens support for the mitigation presented at sentencing and includes entirely new categories of mitigation." Doc. 191, at 107. He has not established that the district court clearly erred in concluding otherwise.

---

[29] The district court noted that the evidence of sexual abuse, childhood PTSD, and neurological defects was new. *See* 1-ER-143–44, 154.

Detrich also asserts that the district court "erred when it refused to give the new mitigation more than *de minimus* weight because it was not causally connected to the crime." *Id*. He contends that in doing so the district court "failed to give effect to mitigation as required by law." *Id*. at 108. Detrich is incorrect. The district court explained that it considered and weighed *all* of Detrich's proven mitigating evidence, even that lacking a causal connection to the crime. 1-ER-162 n.9. "However, as cited throughout the prejudice analysis, the Court also has considered the weight given to specific types of mitigating evidence under Arizona law." *Id*. n.9. This is consistent with *Strickland*'s requirement that the court determine whether "the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U. S. at 695.

Detrich specifically challenges the district court's assignment of minimal weight to his abusive childhood, impulsivity, and neurological impairments. *See* Doc. 191, at 107. The district court explained that Detrich's abusive childhood was entitled to little weight because "under Arizona law, his traumatic childhood may be of less significant mitigating value" given that he committed the murder when he was 30 years old. 1-ER-144 (citing *State v. Ellison*, 140 P.3d 899, 927 (Ariz. 2006), and *State v. Hampton*, 140 P.3d 950, 968 (Ariz. 2006)). Detrich

claims that he "is not required to demonstrate a causal connection," but he does not dispute that a court may consider the lack of a causal connection when determining the weight to give mitigation. Doc. 191, at 107. Nor does he assert that the district court incorrectly described Arizona law when assessing this evidence.

As explained above, the district court found that Detrich's impulsivity did not satisfy the (G)(1) mitigating circumstance because "Arizona courts do 'not equate impulsivity or poor judgment with mental inability to conform one's conduct to the law.'" 1-ER-155–56 (quoting *State v. Hoskins*, 14 P.3d 997, 1019 (Ariz. 2000)). And it assigned minimal weight to Detrich's impulsivity resulting from neurological impairment as a nonstatutory mitigating circumstance because any impairment did not contribute significantly to the crime and had not caused him to be violent in the past. 1-ER-157. Detrich does not dispute that the law permitted the district court to apply less weight to mitigation not having a causal connection to the murder. Doc. 191, at 107–08. Nevertheless, he asserts that he "offered expert testimony demonstrating how his deficits affected him throughout his life, including during the crime." *Id*. at 108. But while he purports to cite the record where his experts so testified, he has not established that the district court's contrary conclusions are not supported by the record. *Id*. For example, he does not contradict the district court's finding that his impulsivity had never led him to be violent before he committed this murder. *See* 1-ER-156 ("To the contrary,

numerous family members and friends attested that they knew [Detrich] to be a non-violent individual even when drinking."). Nor does he challenge the district court's conclusion that the murder was not impulsive. *Id*. at 155. Detrich has failed to demonstrate that the district court erred in finding that his mitigation was entitled to little weight.

Detrich also complains that the district court erred in failing to assign significant weight to his PTSD evidence. Doc. 191, at 108–09. But he does not dispute the district court's conclusion that, while he established that he suffered from PTSD as a child, he did not demonstrate "that he suffered from PTSD in adulthood nor, specifically, at the time of the crime." 1-ER-144–45. Nor does he challenge the district court's assessment that "[n]one of the experts suggested that PTSD had any impact on [Detrich's] actions or mental state at the time of the crime." 1-ER-145. Detrich's mere citation to other cases in which PTSD was found to me mitigating does not establish that the district court clearly erred by finding that his evidence of PTSD as a child was not significantly mitigating. *See* Doc. 191, at 108–09.

**B.** **The state court reasonably determined that counsel were not ineffective in contesting the aggravating circumstance.**

*1.    Factual background.*

The trial court found that the State established that Detrich's murder of Ms. Souter was especially cruel, heinous, or depraved, satisfying the (F)(6) aggravating

factor. 1-ER-271–73. In finding that the victim suffered physical pain to support the cruelty prong of the aggravator, the court noted that Detrich inflicted approximately 40 cuts and stab wounds; "the victim's throat was literally cut from ear to ear," almost decapitating her; the victim was "struggling for her life," as evidenced by the defensive wounds identified by the pathologist; and the victim was alive during a significant part of the attack and attempted to answer Detrich's questions, emitting only a "gurgling sound" because of the injuries to her throat. 1-ER-271–72. The court also found that the victim suffered mental anguish "for a substantial period of time," beginning with her abduction at knifepoint "by the irate defendant who put her life in jeopardy at that time and continued to do so throughout the ride in the car." 1-ER-272.

The court also found the heinous and depraved prong proven by evidence of gratuitous violence and Detrich's relishing of the killing, which he demonstrated when he asked Charlton "if he 'wanted some,'" because the victim's body "was still warm." 1-ER-273. The court further found the killing was senseless and the victim was helpless. *Id*. The Arizona Supreme Court affirmed these findings in its independent review. *See Detrich II*, 932 P.2d at 1338–39.

Detrich asserted in his petition for post-conviction relief that his counsel was ineffective in failing to present an expert witness to rebut the cruel, heinous, or depraved aggravating circumstance. 6-ER-1207. He asserted that an expert would

have rebutted Charlton's testimony that the victim "gurgled" in response to questions because "it would have been impossible for the deceased to respond in any way to questioning after her throat had been slashed in the manner described." *Id*. The post-conviction court rejected this claim:

> Petitioner failed to present a colorable claim that his trial counsel was ineffective in failing to retain an expert to rebut the State pathologist's testimony that the victim could have made "gurgling" sounds in response to questioning by Petitioner after sustaining knife wounds to her throat. Contrary to an affidavit submitted by Petitioner, there was no testimony that the victim "engaged in conversation" or was conscious for a long period of time. The victim sustained four serious wounds to the neck, and it is merely speculative to assume that the victim's attempt to respond occurred after the most serious wound. No prejudice accrued to Petitioner in any event, because evidence other than Charlton's testimony regarding the "gurgling" sounds independently supported a finding of cruelty at sentencing. Petitioner's claim that expert rebuttal testimony would have discredited Charlton's credibility is unavailing, where overwhelming evidence apart from Charlton's testimony supported the finding that Petitioner committed the murder. This claim is summarily dismissed.

1-ER-263, ¶ 4.

The district court held that Detrich could not "establish with the proposed forensic evidence that the PCR court's ruling—that counsel did not perform deficiently and Petitioner was not prejudiced with respect to the cruelty finding— was an objectively unreasonable application of *Strickland* to the facts."[30]   1-ER-

---

[30] The district court observed that Respondents conceded that Claim B was

(continued ...)

195 (citing 28 U.S.C. § 2254(d)(1)). This is because the aggravator was supported by evidence other than the victim's "gurgling":

> … The finding that [the victim] attempted to speak after having her throat slit is only a partial basis for the cruelty finding, and the prong is sufficiently supported without it. Petitioner does not allege he can develop forensic evidence that would fully rebut the finding that the victim was conscious for much of the crime and suffered pain and mental distress, even if there were additional evidence about when the victim lost consciousness. The cruelty finding is sufficiently supported by the eyewitness testimony that the victim was taken to the car at knife point while Petitioner threatened her life, and evidence that she suffered over forty stab wounds, including defensive wounds, as well as blunt force injuries.

1-ER-194–95.

The district court also found that the state court reasonably rejected Detrich's claim that counsel was ineffective in failing to present evidence of his brain dysfunction to establish that he "did not have the culpable mental state

---

( ... continued)

properly exhausted, and thus considered the aggravation portion of the claim on its merits. *See* 1-ER-212. But Claim B, as it appeared in the habeas petition, did not allege that a pathologist would have rebutted the "gurgling" testimony. *See* 5-ER-965. That claim was asserted as part of Claim A(5), which Respondents asserted, and the district court found, was procedurally defaulted. *See* 5-ER-950–51; 1-ER-215–16. The district court confirmed this finding in its ruling on remand. 1-ER-99–100. Because that portion of the aggravation-rebuttal ineffectiveness claim is procedurally defaulted, the district court erred by considering its merits. *See* 1-ER-194–95. Nevertheless, the district court correctly concluded that Detrich was not prejudiced by counsel's failure to challenge the "gurgling" testimony.

necessary for the heinous/depraved prong of the (F)(6) aggravator." 1-ER-195.

The court explained:

> … Although the Arizona caselaw refers to a defendant's "state of mind" at the time of the offense as the relevant issue for the heinous/depraved prong, the determination is based on the perpetrator's "words and acts" not on a subjective mental state. More specifically, there are five non-exclusive factors used by the courts to determine if a murder was heinous or depraved: relishing of the murder, the infliction of gratuitous violence, mutilation of the victim's body, senselessness of the murder and the helplessness of the victim. Thus, a defendant's brain function or mental health are not assessed in applying the (F)(6) prong.

*Id*. (citations omitted).

The district court further rejected Detrich's claim that counsel ineffectively failed to establish that Detrich "was not the killer, and did not intend or foresee the victim's suffering." 1-ER-196. The court found that the sentencing court reasonably concluded that Detrich "intended to and did kill the victim." *Id*.

>    2.    *The state court did not unreasonably apply <u>Strickland</u> in rejecting this claim.*

Detrich asserts that the state court "applied *Strickland* unreasonably to the aggravation allegation" and that "the evidence in aggravation was rebuttable if counsel had bothered to investigate the forensic evidence, extent of Charlton's

101

bias, and [Detrich's] cognitive impairments."[31]  Doc. 191, at 115.  He does not,

however, actually argue that the state court's application of *Strickland* was

unreasonable.  Instead, he merely cites his earlier argument that counsel was

ineffective in failing to rebut the aggravating factor.  *Id*. (citing "subsection

(2)(ii)").  While that argument shows Detrich's disagreement with the state court's

ruling, it does not allege, let alone establish, that the court unreasonably applied

*Strickland*.

> 3.     *The state court's factual determinations are reasonable in light of the*
>        *state court record.*

Detrich asserts that the state court unreasonably held that, "[c]ontrary to an

affidavit submitted by Petitioner, there was no testimony that the 'victim engaged

in conversation' or was conscious for a long period of time."[32]  1-ER-263; Doc.

191, at 118.  But Detrich identifies nothing in the record contradicting the state

court's findings.  Instead, he states that "the [sentencing] court's finding of

especial cruelty was based on" the testimony that the victim "gurgled" in response

---

[31] Detrich also asserts that "taking these steps would have 'opened up' a 'range of mitigation leads.'"  *Id*. (quoting *Rompilla v. Beard*, 545 U.S. 374, 390 (2005)). But "mitigation leads" would not have rebutted the aggravating factor.

[32] The post-conviction court apparently referred to the declaration of criminalist Michael Sweedo, which Detrich attached to his petition for post-conviction relief. *See* 6-ER-1225, ¶ 5.

to questions. Doc. 191, at 118. To the extent he believes the post-conviction court's factual findings are inconsistent with the sentencing court's findings, Detrich is incorrect. Neither court addressed the amount of time the victim remained conscious after her throat was slashed, and finding that the victim could only "gurgle" in response to Detrich's questions is consistent with the conclusion that she did not "engage in conversation." Detrich has not established that the post-conviction court unreasonably determined that the evidence did not suggest that the victim was engaged in conversation or remained conscious for a prolonged period of time after Detrich slashed her throat. Moreover, even if those findings were unreasonable, they were not the basis for the state court's ruling. *See* 28 U.S.C. § 2254(d)(2) (providing relief only if the state court's adjudication "resulted in a decision that *was based on* an unreasonable determination of the facts…." (emphasis added)). Moreover, the cruelty finding was adequately supported by evidence that the victim was conscious during the majority of Detrich's attack on her, even if she lost consciousness quickly (but not immediately) after her throat was cut.

Detrich also challenges the state court's conclusion that "[t]he victim sustained four serious wounds to the neck, and it is merely speculative to assume that the victim's attempt to respond occurred after the most serious wound." 1-ER-263; *see* Doc. 191, at 118–19. He states, "it is likewise speculative to assume it did

103

not." Doc. 191, at 119. This is insufficient to establish that the state court's factual finding is unreasonable.

Moreover, to the extent Detrich asserts that the post-conviction court held him to a higher burden than *Strickland* requires, he is incorrect. *See id*. He claims that, to show a reasonable probability of a different outcome on the cruelty prong, he had to demonstrate that "there is a reasonable doubt regarding the victim's consciousness" and he claims that expert testimony rebutting the "gurgling" testimony satisfied this burden. *Id*. But even if an expert could have rebutted the "gurgling" testimony, she would not have rebutted the "overwhelming evidence that the victim was conscious throughout much of the crime," witness testimony "that the victim looked terrified as defendant dragged her to the car," or the pathologist's testimony "that the victim suffered numerous cutting wounds over her hands, which are consistent with defensive-type injuries one would sustain while trying to fend off an attacker." *Detrich II*, 932 P.2d at 1338; *see also id*. at 1339 (The victim "must have suffered excruciating pain before she died.").

The cruelty finding was also independently supported by evidence that the victim suffered mental anguish during her kidnapping and murder:

> THE COURT FURTHER FINDS based on the circumstances surrounding her death, which began with her abduction from her house at knife point by the irate defendant who put her life in jeopardy at that time and continued to do so throughout the ride in the car, that the victim suffered severe mental anguish and anxiety for a substantial period of time, when she was uncertain of her fate and afraid of dying.

1-ER-272; *see Detrich II*, 932 P.2d at 1339 ("Anyone in the victim's situation would have been uncertain as to his or her ultimate fate."). Detrich does not challenge these findings. Accordingly, even if Detrich could have established that the victim lost consciousness as soon as he cut her neck from ear to ear, there is no possibility, reasonable or otherwise, that the sentencing court would not have found the murder especially cruel. *See* 1-ER-195 (district court holding that "[t]he cruelty finding is sufficiently supported by the eyewitness testimony that the victim was taken to the car at knife point while Petitioner threatened her life, and evidence that she suffered over forty stab wounds, including defensive wounds, as well as blunt force injuries").

Moreover, even if Detrich could have discredited the cruelty finding altogether, the (F)(6) aggravator was nevertheless established by the state court's finding that the murder was heinous or depraved. *See State v. Djerf*, 959 P.2d 1274, 1286, ¶ 44 (Ariz. 1998) ("Because this subsection is stated in the disjunctive, a finding of either cruelty or heinousness/depravity will suffice to establish this factor."). The supreme court noted the evidence establishing that the murder was heinous or depraved:

> We find that the record supports the trial court's finding of heinous and depraved conduct. Defendant's statement to Charlton, "It's dead, but it's warm. Do you want a shot at it?" clearly shows that defendant relished the murder. The trial court found that this statement showed an abhorrent lack of regard for human life, and we agree. Furthermore, we find that defendant engaged in gratuitous

violence beyond that necessary to cause death. Of the forty cutting and stab wounds, only three were potentially fatal. The other thirty-seven sharp-force injuries and the countless bruises were unnecessary and excessive.

We also find that the victim was helpless. Defendant held a knife to the victim's throat and forced her into the car. She was unarmed and partially clothed, with no means of escape. In the car, defendant was on top of her, abusing and stabbing her. The victim was unable to resist defendant's attack.

Finally, the murder was senseless. A murder is senseless when it is unnecessary to achieve the killer's goal. Defendant's apparent goal was to be paid back for the money he wasted on the bad drugs. Killing the victim was unnecessary to accomplish this goal and in fact, ensured that he would neither be paid back, nor find out the identity of the drug dealer. In total, the record overwhelmingly supports a finding of heinous and depraved conduct.

*Detrich II*, 932 P.2d at 1339 (citations omitted). The post-conviction court correctly concluded that Detrich was not prejudiced by the absence of expert testimony to rebut the "gurgling" testimony.

Detrich finally challenges the state court's finding that "overwhelming evidence apart from Charlton's testimony supported the finding that Petitioner committed the murder." Doc. 191, at 119 (quoting 1-ER-263). He claims that Charlton "confessed and exaggerated [Detrich's] role to save his own skin." *Id*. But Detrich ignores that the evidence also showed that he confessed to Carbonell that he murdered the victim. *See Detrich II*, 932 P.2d at 1332. Although Detrich appears to disagree with the state court's assessment that this evidence is "overwhelming," he has not established that its finding was unreasonable. In any

106

event, as Detrich notes, he had already been found guilty of the murder at this stage, and therefore the state court's finding that sufficient evidence established his guilt was unnecessary for its finding that the murder was cruel. *See* Doc. 191, at 119. Detrich has failed to establish that the state court's ruling is based on an unreasonable determination of the facts.

### 4. *District court's factual findings.*

To the extent this Court reviews this claim de novo, it must defer to the district court's factual findings unless they are clearly erroneous. *See* Fed. R. Civ. P. 52(a)(6). Detrich again challenges the district court's finding that Claim A(5), alleging that counsel was ineffective in failing to challenge the guilt-phase "gurgling" testimony, was procedurally defaulted by his failure to include the claim in his petition for review to the Arizona Supreme Court and therefore outside the scope of the remand.[33] Doc. 191, at 109 (citing 1-ER-99–100). But the district court dismissed Claim B (as it relates to rebutting aggravation) on the merits in 2006. 1-ER-202–03. And this Court issued a certificate of appealability on the claim in 2009. Doc. 50. Accordingly, the district court's merits ruling was already before this Court prior to the remand. *See Detrich V*, 740 F.3d at 1259 ("We do

---

[33] Respondents addressed this argument in § I(D)(1)(a), *supra*, and will not repeat their argument here.

not reach Detrich's non-defaulted sentencing-phase IAC claims."). The district court's ruling on Detrich's *Martinez* motion has no impact on its ruling on the merits of Claim B more than 16 years earlier.

Detrich also asserts that "the district court was incorrect that such allegations were not presented in the amended petition." Doc. 191, at 109–10 (citing 5-ER-950; 1-ER-192). But the district court did *not* find that Detrich failed to present the "gurgling" aggravation rebuttal claim in his amended petition. *See* 1-ER-192. In fact, it noted that Detrich "argues [in his amended petition] that forensic testing could rebut the cruelty finding because it was based on the victim making gurgling sounds after her throat was cut, and a pathologist could have established that any response by the victim was impossible." 1-ER-194. Thus, it is unclear why Detrich believes that the district court held that he failed to present the claim in his amended habeas petition.

Detrich next asserts that the district court erred by "refus[ing] to consider the evidence developed in initial and successive PCR—the challenges to Charlton's version of events, including the opinion of an independent pathologist that undercuts the medical examiner's testimony at trial," which he claims "supports Shell's testimony that Charlton was the actual killer." Doc. 191, at 110. He cites, without explanation, one paragraph of Michael Sweedo's declaration, and to Dr. Haddix's declaration. *Id.* (citing 6-ER-1225, ¶ 5; 2-ER-400-09). Dr. Haddix

executed her declaration on July 27, 2015, 9 years *after* the district court dismissed Claim B. 2-ER-409. The district court did not err by failing to consider evidence that did not yet exist. And Detrich has not established that the district court "refused" to consider Sweedo's declaration. In fact, given that the district court reviewed the post-conviction court's ruling, it must have considered all evidence presented to that court, including Sweedo's declaration. *See* 1-ER-194–95.

Detrich next claims that the district court erred by concluding that "under Arizona law, the 'especially cruel factor is not dependent on Detrich's state of mind while murdering the victim, but on whether the victim consciously suffered physical pain or mental distress.'" Doc. 191, at 110 (quoting 1-ER-90). Again, however, Detrich cites the district court's 2022 finding that *Martinez* could not excuse the defaults of certain claims; he does not challenge factual findings in the district court's 2006 order dismissing the claim on the merits. In any event, the district court was correct. Cruelty requires that "a defendant knew or should have foreseen that the victim would suffer." *State v. Carlson*, 48 P.3d 1180, 1193, ¶ 48 (Ariz. 2002). "Foreseeability in connection with the cruelty factor has been based on an objective rather than subjective standard. [The supreme court has] held that the physical pain or mental anguish suffered by a victim before death must only be reasonably foreseeable, regardless of whether the defendant actually foresaw it." *Id*. at 1192, ¶ 44. Accordingly, the district court correctly found that, under

Arizona law, cruelty does not depend on the defendant's state of mind during the murder.

Detrich does not suggest that he could not have foreseen that the victim would suffer as he dragged her from her home and into a car and then stabbed her more than 40 times as she fought back before he finally killed her. In fact, the evidence established that his attack on the victim was *designed* to make her suffer because she had given Detrich "bad" drugs. *See* SER-79 (Detrich told victim "that they had bad drugs and she was going to pay for it"); SER-81 (Detrich held knife to victim's neck); SER-109 (Detrich told victim, "you must not believe me, I will kill you"); 7-ER-1422 (after slicing the victim's throat, Detrich "hit her with his hand and asked her who is the person that she got the shit off of"). Detrich nevertheless argues that "[t]he subjective element of cruelty [i.e. intent] is highly problematic if Charlton was the actual killer, or even if [Detrich] was."[34] Doc. 191, at 110 (citations omitted). The district court observed, however, that "the trial judge made a finding that Petitioner intended to and did kill the victim." 1-ER-

---

[34] Detrich cites *State v. Moody*, 94 P.3d 1119, 1167, ¶ 226 (Ariz. 2004), in which the court held that evidence that defendant "was in a 'dissociated state' due to psychosis, drug impairment, or both" prevented it from "conclud[ing] beyond a reasonable doubt that a reasonable jury" would find that he "knew or should have known that suffering would occur." *See* Doc. 191, at 110–11. Detrich does not suggest that he was unable to appreciate that the victim would suffer.

196.  It further found that this conclusion was not "objectively unreasonable based on the evidence presented to the trial court."  *Id*.  Detrich does not assert either that the state court's finding is unreasonable or that the district court's finding is clearly erroneous.

Detrich also claims that the district court "mischaracterized" the heinous or depraved prong of the cruelty aggravator when it stated that the aggravator is "based on the perpetrator's 'words and acts' not on a subjective mental state."  Doc. 191, at 111 (quoting 1-ER-195).  The district court explained that "there are five non-exclusive factors used by the courts to determine if a murder was heinous or depraved:  relishing of the murder, the infliction of gratuitous violence, mutilation of the victim's body, senselessness of the murder and the helplessness of the victim."  1-ER-195 (citing *State v. Fulminate*, 778 P.2d 602, 620 (Ariz. 1988)).  "Thus, a defendant's brain function or mental health are not assessed in applying the (F)(6) prong."  *Id*.

Detrich agrees that "state of mind may be inferred by defendant's words and actions."  Doc. 191, at 111; *see State v. Lujan*, 604 P.2d 629, 636 (Ariz. 1979) (state of mind for heinous or depraved prong "may be shown by [defendant's] behavior at or near the time of the offense").  He asserts only that the sentencer "is not prohibited from considering mental health evidence" to rebut evidence of heinousness or depravity.  Doc. 191, at 111.  Even if a sentencer *may* consider

mental health evidence, however, Detrich has not established that the district court incorrectly stated Arizona's requirements for heinousness or depravity.

Moreover, the Arizona Supreme Court found that this prong of the aggravator was proven by Detrich's "statement to Charlton, 'It's dead, but it's warm. Do you want a shot at it?'" which "showed an abhorrent lack of regard for human life." *Detrich II*, 932 P.2d at 1339. The court also found that Detrich "engaged in gratuitous violence beyond that necessary to cause death." *Id*. "Of the forty cutting and stab wounds, only three were potentially fatal. The other thirty-seven sharp-force injuries and the countless bruises were unnecessary and excessive." *Id*. Detrich identifies no mental health evidence that would have rebutted this evidence. Nor does he assert that any mental health evidence would have rebutted evidence that the victim was helpless and the murder was senseless, as the supreme court found. *Id*.

    5.    *The district court did not abuse its discretion by denying evidentiary development on this claim.*

Detrich asserts that the district court abused its discretion by denying a hearing on his claim that counsel failed to rebut aggravation. Doc. 191, at 120–21. Detrich correctly notes that the district court found that he was diligent in developing this claim in state court. *Id*.; *see* 1-ER-242. But the district court's finding that Detrich was diligent, without more, did not require it to hold a hearing on the claim. As the court explained, it was required to determine whether

Detrich's allegations, "if true, would entitle him to relief."  1-ER-241 (citing *Townsend v. Sain*, 372 U.S. 293, 313 (1963)[35]).  In denying an evidentiary hearing on this portion of Claim B, the district court explained that Detrich "has not demonstrated an ability to rebut either prong of the (F)(6) aggravating factor."  1-ER-196; *see Ramirez*, 596 U.S. at 390 ("[A] … hearing is improper if the newly developed evidence never would entitle the prisoner to federal habeas relief." (quotation and alteration marks omitted)).  Given this, the district court could not grant relief, or hold a hearing, despite its finding of diligence.  *See* 28 U.S.C. § 2254(d).

Detrich does not meaningfully contest the district court's conclusion that forensic evidence would not have rebutted the cruelty aggravator.  *See* Doc. 191, at 120–21.  Instead, he asserts that the district court "wrongly found the gurgling

_____

[35] *Townsend*'s continued application in AEDPA cases is questionable. First, *Townsend* was not grounded on constitutional law, but rather on the Supreme Court's perception of Congress' intent in passing the habeas statute in effect in 1963. *See Townsend*, 372 U.S. at 311. Second, 3 years after *Townsend* was decided, Congress amended 28 U.S.C. § 2254(d) to incorporate the *Townsend* factors, but subsequently removed them in enacting AEDPA. *See Williams v. Taylor*, 529 U.S. 362, 380 n.11 (2000). Third, the Supreme Court has never held that the *Townsend* factors apply to an AEDPA proceeding. Fourth, *Townsend*'s standard contravenes Congress' intent in enacting AEDPA: "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (citations and quotation marks omitted).

allegations defaulted." *Id*. at 120. But as explained above, the district court rejected the "gurgling" claim (as it related to rebutting aggravation) on the merits, finding that Detrich failed to establish that the state court unreasonably applied *Strickland* in rejecting the claim. *See* 1-ER-194–95; *see* 28 U.S.C. § 2254(d)(1). Detrich does not challenge this finding.

**III**

**THE STATE COURTS DID NOT APPLY AN UNCONSTITUTIONAL CAUSAL NEXUS TEST TO DETRICH'S MITIGATION.**

## A.  Legal and factual background.

The Supreme Court has held that the sentencer in a capital case cannot be "precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). In addition, the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). However, the sentencer may determine the weight to be given relevant mitigating evidence. *Id*. at 114–15. In *McKinney v. Ryan*, 813 F.3d 798, 802 (9th Cir. 2015) (en banc), this Court held that the Arizona Supreme Court had improperly imposed a causal nexus requirement when conducting its independent review during a period of time that included the Arizona Supreme Court's review

114

of Detrich's sentence. *See id*. at 813 (holding Arizona Supreme Court applied causal nexus test from "the late 1980s" until "the mid-2000s").

Detrich asserted in his amended habeas petition that both the sentencing court and the Arizona Supreme Court applied an unconstitutional causal nexus requirement to mitigating evidence he presented in the penalty phase of his trial, in violation of *Lockett* and *Eddings*. *See* 5-ER-995–96. The district court initially found that Detrich failed to assert in state court a federal constitutional violation resulting from the sentencing court's alleged application of a causal nexus requirement and as a result had defaulted his claim. 1-ER-222. It further found the claim meritless. 1-ER-222–24. The district court also found that Detrich had failed to properly exhaust his claim that the Arizona Supreme Court had applied an unconstitutional causal nexus test, defaulting it. 1-ER-224 ("Petitioner neglected to make use of the available opportunities to fairly present his reweighing claim to the Arizona Supreme Court."). It further rejected Detrich's claims that he demonstrated cause and prejudice or a fundamental miscarriage of justice to excuse the default. 1-ER-225–26. The court did not address the merits of this claim.

On remand, the district court "assume[d]" that the Arizona Supreme Court's independent review of Detrich's sentence served to exhaust a federal claim that the sentencing court applied an improper causal nexus test to his mitigation. 1-ER-113. It nevertheless affirmed its earlier ruling that the sentencing court did not

impose a causal nexus requirement, finding that "*McKinney* has no impact" on that finding.  *Id*.  The district court again found that Detrich had defaulted his claim that the Arizona Supreme Court applied a causal nexus test, rejecting Detrich's argument that *McKinney* held that "the Arizona Supreme Court's independent review of the death sentence exhausted the petitioner's causal nexus claim in that court." 1-ER-115–16.  The court alternatively held that the claim lacked merit.  1-ER-116–18.

## B.   The sentencing court did not apply a causal nexus test to Detrich's mitigation.

While Detrich asserts that the "district court … wrongly conclud[ed] that the superior court and the Arizona Supreme Court 'both considered all of Detrich's evidence offered in mitigation and found it insufficient to outweigh the serious aggravating factor,'" he does not actually allege that the sentencing court applied a causal nexus test to any of his mitigation.[36]   Doc. 191, at 127 (quoting 1-ER-118); *see id*. at 122–28.  And Detrich does not challenge the district court's factual findings that the sentencing court considered all of his proffered mitigation:[37]

_____

[36] Detrich's claim that "Arizona law precluded full consideration of relevant mitigation," does not allege that the sentencing court in fact applied a causal nexus test here.  Doc. 191, at 128.

[37] While Detrich asserts that "[t]he Arizona Supreme Court plainly did *not* consider

(continued ...)

At Detrich's sentencing, the court stated that it had "considered each of the mitigating circumstances offered by the Defendant and proved to exist," and found that "they are not sufficiently substantial to outweigh the aggravating circumstances of having committed this offense in an especially cruel, heinous or depraved manner." Specifically, the court found that Detrich had proven the (G)(1) mitigating circumstance. The court further found that Detrich had proven as a non-statutory mitigating factor that he came from "an abusive background, including both physical and mental abuse." In addition, the court found that Detrich felt "some remorse for the killing" and took that into account as a non-statutory mitigating factor. The court considered Charlton's less severe sentence and the fact that Detrich had a ten-year-old child and determined that they were not relevant nonstatutory mitigating factors. The court also found Detrich's lack of a prior violent conviction was a relevant, non-statutory mitigating circumstance. Finally, the court considered Detrich's "longstanding history of alcohol and substance abuse," and found that history to be a non-statutory mitigating factor.

1-ER-114 (citations omitted).[38] In fact, Detrich agrees that "the sentencer … did not specifically refer to the lack of causal nexus to reject [his] mitigation." Doc. 191, at 125; *see* 1-ER-114–15 ("Significantly, the [sentencing] court never stated that it had considered whether the mitigating circumstances caused or explained the murder or otherwise stated that the proffered mitigation failed to affect his conduct."). Thus, Detrich has abandoned his argument that the sentencing court

--------

( ... continued)

*and give effect to* all the mitigation," he makes no such allegation against the sentencing court. Doc. 191, at 127.

[38] As noted earlier, this Court must defer to the district court's factual findings unless it finds them clearly erroneous. *See* Fed. R. Civ. P. 52(a)(6).

applied a causal nexus test to his mitigation, and this Court should deny a certificate of appealability on this claim. Alternatively, it should defer to the district court's unchallenged factual findings and deny relief.

**C.    Detrich has procedurally defaulted his claim that the Arizona Supreme Court applied a causal nexus test to his mitigation.**

As explained above, the district court found that "the claim that the Arizona Supreme Court applied a causal nexus requirement to Detrich's mitigating evidence is procedurally defaulted, and Detrich has not established cause or prejudice to excuse the default." 1-ER-116. Detrich does not challenge the finding of procedural default or the finding that he failed to establish cause and prejudice to excuse the default. *See* Doc. 191, at 121–28. Accordingly, Detrich has not established that that "jurists of reason could disagree" with the district court's procedural default finding, and this Court should deny a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Moreover, Detrich has not established that "jurists of reason" could find that the district court erred by alternatively rejecting the claim on the merits. In *Greenway v. Ryan*, 866 F.3d 1094, 1095 (9th Cir. 2017), this Court explained that "[w]e said in *McKinney* that the Arizona courts had 'consistently' applied the causal-nexus test. ***We did not say, however, that Arizona had always applied it.***" (emphasis added). Rather, *McKinney* "resolved only the 'precise question' whether the state court had applied the causal-nexus test in that specific case."

*Greenway*, 866 F.3d at 1096. In *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), this

Court found that the "critical factors" the *McKinney* court relied on to find that the

Arizona Supreme Court were not present and therefore prevented a finding that the

court had applied a causal nexus test:

> None of the critical factors in *McKinney* are present in this case. In
> particular: (1) the trial court did not state a factual conclusion that any
> of [petitioner's] proffered mitigation failed to affect his conduct; (2)
> the Arizona Supreme Court did not state a factual conclusion that any
> of [petitioner's] proffered mitigation would have influenced him not
> to commit the crime; and (3) the Arizona Supreme Court did not cite
> *Ross* or *Wallace*[39] when reviewing [petitioner's] mitigation
> evidence.

*Apelt*, 878 F.3d at 839–40. The district court concluded, and Detrich does not

dispute, that these "critical factors" are likewise absent here. *See* 1-ER-116–17. In

fact, Detrich agrees that "the Arizona Supreme Court did not specifically refer to

the lack of causal nexus to reject [Detrich's] mitigation." Doc. 191, at 125; *see* 1-

ER-117. And he identifies nothing in the supreme court's opinion suggesting it

applied a causal nexus test. Doc. 191, at 125–26.

Detrich nevertheless asserts that "[o]n direct appeal, the Arizona Supreme

Court entirely ignored the bulk of the mitigating evidence." *Id*. at 125. He argues

that the supreme court violated his Eighth Amendment rights by "failing even to

---

[39] *State v. Ross*, 886 P.2d 1354 (Ariz. 1994); *State v. Wallace*, 773 P.2d 983 (Ariz. 1989).

119

*acknowledge* [his] mitigating evidence." *Id*. at 126. But the supreme court not only acknowledged Detrich's mitigation, it noted that the sentencing court found several mitigating circumstances:

> (1) Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of law was significantly impaired but not so impaired as to constitute a defense to prosecution.

> (2) Defendant comes from an abusive background, including both physical and mental abuse.

> (3) Defendant feels some remorse for the killing.

> (4) Defendant does not have prior violent convictions.

> (5) Defendant has had a longstanding history of alcohol and drug abuse.

*Detrich II*, 932 P.2d at 1338. The supreme court also discussed Detrich's claim that Charlton's lesser sentence was mitigating. *Id*. at 1339–40. Thus, Detrich is simply incorrect in stating that the supreme court did not acknowledge his mitigating evidence.

To the extent Detrich asserts that the supreme court was required to discuss all of his proffered mitigation in order to demonstrate it did not apply a causal nexus test, he is incorrect. The district court explained:

> Although the Arizona Supreme Court did not address each mitigating factor, neither did it mention a causal nexus requirement or cite any case that set forth a causal nexus test. State courts need not exhaustively analyze each mitigating factor as long as a reviewing federal court can discern from the record that the state court did

indeed consider all mitigating evidence offered by the defendant. Neither did the Arizona Supreme Court expressly exclude any mitigation evidence or claim on the ground that it lacked causal relationship to the commission of the crime.

1-ER-117 (quotation marks and citations omitted). Detrich again does not dispute these findings but relies solely on *McKinney*'s holding that the Arizona courts applied a causal nexus test to mitigation. But as explained above, the *McKinney* court relied on certain "critical factors" in the Arizona Supreme Court's opinion that indicated a causal nexus test. Detrich does not assert that these factors are present in the opinion affirming his convictions and death sentence; nor are they.

Detrich's reliance on *McKinney* alone is insufficient to establish that the Arizona Supreme Court applied a causal nexus test in his case. Because Detrich does not dispute that he failed to establish cause and prejudice to excuse the default of this claim, and the claim in any event lacks merit, this Court should deny a certificate of appealability.

## CONCLUSION

For all the foregoing reasons, this Court should affirm the district court's dismissal of Detrich's habeas petition.

Respectfully submitted,

Kristin K. Mayes
Attorney General

Jason D. Lewis
Deputy Solicitor General/
Section Chief of Capital Litigation


/s/ Laura P. Chiasson
Assistant Attorney General

Attorneys for Respondents-Appellees

# STATEMENT OF RELATED CASES

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form17instructions.pdf](http://www.ca9.uscourts.gov/forms/form17instructions.pdf)

**9th Cir. Case Number(s)** 08–99001_____

The undersigned attorney or self-represented party states the following:

[X]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/Laura P. Chiasson_____ **Date** March 19, 2024_____
*(use "*s/[typed name]*" to sign electronically filed documents)*

123

## CERTIFICATE OF COMPLIANCE

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number**(s) 08–99001_____

I am the attorney or self-represented party.

**This brief contains 27,716 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [  ] it is a joint brief submitted by separately represented parties;
   [  ] a party or parties are filing a single brief in response to multiple briefs; or
   [  ] a party or parties are filing a single brief in response to a longer joint brief.

[X] complies with the length limit designated by court order dated 10/13/2022.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Laura P. Chiasson_____ **Date** March 19, 2024_____

124

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 19, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ L. Fielding
Legal Secretary
Criminal Appeals/
Capital Litigation Sections
400 W. Congress, S-215
Tucson, Arizona 85701
Telephone: (520) 628-6520

Doc. No. U20MJJZ40F0C1Q